# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| COMPAGNIE DES GRANDS HÔTELS D'AFRIQUE S.A., | **Case No. _____** |
| Plaintiff, | **<u>JURY TRIAL DEMAND</u>** |
| v. |  |
| STARWOOD CAPITAL GROUP GLOBAL I LLC and STARMAN HOTEL HOLDINGS LLC, |  |
| Defendants. |  |

## <u>COMPLAINT</u>

| | |
|---|---|
| | **CHIPMAN BROWN CICERO & COLE, LLP** <br> Paul D. Brown (#3903) <br> Joseph B. Cicero (#4388) <br> Gregory E. Stuhlman (#4765) <br> Hercules Plaza <br> 1313 N. Market Street, Suite 5400 <br> Wilmington, DE 19801 <br> Telephone:  (302) 295-0191 |
| **OF COUNSEL:** <br><br> David Spears <br> Charlita Mays <br> Cynthia Chen <br> SPEARS & IMES LLP <br> 51 Madison Avenue <br> New York, New York 10010 <br> Telephone:  (212) 213-6996 <br> Fax:  (212) 213-0849 | *Attorneys for Plaintiff Compagnie des Grands Hôtels d'Afrique S.A.* |

**TABLE OF CONTENTS**

**Page**

I.      OVERVIEW OF THE COMPLAINT ....................................................................1

        A.      Background ........................................................................................1

        B.      The Arbitration Before the ICC International Court of Arbitration ........................4

II.     THE PARTIES ....................................................................................6

III.    RELEVANT NON-PARTIES ........................................................................7

IV.     JURISDICTION AND VENUE ......................................................................8

V.      FACTUAL BACKGROUND ........................................................................8

VI.     CHANGE IN OWNERSHIP OF THE MANAGER
        AND THE GUARANTOR ........................................................................10

VII.    EVENTS AFTER DEFENDANT STARMAN'S
        ACQUISITION OF THE MANAGER ..............................................................11

        A.      The Operating Agreement Between the Manager
                and Starwood Hotels ........................................................................11

        B.      Defendant Starman's Express Assumption of the
                Manager's Obligations ......................................................................12

        C.      Changes at Defendant Starman and Judgment-Debtor
                Woodman After Plaintiff CGHA Alleged Default Under
                the Management Agreement ..................................................................14

VIII.   PLAINTIFF CGHA'S COMMENCEMENT OF THE ARBITRATION
        AGAINST JUDGMENT-DEBTOR WOODMAN, AND
        DEFENDANT STARMAN'S SALE OF WOODMAN...................................................20

        A.      Commencement of the Arbitration ..........................................................20

        B.      Plaintiff CGHA'S Emergency Motion to the
                Arbitrators and the Issuance of the Interim Order ........................................22

IX.     THE ARBITRATION HEARING AND THE ARBITRATION AWARD ......................24

X.     DEFENDANT STARMAN CONTROLLED AND
DOMINATED JUDGMENT-DEBTOR WOODMAN, AND
DEFENDANT STARWOOD CAPITAL GROUP CONTROLLED
AND DOMINATED STARMAN AND WOODMAN....................................................27

     A.    Defendant Starwood Capital Group Publicly Acknowledged
its Control of Defendant Starman .........................................................28

     B.    Defendant Starwood Capital Group Controlled and
Dominated the Entities Upstream from Defendant Starman
in the Ownership Structure ...................................................................31

     C.    The Entities Upstream from Defendant Starman in the
Ownership Structure Were Undercapitalized by Defendant
Starwood Capital Group .......................................................................37

     D.    The Entities Upstream from Defendant Starman in the
Ownership Structure Lacked Infrastructure ..........................................39

FIRST CAUSE OF ACTION .......................................................................................40

SECOND CAUSE OF ACTION ...................................................................................43

Plaintiff Compagnie des Grands Hôtels d'Afrique S.A., by its undersigned attorneys, for its complaint against Defendants Starwood Capital Group Global I LLC and Starman Hotel Holdings LLC hereby alleges as follows:

## I.   OVERVIEW OF THE COMPLAINT

1.      Plaintiff Compagnie des Grands Hôtels d'Afrique S.A. ("CGHA") brings this action under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention") to enforce against Defendant Starwood Capital Group Global I LLC ("Starwood Capital Group") and Starman Hotel Holdings LLC ("Starman") an arbitral award dated May 6, 2015, by the ICC International Court of Arbitration in London, United Kingdom in favor of CGHA against Woodman Maroc S.à.r.l. ("Woodman" or "Judgment-Debtor Woodman").

### A.   Background

2.      Plaintiff CGHA is the owner of a luxury hotel in Casablanca, Morocco called the Royal Mansour Hotel ("Hotel").  In 1989, CGHA entered into a management agreement with an international hotel group, pursuant to which that group was to be the manager of the Hotel for a term of 35 years.  The manager was given total authority over management decisions, but was responsible for the maintenance of the Hotel and was required to maintain the Hotel to certain standards.  In particular, the management agreement provided that the manager would always maintain the Hotel at its historical level as an international five-star hotel.  The management agreement also provided that the manager would make quarterly fee payments to CGHA as owner of the Hotel.

3.      By 2005, Le Meridien Group ("Meridien" or the "Meridien Group") had become the owner of the manager of the Hotel.  In 2005, Defendant Starwood Capital Group and the

investment bank known as Lehman Brothers purchased the owned and leased properties of the Meridien Group, including the manager of the Hotel.  Specifically, Starwood Capital Group and Lehman Brothers formed Defendant Starman to purchase those assets from Meridien, with respective affiliates of Starwood Capital Group and Lehman Brothers each holding a 50% interest in Starman.

4.      Through the acquisition of those assets from Meridien, Defendant Starman became the owner of the manager of the Hotel.  In 2006, the name of the manager was changed to Woodman.

5.      Defendant Starwood Capital Group and Lehman Brothers required as a condition of the Meridien transaction that the owned and leased properties acquired by Defendant Starman be managed by Starwood Hotels & Resorts Worldwide, Inc., including one or more of its affiliates (collectively, "Starwood Hotels").  Starwood Capital Group and Starwood Hotels were closely affiliated:  during the planning and negotiation of the acquisition from Meridien, Starwood Capital Group and Starwood Hotels shared the same Chief Executive Officer and Chairman, Barry S. Sternlicht ("Sternlicht"); and up through at least 2004, Sternlicht was the largest non-institutional shareholder of Starwood Hotels, holding over 4% of its publicly-traded shares.  Sternlicht founded Starwood Capital Group in 1991, and he also created Starwood Hotels in the mid-1990s and managed it for nearly a decade after its formation.

6.      In 2005, consistent with the requirement that all of the properties purchased from Meridien be managed by Starwood Hotels, Defendant Starwood Capital Group and Lehman Brothers caused the manager of the Hotel, which was then owned by Defendant Starman, to enter into a separate operating agreement with Starwood Hotels.  Pursuant to that agreement, the manager delegated management and operating authority over the Hotel to Starwood Hotels, as

the manager's contractual agent.  Plaintiff CGHA was not a party to the operating agreement, nor was it given notice of it.

7.    No later than May 2008, Lehman Brothers had ceded operating authority of Defendant Starman to Defendant Starwood Capital Group and certain of its affiliates, and thereafter Starwood Capital Group and certain of its affiliates had sole control of Starman and Woodman.

8.    In the years following Defendant Starman's purchase of the manager of the Hotel, Plaintiff CGHA repeatedly called on Starman and Woodman to comply with the terms of the management agreement and, in particular, to restore the Hotel to the required international five-star level.  But they did not comply.

9.    In 2011, Plaintiff CGHA formally accused Woodman of default under the management agreement, and promptly thereafter, Thierry Drinka ("Drinka"), an individual in whom Defendant Starwood Capital Group placed great trust and confidence to act on its behalf, and on behalf of its affiliates, acted as a manager of Woodman and took charge of its dealings with CGHA with regard to the allegation of default.

10.    In 2011 and subsequent years, Drinka simultaneously served as a manager of Woodman and of Defendant Starman, as well as a manager of Starman's direct owner, and as a manager of other entities upstream from Starman in the ownership structure created by Defendant Starwood Capital Group.  Other senior executives of Starwood Capital Group served alongside Drinka as managers of Starman's direct parent, and as managers of the other entities upstream from Starman.  Even though there were many limited liability entities, including foreign entities, in the ownership structure between Starman and Starwood Capital Group, Starwood Capital Group controlled and dominated all of those entities.

3

11.     Between March 2011 and January 2013, Drinka, acting as a manager of Woodman and Defendant Starman, simultaneously (a) deflected Plaintiff CGHA's accusations of default with false statements that Woodman was in full compliance with the management agreement, and (b) on behalf of Defendant Starwood Capital Group, took steps to make Woodman readily disposable so that CGHA would never be able to hold Woodman accountable for the serious injury it was inflicting.  Among other things, on one day in February 2012, Drinka, acting as Starman's manager, caused Woodman's shares, and ownership of Woodman, to be transferred to three separate entities in rapid succession, with the shares eventually coming to rest in the hands of a newly-formed entity directly owned by Starman; at a later time this parent entity of Woodman would be sold by Starman to a third party for a pittance.

**B.        The Arbitration Before the ICC International Court of Arbitration**

12.     Beginning at the end of 2012, Woodman failed to make required quarterly fee payments to Plaintiff CGHA as owner of the Hotel.  At that time, Drinka, acting as a manager of Woodman, informed CGHA that Woodman would not make any required payments to CGHA in the future.

13.     In August 2013, Plaintiff CGHA commenced an arbitration proceeding against Woodman before the ICC International Court of Arbitration in London alleging breach of the management agreement ("Arbitration").  Woodman appeared in the Arbitration and participated in it for approximately 12 months.  But in June 2014, Defendant Starman engaged in a transaction with a newly-incorporated third party to which Woodman's then-parent company was sold for €100, taking ownership of Woodman with it.  It later emerged that, at the time of this transaction, Starman and the third party were both shareholders in a closely held entity called Eigg Bermuda Ltd., of which Drinka was Director and President.  On August 11, 2014,

4

following Starman's sale of Woodman's parent, including Woodman, to the third party, Woodman's counsel in the Arbitration gave notice that it was no longer authorized to represent Woodman, and Woodman ceased to appear in the Arbitration.

14.     Plaintiff CGHA received notice of Defendant Starman's sale of Woodman and its parent shortly after it occurred, and, after learning that Woodman would no longer participate in the Arbitration, CGHA promptly sought interim relief on an emergency basis in the Arbitration in order to protect its interest in the Hotel and preserve any financial assets Woodman may have had.

15.     In September 2014, the three arbitrators appointed to hear the case ("Arbitrators") issued an interim order ("Interim Order") granting interim relief to CGHA.  Based on the suspicious, post-Arbitration sale of Woodman's parent, the Arbitrators concluded that there was a "serious threat" that Woodman's assets could somehow be diverted to the profit of Defendant Starman, and accordingly the Interim Order directed Woodman to, among other things, (a) immediately turn over possession and operation of the Hotel to CGHA, and effect an orderly handover of the Hotel's business, including the transition of Hotel guest and reservation data, (b) cease making payments to any third parties, and (c) account for all payments made by it to anyone since the end of 2012, when it had ceased making required fee payments to CGHA.

16.     The Arbitration hearing proceeded in Woodman's self-imposed absence on January 28 and 29, 2015.  On May 6, 2015, the Arbitrators issued an 82-page Final Award in favor of Plaintiff CGHA on its claims against Woodman ("Arbitration Award").  In the Arbitration Award, the Arbitrators focused on the requirement in the management agreement that Woodman must ensure "that the Hotel shall remain an international five star Hotel" and concluded "that the current condition of the Hotel is far short of an international five-star

standard." The Arbitrators added, in summary, that they had before them "clear evidence of the lack of maintenance by [Woodman] and poor level of services in the operation of the Hotel at least since 2005, in breach of [Woodman's] obligations under the Management Agreement." The Arbitrators also discussed in great detail the egregious failure of Woodman over many years to provide even rudimentary maintenance to the Hotel, and the related damage that it had caused to the Hotel.

17.     In an extended analysis of the damages suffered by Plaintiff CGHA, the Arbitrators found that Woodman owed CGHA an amount that, converted from the Moroccan currency in which the damages were awarded, totaled approximately $57.1 million at then-prevailing exchange rates, plus attorneys' fees and costs in the approximate amount of $2.3 million, together with 6% simple interest per annum for as long as the amount awarded remained unpaid. Woodman has paid no part of the amount awarded, and significant interest has accrued and continues to accrue on that amount.

## II.     THE PARTIES

18.     Plaintiff CGHA is a corporation organized under the laws of Morocco. It is the owner of the Royal Mansour Hotel in Casablanca, Morocco. Its registered address is 27 Avenue de l'Armée Royale, Casablanca, Morocco. CGHA holds a judgment against Judgment-Debtor Woodman that totals approximately $59.4 million, based on exchange rates prevailing at the time, plus post-judgment interest of 6% simple interest per annum.

19.     Defendant Starwood Capital Group Global I LLC is a limited liability corporation established under the laws of Connecticut, with its principal place of business at 591 West Putman Avenue, Greenwich, Connecticut. It is a private investment firm with a primary focus on global real estate and has assets under management of approximately $56 billion. It was

previously known by the name of Starwood Capital Group Global LLC.  Since 1991, Sternlicht has been the Chief Executive Officer and Chairman of Starwood Capital Group.

20.     Defendant Starman Hotel Holdings LLC is a limited liability corporation established under the laws of Delaware.  Its registered agent is located at 1209 Orange Street, Wilmington, Delaware.  Until in or about June 2014, it was an indirect parent of Judgment-Debtor Woodman.

## III.    **RELEVANT NON-PARTIES**

21.     Woodman Maroc S.à.r.l. is an entity organized under the laws of Morocco.  In the Arbitration Award issued on May 6, 2015, Plaintiff CGHA was awarded damages against Woodman of approximately $57.1 million at then-prevailing exchange rates, plus attorneys' fees and costs of approximately $2.3 million at then-prevailing exchange rates, along with post-judgment interest at the rate of 6% simple interest per annum.

22.     Starwood Hotels & Resorts Worldwide, Inc., through one of its affiliates, was Judgment-Debtor Woodman's contractual agent to manage and operate the Hotel.  Historically, and at relevant times, Defendant Starwood Capital Group, along with Sternlicht, who, at the time of relevant events, was Chief Executive Officer and Chairman of Starwood Hotels, were shareholders of Starwood Hotels.

23.     Barry S. Sternlicht is the Chief Executive Officer and Chairman of Defendant Starwood Capital Group.  Sternlicht also created and founded Starwood Hotels, and at relevant times, he served simultaneously as Chief Executive Officer and Chairman of Starwood Capital Group and Starwood Hotels.  Sternlicht was an architect of the complex transactions that led to the creation of Defendant Starman, its ownership of Judgment-Debtor Woodman, and the engagement of Starwood Hotels to manage and operate the Hotel.

24.     Thierry Drinka was a manager of Judgment-Debtor Woodman, a manager of Defendant Starman, and a manager of other entities upstream from Starman in the ownership structure created by Defendant Starwood Capital Group.  As a manager of Woodman, Starman, and those other entities, Drinka acted on behalf of Starwood Capital Group.

## IV.    JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) because, under 9 U.S.C. § 203, actions under the New York Convention arise under the laws and treaties of the United States; and under 28 U.S.C. 1367(a) because all of the claims set forth in the Complaint are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

26.     The Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) (diversity jurisdiction) because there is complete diversity of citizenship between Plaintiff CGHA and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391(b)(3) because Defendant Starman is formed under the laws of Delaware and subject to the Court's jurisdiction, and because there is no judicial district in which this action may otherwise be brought under 28 U.S.C. § 1391(b)(1) or (2).

## V.    FACTUAL BACKGROUND

28.     Plaintiff CGHA is the owner of the Hotel.  Historically, the Hotel was an international five-star luxury hotel.  It opened in 1952 as one of the first modern luxury hotels in Casablanca, and for many years after it opened, it was the only international five-star hotel in Casablanca.  The Hotel has an international reputation for excellence, having hosted as guests

8

many foreign dignitaries and international celebrities.  In 1989, while owned and operated by CGHA, the Hotel underwent a complete renovation and was associated with The Leading Hotels of the World luxury brand.

29.     On November 23, 1989, following the renovation, Plaintiff CGHA entered into a long-term agreement with Trusthouse Forte Morocco S.à.r.l. and Trusthouse Forte (UK) Limited relating to the management of the Hotel ("Management Agreement").  These two entities were part of a large international hotel group called the Trusthouse Forte Group.  Under the Management Agreement, Trusthouse Forte Morocco S.à.r.l. was to be the manager ("Manager") of the Hotel for a term of 35 years from the effective date of April 1, 1989, and Trusthouse Forte (UK) Limited was the guarantor ("Guarantor") of the Manager's obligations under the Management Agreement.

30.     In the Management Agreement, Plaintiff CGHA granted the Manager "the sole and exclusive right to manage the Hotel during the Term in its own name," and agreed that the Manager would be "entirely responsible for and have full and absolute day to day control and discretion in the marketing operation and management of the Hotel and the Owner [CGHA] shall not attempt to interfere with or be in any way concerned with such management."

31.     The Management Agreement required the Manager to "decorate and maintain and keep in good and substantial repair and condition the interior of the Hotel, the Fixed Plant," and "when necessary renew," the interior, the fixed plant, and the furniture, fixtures, and equipment of the Hotel so that it "shall remain an international five star Hotel."  The Management Agreement provided that during each year of its 35-year term, the Manager would pay Plaintiff CGHA, as owner, a minimum annual amount, payable quarterly at the end of each quarter ("Minimum Fee").

32.     Under the Management Agreement, the Guarantor "jointly and indivisibly" with the Manager "guarantee[d] to the Owner . . . the due performance by the Manager of its obligations under [the Management Agreement]."

## VI.    CHANGE IN OWNERSHIP OF THE MANAGER AND THE GUARANTOR

33.     By 2005, two different hotel groups had acquired ownership of the Manager and the Guarantor.  First, the Meridien Group had acquired the assets of the Trusthouse Forte Group and become the owner of the Manager; and the Meridien Group then assumed the Manager's obligations under the Management Agreement and changed the name of the Manager from Trusthouse Forte Morocco S.à.r.l. to Meridien Maroc S.à.r.l.  Second, Travelodge Hotels Ltd. had become the owner of the Guarantor.

34.     In the summer of 2005, the Meridien Group was purchased in two related and conditional transactions orchestrated by Defendant Starwood Capital Group and Lehman Brothers.

35.     First, Defendant Starwood Capital Group and Lehman Brothers jointly created Defendant Starman to purchase the owned and leased properties of the Meridien Group. Starman was formally registered in Delaware on July 19, 2005.  Starman was directly owned by affiliates of Defendant Starwood Capital Group and Lehman Brothers:  Starwood Capital Group's affiliate SOF MER Holdings S.à.r.l. owned 50% of Starman, and Lehman Brothers' affiliate LBS Holdings S.à.r.l. owned the other 50% of Starman.

36.     Second, the brand and management business of the Meridien Group was purchased by Starwood Hotels.  Defendant Starwood Capital Group and Lehman Brothers structured the acquisition of the Meridien Group in such a way as to require that the owned and

leased properties acquired by Defendant Starman from Meridien enter management agreements with Starwood Hotels.

37.     As a result of the acquisition by Defendant Starman of the owned and leased properties of the Meridien Group, Starman became the owner of the Manager of the Hotel, which, at that time in 2005, was called Meridien Maroc S.à.r.l.  Starman's ownership of the Manager was indirect:  Starman was the direct owner of Lehwood Holdings S.à.r.l.; Lehwood Holdings S.à.r.l. was the direct owner of Meridien Netherlands Holdings BV (later known as Lehwood Netherlands Holdings BV); and Meridien Netherlands Holdings BV was the direct owner of Meridien Maroc S.à.r.l.

## VII.     EVENTS AFTER DEFENDANT STARMAN'S ACQUISITION OF THE MANAGER

### A.     The Operating Agreement Between the Manager and Starwood Hotels

38.     As mandated by the terms of the acquisition of the Meridien Group, Defendant Starman's wholly-owned subsidiary Meridien Maroc S.à.r.l. – as the Manager of the Hotel was then named – was compelled to enter into an operating agreement with Starwood Hotels for management services to be provided by Starwood Hotels to the Hotel ("Operating Agreement"). Under the Operating Agreement, Starwood Hotels was the agent of the Manager.  Starwood Hotels agreed to "supervise, direct and control, the Operation of all aspects of the [Hotel] for and on behalf of" the Manager.  In turn, the Manager agreed to pay Starwood Hotels an operating fee on a monthly basis.  Plaintiff CGHA was not a party to the Operating Agreement or aware of its existence or terms.

39.     The Operating Agreement provided that all communications from Starwood Hotels to the Manager, including "all notices, consents, determinations, requests, approvals, demands, reports, objections, directions and other communications required or permitted to be

given under [the Operating Agreement]" were to be sent directly to Defendant Starwood Capital Group at its Connecticut headquarters, and Lehman Brothers at its headquarters in New York City.

40.     The Operating Agreement also laid the groundwork for what was to become a chronic and injurious failure on the part of the Manager to satisfy its obligations under the Management Agreement:  although the Management Agreement required the Hotel to be maintained at the level of an international five-star hotel, the separate and distinct Operating Agreement only required Starwood Hotels to operate the Hotel "at a level of service . . . substantially equivalent to a 'four star' standard hotel."  Consistent with the lower standard of service established under the Operating Agreement, the Hotel descended to a level far below the five-star standard mandated by the Management Agreement.

41.     In 2006, the name of the Manager was changed from Meridien Maroc S.à.r.l. to Woodman.  The renamed entity continued to serve as Manager under the Management Agreement.

42.     As of at least May 2008, Lehman Brothers' affiliate LBS Holdings S.à.r.l., which was a 50% owner of Defendant Starman, ceded operating authority of Starman to Defendant Starwood Capital Group's affiliate SOF MER Holdings S.à.r.l., the other 50% owner of Starman. From that time forward, Starwood Capital Group acted unilaterally with regard to the affairs of Starman and Judgment-Debtor Woodman.

**B.     Defendant Starman's Express Assumption of the Manager's Obligations**

43.     On June 7, 2006, a representative of Plaintiff CGHA wrote to a representative of the Meridien Group – which, before Defendant Starman's purchase of the Meridien Group's owned and leased properties, had owned the Manager of the Hotel – about the need for

significant investment in the Hotel and for a renovation of the Hotel.  On July 3, 2006, CGHA received a response on Starwood Hotels letterhead stating that Starwood Hotels had acquired the Meridien brand.  The letter also stated that the Management Agreement for the Hotel had been "transferred to Starman" and that Starman had "assumed all the responsibilities related to" the Management Agreement.  The letter added that Karyn Marasco, "Asset Manager of Starman," could meet with CGHA to discuss the concerns set out in CGHA's June 7 letter**.**

44.     Plaintiff CGHA received a follow-up letter on July 17, 2006, this time on the letterhead of Defendant Starman, from Felicity Black-Roberts ("Black-Roberts"), who signed the letter as "Director of Property, Starman Hotels."  In that letter, Black-Roberts explained that Starman "has acquired practically all of the Meridien Hotels controlled directly or operating under [a lease], in particular the [Hotel]."  The letter added that, "although Starman hesitates to incur equipment expenses" for the Hotel until the "vision" for the Hotel has been "fine-tuned," she would "begin a period of consultation regarding the positioning and renovating of the [Hotel]."

45.     Thereafter, Plaintiff CGHA and Black-Roberts corresponded often about Defendant Starman's role as de facto Manager of the Hotel.  For example:

(a)     In a December 19, 2006 letter addressed to CGHA on Starman letterhead, Black-Roberts noted that "Starman has increasing difficulties in leasing the [H]otel as a result of the commercial losses."

(b)     In a December 26, 2006 letter addressed to Black-Roberts, CGHA referenced the restructuring that had made "[Starman] a party to the free management contract between us as owner of the Hotel."

13

(c)      In a July 17, 2007 letter addressed to Black-Roberts, CGHA discussed "Starman's wish to terminate the [Management Agreement] in exchange for compensation to be paid [to CGHA] by Starman."

(d)      In a July 26, 2007 letter addressed to CGHA on Starman letterhead, Black-Roberts stated that "Starman is willing to make a payment to you of [€2,000,000] in consideration of the transfer of the business and surrender of the [Management Agreement]."

46.      The letters from Black-Roberts were signed by her as "Director of Property, Starman Hotels."  The return mailing address provided by Black-Roberts was Starman UK Services Company Limited ("Starman UK"), and her stated title at Starman UK was Director of Property, the same as her title at Defendant Starman.  Starman UK was a subsidiary of Starman. In addition to having overlapping Director roles at Starman and Starman UK, beginning in 2009 Black-Roberts simultaneously served as a manager of Judgment-Debtor Woodman, where she also corresponded with Plaintiff CGHA about management of the Hotel and Woodman's performance under the Management Agreement.  Even after Black-Roberts' formal designation as a manager of Woodman expired on June 30, 2010 – at which time she remained a Director of Starman – she continued to correspond with CGHA on Woodman letterhead.

**C.      Changes at Defendant Starman and Judgment-Debtor Woodman After Plaintiff CGHA Alleged Default Under the Management Agreement**

47.      Between 2006 and at least 2011, Plaintiff CGHA regularly communicated with Defendant Starman about the state of the Hotel, the need for investment in the Hotel in the form of a major renovation, and the Manager's obligations under the Management Agreement to maintain the Hotel as an international five-star hotel.  Correspondence directed to CGHA was typically from Starman and/or Starman UK.  However, in 2011, after CGHA first sent

14

correspondence formally alleging default under the Management Agreement, return correspondence to CGHA began to come exclusively on the letterhead of Judgment-Debtor Woodman.  That correspondence from Woodman was authored by Drinka, who had overlapping management roles and titles at Starman and Woodman.

48.     At various times during the relevant period, Defendant Starman and/or Judgment-Debtor Woodman sought to negotiate a resolution to Plaintiff CGHA's complaints about the Manager's non-compliant performance under the Management Agreement, including offering to buy out the Management Agreement and terminate it, or alternatively to sell the shares of Woodman to CGHA.  CGHA rejected these proposals because they were unfair and unreasonable, and the Hotel continued to fall into disrepair and to decline far below the international five-star level at which the Management Agreement required it to be maintained.

49.     In mid-2010, Black-Roberts, writing for Defendant Starman, informed Plaintiff CGHA that "the financial position of the Starman group has . . . deteriorated."  Judgment-Debtor Woodman then failed to make the Minimum Fee payments due to CGHA for the quarters ending September 30 and December 31, 2010.  In response to this clear breach of the Management Agreement, CGHA escalated the matter to its outside counsel, who then engaged with Woodman and Starman on CGHA's behalf.  By letter dated February 9, 2011, counsel for CGHA wrote to Woodman, accusing it of defaulting under the Management Agreement through its failure to make the Minimum Fee payments due for the last two quarters of 2010 and through its "unsatisfactory performance of [its] commitments as lessee-manager of the [Hotel]."

50.     After Plaintiff CGHA's counsel had alleged default under the Management Agreement in 2011, Drinka, who became a manager at Judgment-Debtor Woodman in 2010, began to speak directly to CGHA regarding its allegation of default.

15

51.     When Drinka engaged with Plaintiff CGHA regarding its complaints and demands relating to Defendant Starman and Judgment-Debtor Woodman's longstanding breaches of the Manager's obligations under the Management Agreement, Drinka dealt with CGHA in bad faith.  Over a prolonged period, he insisted falsely in his correspondence to CGHA on behalf of Woodman that Woodman had duly performed all its obligations under the Management Agreement, while simultaneously threatening CGHA with warnings about Woodman's financial distress and financial dependence on Starman and on its "shareholders" in an effort to convince CGHA to accept Drinka's unfair proposals for a resolution of its claims.

52.     Between March 11, 2011 – which was shortly after Plaintiff CGHA's outside counsel first wrote to Judgment-Debtor Woodman alleging default – and January 7, 2013, all of Woodman's letters to CGHA's representatives were signed by Drinka.  This correspondence included the following:

(a)     In a March 11, 2011 letter that responded directly to the February 9, 2011 letter from CGHA's outside counsel to Black-Roberts alleging default, Drinka noted that Woodman had settled the Minimum Fee payments due to CGHA for the third and fourth quarters of 2010 on February 18, 2011 and March 8, 2011, respectively, and insisted that Woodman "remains in compliance with the terms of the Management Agreement" and "intends to continue operating [the Hotel] in accordance with the terms of the Management Agreement."

(b)     In an October 4, 2011 letter, Drinka reiterated that Woodman was "in compliance with the terms of the Management Agreement and intend[s] to continue to operate [the Hotel] in accordance with the terms of the Management Agreement."  The

letter also instructed CGHA that, when it mailed correspondence to Woodman in the future, it should also email a copy to a manager of Starman named Mark Osborne**.**

(c)     In an October 18, 2011 letter, Drinka again "denie[d] that [Woodman] is in breach of the Management Agreement on any basis whatsoever," but also offered that Woodman was "willing to discuss commercial terms" to terminate the Management Agreement and exit the Hotel.

(d)     In a February 3, 2012 letter, Drinka referred to a meeting between representatives of CGHA and Woodman that had occurred on January 24, 2012 (at the offices of Starman UK in London) and summarized two proposals that had been discussed:  (i) that Woodman exit the hotel by November 30, 2012, after making a mutually agreed upon payment to CGHA to allow the early termination of the Management Agreement, which Woodman "would have to discuss . . . with our shareholders," or (ii) that Woodman, CGHA, and Starwood Hotels each contribute capital to the refurbishment of the Hotel.

(e)     A few weeks later, in an April 30, 2012 letter, Drinka wrote to CGHA that Woodman had "incurred significant losses in managing the Hotel" and could only offer to pay €500,000 for termination of the Management Agreement.

(f)     In a June 6, 2012 letter, Drinka asserted that Woodman did "not have funds available to offer an excessive payment for early termination of the Management Agreement" and repeated Woodman's offer of €500,000 as a termination payment.

(g)     In a November 2, 2012 letter, Drinka stated once again that "we are meeting our obligations under the Management Agreement."  In addition, in response to a recent demand by CGHA that Woodman vacate the Hotel by a specified date so that

17

CGHA could take control of management, Drinka insisted that CGHA could not require Woodman to do so.  Drinka also issued a familiar threat:  "[W]hilst our shareholders have continued to support us, we do not believe they will do so for much longer."  Finally, Drinka suggested that representatives of CGHA meet "together with representatives of our shareholders" at the "Starman UK Services Company Limited's" offices in London to have further discussions.

53.     By 2012, Drinka had become a manager at Defendant Starman; he also had become a manager at other entities upstream from Starman in the ownership structure created by Defendant Starwood Capital Group, where he joined a team of senior management executives from Starwood Capital Group who had long-standing manager positions at these upstream Starman entities.

54.     Unbeknownst to Plaintiff CGHA, in February 2012, when CGHA was making good faith efforts to work with Drinka, Defendant Starman, and Judgment-Debtor Woodman, Defendants were busy making defensive changes through a series of financial transactions that transferred ownership of Woodman's shares to different entities in rapid succession. Specifically:

(a)     On February 28, 2012, Lehwood Netherlands Holdings BV, the direct owner of Woodman, sold its shares of Woodman to Lehwood Holdings S.à.r.l., which was the parent of Lehwood Netherlands Holdings BV and was directly owned by Starman.

(b)     On the same day, Lehwood Holdings S.à.r.l. sold the Woodman shares to Starman.

      (c)     Also on the same day, a new Starman subsidiary was created called Starman (Maroc) S.à.r.l. ("Starman (Maroc)"), and Starman sold the Woodman shares to Starman (Maroc), which then became the direct parent of Woodman, with Starman as the direct parent of Starman (Maroc).

Neither Starman nor Woodman disclosed to CGHA these transfers of ownership of Woodman's shares.

55.     On December 31, 2012, Judgment-Debtor Woodman failed to pay to Plaintiff CGHA the Minimum Fee that was due at that time, and from that date forward, Woodman failed to make any of the required Minimum Fee payments to CGHA.  In a letter to CGHA dated January 7, 2013, Drinka acknowledged Woodman's failure to pay the Minimum Fee due on December 31, 2012, and threatened CGHA even more aggressively than in the past:  "We do not anticipate having the funds available to pay the monies owing in the immediate future. Woodman is taking insolvency advice and anticipates filing by January 14, 2013."

56.     On January 8, 2013, Plaintiff CGHA responded to Drinka's January 7, 2013 letter, giving formal notice that Judgment-Debtor Woodman's "default in paying the rent is clearly . . . a unilateral breach of the Management Agreement."

57.     Contrary to Drinka's manipulative threat, Judgment-Debtor Woodman did not file for insolvency on January 14, 2013, or ever.  Rather, despite its failure to pay the required Minimum Fee payments to Plaintiff CGHA on December 31, 2012, or at any time thereafter, and despite operating at a loss in 2013, Woodman made payments totaling 10,107,524 Moroccan dirham, approximately $1 million under current exchange rates, to various Starwood Hotels entities in 2013 and 2014.

## VIII. PLAINTIFF CGHA'S COMMENCEMENT OF THE ARBITRATION AGAINST JUDGMENT-DEBTOR WOODMAN, AND DEFENDANT STARMAN'S SALE OF WOODMAN

### A. Commencement of the Arbitration

58.     The Management Agreement provided that disputes arising under it were to be settled by arbitration before the ICC International Court of Arbitration (the "ICC"), and that Moroccan law would govern in that proceeding.  On August 6, 2013, Plaintiff CGHA commenced the Arbitration before the ICC by filing a Request for Arbitration alleging breach of the Management Agreement against both Judgment-Debtor Woodman, as Manager, and Travelodge Hotels Ltd., as Guarantor.  On October 18, 2013, Woodman and Travelodge Hotels Ltd. filed separate answers, and on November 14, 2013, the ICC submitted the Arbitration to the Arbitrators for further proceedings.  CGHA later dismissed Travelodge Hotels Ltd. from the Arbitration.

59.     On June 19, 2014, nearly one year after the Arbitration was commenced, Defendant Starman sold its subsidiary Starman (Maroc) – the newly created entity to which Starman had transferred Judgment-Debtor Woodman's shares through a coordinated series of transfers on February 28, 2012 – along with other Starman subsidiaries, to a United Kingdom entity called Maquay Investments Ltd. ("Maquay") for €100.  Maquay had been incorporated in the United Kingdom only six weeks earlier, and accordingly it had no operating or other history. It appeared to be in no way related to the business of hotel management.

60.     Plaintiff CGHA learned of Defendant Starman's June 19 sale of Judgment-Debtor Woodman through a July 2, 2014 letter from Sarah Purdy of Maquay, in which she informed CGHA that Starman had sold Woodman's parent, Starman (Maroc), to Maquay.  CGHA wrote to Starman on July 31, 2014 seeking certain information about Woodman, and Starman replied on

20

August 4, 2014, directing CGHA to "address all future correspondence to [Woodman's] new owner" because Starman "no longer has any interest in [Woodman]."

61.     On July 15, 2014, less than one month after Defendant Starman sold Judgment-Debtor Woodman's parent company to Maquay, Maquay placed the parent company into voluntary liquidation.  Woodman continued on under its new ownership by Maquay, and upon information and belief, it is still extant at the present time.

62.     At the time of these events, Maquay was completely unknown to Plaintiff CGHA, and in particular CGHA was not aware of any pre-existing relationship between Defendant Starman and Maquay.  However, this changed with the release of the so-called "Paradise Papers" in 2017.

63.     On November 5, 2017, 13.4 million documents that had been taken surreptitiously from an offshore legal service provider known as Appleby were made public.  Those documents contained extensive information about a large number of individuals and entities' financial arrangements and holdings in various countries and jurisdictions that are considered tax havens or tax "paradises."  Referred to as the Paradise Papers, these documents are reported to show that there was a shared business interest between and among Defendant Starman, Maquay, and Drinka dating back to at least the time of Starman's sale of Judgment-Debtor Woodman's parent company to Maquay in July 2014.

64.     As reported, this information revealed that from at least February 2011, Drinka had been President and Director of an entity called Eigg Bermuda Ltd. ("Eigg"), and that as of 2014, the shareholders of Eigg were Defendant Starman, Maquay, Lehwood Netherlands Holdings BV, and Lehwood Holdings S.à.r.l.  As noted in paragraph 37 above, the two latter entities were subsidiaries of Starman and had been the owner and indirect owner, respectively,

Judgment-Debtor Woodman prior to February 28, 2012, when Defendants caused those two entities to transfer their ownership of Woodman's shares in a series of coordinated transactions.

65.     These disclosures relating to Eigg, including the involvement of Defendant Starman, Maquay, and Drinka in Eigg, demonstrate that Starman's 2014 sale of Judgment-Debtor Woodman's parent and Woodman to Maquay was likely not an arm's length transaction.

### B.   Plaintiff CGHA'S Emergency Motion to the Arbitrators and the Issuance of the Interim Order

66.     Judgment-Debtor Woodman initially participated in the Arbitration from its commencement in August 2013.  But on August 11, 2014 – after Defendant Starman had sold Woodman's parent, and Woodman, to Maquay – Woodman's counsel of record in the Arbitration advised the Arbitrators that it was no longer authorized to represent Woodman and Woodman did not appear in the Arbitration thereafter.  In a related move two days later, on August 13, 2014, the Joint Liquidator of Woodman's parent company informed Plaintiff CGHA by email that Woodman would not, "by virtue of its insolvency, participate in the proceedings at the [ICC]" and that Woodman "would clearly not be in a position to satisfy any judgment or award for costs."

67.     On August 20, 2014, a week after Plaintiff CGHA was informed that Judgment-Debtor Woodman would no longer participate in the Arbitration, CGHA requested that the Arbitrators issue an urgent order requiring Woodman (a) to return possession and operation of the Hotel to CGHA immediately; (b) to account for all payments made by it since December 31, 2012, when it had ceased making required Minimum Fee payments to CGHA; and (c) to refrain from making any future payments to any third party, pending the Arbitrators' future award on liability.

68.     On September 1, 2014, the Arbitrators heard Plaintiff CGHA on the merits of its request for interim relief.  Although Judgment-Debtor Woodman had been duly notified of this hearing, it chose not to appear.

69.     On September 19, 2014, the Arbitrators issued the Interim Order, granting interim relief to Plaintiff CGHA.  The Interim Order explained that CGHA "has shown sufficient evidence that, despite its failure to pay the fees owed under the Management Agreement, [Woodman] may have made and still is about to make, payments to the profit of [Starman] under an operating agreement which it allegedly entered into with [Starwood Hotels]," and that "there is a serious threat that [Woodman's] assets be diverted to the profit of [Starman] and to the detriment of [CGHA]."

70.     Among other things, the Interim Order directed Judgment-Debtor Woodman (a) to "hand back the possession, operation and business of the Hotel to [CGHA]" within 31 days, including taking all practical measures needed to effect an orderly handover of the business with respect to the transition of Hotel guest and reservation data; (b) within 14 days of handing over the Hotel, to provide a full financial statement as of the handover date and account to CGHA for all payments made by Woodman since December 31, 2012; and (c) to cease making any payments to any third party, including under the Operating Agreement, until the Arbitrators issued their final award on liability.

71.     On October 19, 2014, representatives of Plaintiff CGHA and representatives of Judgment-Debtor Woodman met for the handover of the Hotel to CGHA.  On November 3, 2014, Woodman provided to CGHA the required financial statement and list of payments.  That list of payments showed that Woodman had made payments totaling 10,107,524 Moroccan dirham, approximately $1 million under current exchange rates, to Starwood Hotels entities

during 2013 and 2014, during which period Woodman had failed to make any of the required

Minimum Fee payments to CGHA.  Further, as the Arbitrators noted, the list showed that

Woodman had "continued to make payments to Starwood entities, including after the [Interim

Order] and in breach of such Order."

72.     Judgment-Debtor Woodman openly flaunted the direction in the Interim Order to

provide an orderly handover to Plaintiff CGHA with respect to the transition of Hotel guest and

reservation data.  Specifically, the only information that Woodman provided to CGHA was a

paper list of upcoming bookings, with only the guests' names and no contact information.  Also,

Plaintiff CGHA was blocked from access to the Hotel's IT operating system; Woodman left

behind all computers but deleted all data regarding Hotel guests, depriving CGHA of 20 years of

historical data essential for the orderly transition of the business; and Starwood Hotels,

Woodman's contractual agent in the management and operation of the Hotel, took active steps to

migrate customers away from the Hotel to its own nearby Sheraton Hotel.

## IX.    THE ARBITRATION HEARING AND THE ARBITRATION AWARD

73.     The hearing in the Arbitration was held on January 28 and 29, 2015, in the self-

imposed absence of Judgment-Debtor Woodman.  On May 6, 2015, the Arbitrators issued the

82-page Final Award, the Arbitration Award, in which they set out a reasoned decision in favor

of Plaintiff CGHA and ordered Woodman to pay CGHA damages of 549,612,765 Moroccan

dirham, approximately $57.1 million at then-prevailing exchange rates, plus attorneys' fees and

other costs in the approximate amount of $2.3 million at then-prevailing exchange rates, and

imposed post-judgment interest of 6% simple interest per annum for as long as the amount

awarded remained unpaid.

74.     In the Arbitration Award, the Arbitrators reviewed in detail the Management Agreement that governed the relationship between Plaintiff CGHA, as owner of the Hotel, and Judgment-Debtor Woodman, as Manager of the Hotel.  In particular, the Arbitrators focused on Woodman's contractual obligation to take specific actions to ensure "that the Hotel shall remain an international five star Hotel" and on Woodman's egregious breach of that obligation.

75.     The Arbitrators cited with approval the findings of an expert witness who had concluded "that the current condition of the Hotel is far short of an international five-star standard."  Among other findings by the expert, the Arbitrators endorsed the following:  (a) "overall a poor level of maintenance for many years of electrical and mechanical installations . . . as well as [furniture, fixtures, and equipment] requiring complete refurbishment and replacement," (b) "an understaffed maintenance team which decreased from 32 to 12 over the years with no proper replacement strategy and no planned maintenance strategy showing a clear lack of investment in maintenance," (c) "dilapidated plant & equipment systems and neglected interior," (d) "a number of mechanical and electrical systems at high risk of failure," and (e) "an accelerated deterioration of the building due to lack of planned preventive maintenance."  These findings led the Arbitrators to recognize "[t]he poor level, if not the absence, of maintenance of the premises."

76.     The Arbitrators also adopted expert findings that Judgment-Debtor Woodman had "a maintenance cycle 10 years behind that required by international five-star standard" and that "the maintenance that has been carried out by the Manager has been late, degrading in advance the building and increasing the maintenance costs."  The Arbitrators found that "there was no proper plant replacement, [and] no planned preventative maintenance strategy."  The Arbitrators concluded that there was "clear evidence of the lack of maintenance by [Woodman] and poor

level of services in the operation of the Hotel at least since 2005, in breach of its obligations under the Management Agreement."

77.     The Arbitrators also examined the role of Defendant Starman in Judgment-Debtor Woodman's performance as Manager and concluded that Starman had actually acted as the Manager of the Hotel under the Management Agreement.  The Arbitrators pointed to the July 3, 2006 letter from Starwood Hotels to Plaintiff CGHA, which stated that the "[Management Agreement] has been transferred to Starman" and Starman "has assumed all responsibilities related to [the Management Agreement]."  The Arbitrators found that, from this correspondence, CGHA was led to believe that it could rely on Starman assuming all the responsibilities of the Manager under the Management Agreement.

78.     The Arbitrators also made negative findings regarding Defendant Starman's machinations in the sale of Starman (Maroc), its wholly-owned subsidiary and Judgment-Debtor Woodman's parent, to Maquay after the commencement of the Arbitration:

> The restructuring of the Manager's sole shareholder after the Management
> Agreement had been terminated and this Arbitration started . . . suggests that
> Maquay Investments, which does not appear in any way related to the
> international five-star hospitality industry or involved in the operation of hotels in
> such category, was created for the sole purpose of receiving the shares of the
> Manager's sole shareholder before being . . . placed in voluntary liquidation and,
> as a result, avoid any possible liabilities under the Management Agreement.

79.     In more than 20 pages of the Arbitration Award, the Arbitrators set out their detailed analysis and calculation of the damages that Plaintiff CGHA had suffered as a result of Judgment-Debtor Woodman's breach of the Management Agreement.  The various components of these damages totaled 549,612,765 Moroccan dirham, approximately $57.1 million at then-prevailing exchange rates.  The Arbitrators also awarded attorneys' fees and costs to CGHA in the amount of approximately $2.3 million, at then-prevailing exchange rates, bringing the total

amount awarded to approximately $59.4 million.  Finally, the Arbitrators ordered Woodman to pay 6% simple interest per annum on all of the amounts awarded that remained unpaid 21 days after the date of the Arbitration Award, which was May 6, 2015.

80.     On October 30, 2015, counsel for Plaintiff CGHA sent to the Joint Liquidator of Judgment-Debtor Woodman's parent, and to a representative of Woodman, a letter attaching the Arbitration Award and demanding payment, noting that, as of that date, Woodman had failed to make the ordered payments.  Woodman's representative replied in emails on October 30 and November 4, 2015, stating that Woodman "is insolvent" and "will not trade again"; tax authorities in Casablanca have "put a block on the company's bank account" due to unpaid taxes; and Woodman has "no assets," "[j]ust large liabilities."

81.     On December 14, 2016, Plaintiff CGHA obtained an order from the appropriate court tribunal in Casablanca, Morocco recognizing and enforcing the Arbitration Award against Judgment-Debtor Woodman in Morocco.  Woodman was notified of the decision, but Woodman has failed to make any payment on the Arbitration Award to CGHA, and the Arbitration Award and the interest due on it remain unsatisfied in full.

## X.     DEFENDANT STARMAN CONTROLLED AND DOMINATED JUDGMENT-DEBTOR WOODMAN, AND DEFENDANT STARWOOD CAPITAL GROUP  CONTROLLED AND DOMINATED STARMAN AND WOODMAN

82.     At all relevant times, Defendant Starman controlled and dominated Judgment-Debtor Woodman, thereby directing the actions and affairs of Woodman and treating Woodman as an agent; and Defendant Starwood Capital Group controlled and dominated both Starman and Woodman.

A.   **Defendant Starwood Capital Group Publicly**
**Acknowledged its Control of Defendant Starman**

83.    Defendant Starwood Capital Group touted its involvement in and control of the

restructuring of the Meridien Group hotels, including the Hotel.  Among other things, in

correspondence to Plaintiff CGHA in July 2006 concerning Defendant Starman's takeover as

Manager of the Hotel under the Management Agreement, Black-Roberts, writing for Starman,

emphasized that Starwood Capital Group and Lehman Brothers were "reliable contacts with

significant commercial experience and financial soundness" and that they each had "extensive

experience in the global property sectors."  Black-Roberts further stated that "Starman is

*controlled by* subsidiaries of Lehman and [Starwood Capital Group].  Lehman and [Starwood

Capital Group] each hold a 50% interest in Starman and have committed an investment totaling

EUR 215 million to Starman."  (Emphasis added.)

84.    Defendant Starwood Capital Group's involvement in the Meridien Group

acquisition was covered extensively in the press.  Starwood Hotels issued a press release on

November 25, 2005 stating that "[Starwood Capital Group], a closely held real estate investment

firm based in Greenwich, Connecticut, today announced that its *controlled affiliate*, in a 50/50

joint venture with an affiliate of Lehman Brothers has acquired the owned and leased hotel

portfolio of Le Meridien Hotels and Resorts."  (Emphasis added.)

85.    On July 20, 2005, the European Commission issued a press release concerning its

approval of Defendant Starwood Capital Group and Lehman Brothers' joint acquisition of the

Meridien Group and noted that, "following the completion of the proposed operation, the Le

Meridien owned and leased hotel portfolio . . . will be sold to [an entity] jointly *controlled by*

Lehman Brothers and [Starwood Capital Group].  Conditional to this transaction, [Starwood

Hotels] shall enter into management agreements with each hotel owned and leased by [the joint venture]." (Emphasis added.)

86.     Sternlicht, who was at all relevant times Chief Executive Officer and Chairman of Defendant Starwood Capital Group, was personally involved in the acquisition of the Meridien Group. In 2005, after the announcement of the acquisition, Sternlicht was quoted in a Starwood Hotels press release stating that "[t]his acquisition will allow us to capitalize on an ongoing recovery in the European full-service lodging sector as many of the assets in this portfolio are located in strategic European markets . . . . It is rewarding to see this transaction consummated after almost two years of complex negotiations."

87.     When announcing the deal, Sternlicht further stated his belief that "this transaction is an excellent strategic fit for Starwood Hotels and . . . Starwood Hotels' operational expertise could improve the performance of these assets." Sternlicht obviously did believe that Starwood Hotels was an "excellent strategic fit" for the Meridien deal, because he made it mandatory that Starwood Hotels would manage the properties in the Meridien Group portfolio upon completion of the acquisition. As set out in the European Commission report approving the transaction, "[c]onditional to this transaction, Starwood [Hotels] shall enter into management agreements with each hotel owned and leased by [Starman]." Based upon Defendant Starwood Capital Group's imposition of Starwood Hotels as manager of all of the purchased assets, Judgment-Debtor Woodman had no power or authority to manage the Hotel on its own or to select a different agent, despite being a party to the Management Agreement.

88.     Defendant Starwood Capital Group and Sternlicht's decision to impose Starwood Hotels as Judgment-Debtor Woodman's agent reflected Sternlicht's control over, and personal interest in, Starwood Hotels at the time. As noted on Starwood Capital Group's website, in the

mid-1990s Sternlicht and Starwood Capital Group "creat[ed] and buil[t] Starwood Hotels." Historically, Starwood Capital Group and Sternlicht were significant and influential shareholders of Starwood Hotels.  Starwood Hotels' year-end 1997 10-K filing with the U.S. Securities and Exchange Commission disclosed that "Starwood Capital Group, LLC, its affiliated entities and Barry S. Sternlicht" together held 5.3% of the outstanding shares of Starwood Hotels.

89.     Moreover, Sternlicht was not merely a shareholder of Starwood Hotels, but also served as its Chief Executive Officer and Chairman from 1995 through 2004 and 2005, respectively.  Notably, he held those roles during the planning stages and culmination of the Meridien Group acquisition.  Starwood Hotels openly acknowledged in filings made with the U.S. Securities and Exchange Commission that, "[a]s a consequence [of Sternlicht's overlapping roles as Chairman and Chief Executive Officer of Starwood Capital Group and Starwood Hotels], Mr. Sternlicht has the ability to exercise certain influence over the affairs of [Starwood Hotels]."  Through his simultaneous influence over Starwood Capital Group and Starwood Hotels, Sternlicht injected Starwood Hotels into the Meridien Group acquisition as a mandatory manager of Starman's leased and owned properties, including the Hotel.  This act of control and domination worked to the detriment of Plaintiff CGHA by contributing to Woodman's failure to satisfy its obligations as Manager under the Management Agreement.

90.     At least from May 2008, Defendant Starwood Capital Group completely controlled the operations and business of Defendant Starman and Judgment-Debtor Woodman, as, by that time, Lehman Brothers affiliate LBS Holdings S.à.r.l. (direct owner of 50% of Starman) had ceded operating authority of Starman to Starwood Capital Group's subsidiary SOF MER Holdings S.à.r.l. (direct owner of the other 50% of Starman).  Thereafter, Starwood Capital Group and Starman caused Woodman to breach its obligations to Plaintiff CGHA under the

Management Agreement by, among other things, (a) failing to invest in the necessary infrastructure, renovations, and service needed for the Hotel to maintain international five-star quality accommodations; and (b) causing Woodman to cease paying the Minimum Fee to CGHA while continuing to make payments to Starwood Hotels, even though Drinka had represented to CGHA that Woodman was already insolvent at the time.

### B. Defendant Starwood Capital Group Controlled and Dominated the Entities Upstream From Defendant Starman in the Ownership Structure

91.     Defendant Starwood Capital Group controlled and dominated Judgment-Debtor Woodman through a labyrinth of affiliated foreign and domestic entities that were managed by senior executives of Starwood Capital Group, and through Drinka, who simultaneously held manager positions at Starman and Woodman, as well as at other entities upstream from Starman in the ownership structure created by Starwood Capital Group.  Generally, Drinka's role as manager of entities in that structure, which he shared with senior executives of Starwood Capital Group, extended up to entities that were managed directly by Starwood Capital Group and/or Sternlicht.

92.     Notably, long before Drinka served as manager of Defendant Starman and of other entities upstream from Starman in the ownership structure created by Defendant Starwood Capital Group, senior executives of Starwood Capital Group were serving as managers of these upstream entities.  Between 2005 and 2010, the following individuals held manager positions at certain entities upstream from Starman:  Jerome Silvey (2005-15; Starwood Capital Group Executive Vice President and Chief Financial Officer); Madison Grose (2005-07; Starwood Capital Group Senior Managing Director and Co-General Counsel); Merrick Kleeman (2005-07; Starwood Capital Group Senior Managing Director and Head of Acquisitions, who, according to Starwood Capital Group's website, led the acquisition of the Meridien Group); Jeffrey Dishner

31

(2005-07; later Starwood Capital Group Chief Operating Officer); Michael Patrick Murphy (2005-10; founder of Starwood Capital Group's Luxembourg office, and later Controller of Starwood Capital Energy Group); and Desmond Taljaard (2007-12; Starwood Capital Group Chief Operating Officer for Europe).  In addition, Starwood Capital Group executive Michael Patrick Murphy served as manager of Starman from 2007 to 2009, preceding Drinka.

93.     Generally speaking, there were four ownership levels above Defendant Starman before reaching the entities managed directly by Defendant Starwood Capital Group and/or Sternlicht.

94.     The first level directly above Defendant Starman in its ownership structure was SOF MER Holdings S.à.r.l., an entity established under the laws of Luxembourg.  Between 2010 and 2014, SOF MER Holdings S.à.r.l. had a combination of seven managers, only two of whom were not also executives of Defendant Starwood Capital Group:  Drinka and Gerard Becquer. The five Starwood Capital Group managers (and their Starwood Capital Group titles) during this time were Jerome Silvey (2005-at least 2014; Starwood Capital Group Executive Vice President and Chief Financial Officer); Desmond Taljaard (2007-12; Starwood Capital Group Chief Operating Officer for Europe); Michael Patrick Murphy (2005-10; founder of Starwood Capital Group's Luxembourg office, and later Vice President and Controller of Starwood Capital Energy Group); Sarah Broughton (2013; Starwood Capital Group Managing Director); and John Cody Bradshaw (2013-present; Starwood Capital Group Senior Vice President, and later Managing Director of Acquisitions and Asset Management).

95.     The second level above Defendant Starman in its ownership structure, and direct owner of SOF MER Holdings S.à.r.l., was SOF European Hotel Co-Invest Holdings II S.à.r.l., an entity established under the laws of Luxembourg.  Between 2010 and 2014, SOF European Hotel

Co-Invest Holdings II S.à.r.l. had a combination of nine managers, only three of whom were not also executives of Defendant Starwood Capital Group:  Drinka, Gerard Becquer, and Peggy Murphy.  The six Starwood Capital Group managers (and their Starwood Capital Group titles) during this time were Jerome Silvey (2005-15; Starwood Capital Group Executive Vice President and Chief Financial Officer); Desmond Taljaard (2007-12; Starwood Capital Group Chief Operating Officer for Europe); Michael Patrick Murphy (2005-10; founder of Starwood Capital Group's Luxembourg office, and later, Vice President and Controller of Starwood Capital Energy Group); Sarah Broughton (2012-13; Starwood Capital Group Managing Director); John Cody Bradshaw (2013-present; Starwood Capital Group Senior Vice President, and later Managing Director of Acquisitions and Asset Management); and Julien Petitfrere (2014-present; Manager Starwood Capital Funds Luxembourg).

96.     At relevant times, at the third level above Defendant Starman in its ownership structure, which was the level directly above SOF European Hotel Co-Invest Holdings II S.à.r.l., there were two entities:

(a)     From at least 2005 to 2015, I-3/I-2 European Holdings 2 LP was a 75% shareholder of SOF European Hotel Co-Invest Holdings II S.à.r.l.  I-3/I-2 European Holdings 2 LP was established under the laws of the United Kingdom.  Jerome Silvey, at the time Defendant Starwood Capital Group's Executive Vice President and Chief Financial Officer, was the signatory on a corporate filing in the United Kingdom for I-3/I-2 European Holdings LP in 2009, signing in his capacity as I-3/I-2 European Holdings 2 LP's Executive Vice President.  I-3/I-2 European Holdings LP's General Partner was SCG Hotel Management LLC, and from at least 2008, Starwood Capital Group was the managing member of SCG Hotel Management LLC.

(b)      From at least 2005 to 2015, SOF-VII European Hotel Holdings II S.à.r.l. was a 25% shareholder of SOF European Hotel Co-Invest Holdings II S.à.r.l.  SOF-VII European Hotel Holdings II S.à.r.l. was established under the laws of Luxembourg. Between 2010 and 2014, SOF-VII European Hotel Holdings II S.à.r.l. had a total of six managers, three of whom were not also executives of Defendant Starwood Capital Group:  Drinka, Gerard Becquer, and Peggy Murphy.  The three Starwood Capital Group managers (and their Starwood Capital Group titles) during this time were Jerome Silvey (2005-15; Starwood Capital Group Executive Vice President and Chief Financial Officer); Michael Patrick Murphy (2005-10; founder of Starwood Capital Group's Luxembourg office, and later Vice President and Controller of Starwood Capital Energy Group); and Julien Petitfrere (2014-present; Manager Starwood Capital Funds Luxembourg).

97.      At relevant times, at the fourth level above Defendant Starman in its ownership structure, which was the level above I-3/I-2 European Holdings 2 LP and SOF-VII European Hotel Holdings II S.à.r.l., there were multiple entities.  SOF-VII European Hotel Holdings II S.à.r.l. had three shareholders.

(a)      At relevant times, SOF-VII European Hotel II Lux S.à.r.l. was a majority shareholder (55.6%) of SOF-VII European Hotel Holdings II S.à.r.l.  SOF-VII European Hotel II Lux S.à.r.l. was established under the laws of Luxembourg.  Between 2010 and 2014, SOF-VII European Hotel II Lux S.à.r.l. had a combination of seven managers, only three of whom were not also executives of Defendant Starwood Capital Group:  Drinka, Gerard Becquer, and Peggy Murphy.  The four Starwood Capital Group managers (and their Starwood Capital Group titles) during this time were Jerome Silvey (2007-15;

34

Starwood Capital Group Executive Vice President and Chief Financial Officer); Michael Patrick Murphy (2007-10; founder of Starwood Capital Group's Luxembourg office, and later Vice President and Controller of Starwood Capital Energy Group); Julien Petitfrere (2014-present; Manager Starwood Capital Funds Luxembourg); and Franck Hebrard (2010; Starwood Capital Group Managing Director).

(b)　　At relevant times, Starwood Global Opportunity Fund VII-B LP was another shareholder (20.6%) of SOF-VII European Hotel Holdings II S.à.r.l. Starwood Global Opportunity Fund VII-B LP was established under the laws of Connecticut. SOF-VII Management LLC was the General Partner of Starwood Global Opportunity Fund VII-B. From at least 2006, Jerome Silvey, at that time Defendant Starwood Capital Group's Executive Vice President and Chief Financial Officer, served as Executive Vice President and Chief Financial Officer of SOF-VII Management LLC. During this same period, Defendant Starwood Capital Group was the managing member of SOF-VII Management LLC.

(c)　　At relevant times, Starwood International Opportunity Fund VII-E LP was another shareholder (23.8%) of SOF-VII European Hotel Holdings II S.à.r.l. Starwood International Opportunity Fund VII-E LP was established under the laws of the United Kingdom. Jerome Silvey, who was at the time Executive Vice President and Chief Financial Officer of Starwood Capital Group, was a signatory to the 2005 registration statement that registered Starwood International Opportunity Fund VII-E LP as an entity in the United Kingdom. Jerome Silvey signed in his capacity as a representative of SOF-VII International Management LLC, which was the General Partner of Starwood International Opportunity Fund VII-E LP. Sternlicht, who was at the time Chairman and

35

Chief Executive Officer of Starwood Capital Group, was also a signatory to Starwood International Opportunity Fund VII-E LP's 2005 registration statement. Sternlicht signed in his capacity as a limited partner of Starwood International Opportunity Fund VII-E LP. Jerome Silvey was also a signatory to other United Kingdom corporate filings for Starwood International Opportunity Fund VII-E LP in 2005 and 2009. As noted above, the General Partner of Starwood International Opportunity Fund VII-E LP was SOF-VII International Management LLC. At relevant times, Starwood Capital Group was the general manager and/or the managing member of SOF-VII International Management LLC and the two entities shared the same corporate address in Greenwich, Connecticut.

98.     At the fifth level above Defendant Starman in its ownership structure, which included, among other entities, the level above SOF-VII European Hotel II Lux S.à.r.l., was Starwood Global Opportunity Fund VII-A LP. Starwood Global Opportunity Fund VII-A LP was the sole shareholder of SOF-VII European Hotel II Lux S.à.r.l. Starwood Global Opportunity Fund VII-A LP was established under the laws of Delaware. SOF-VII Management LLC was the General Partner of Starwood Global Opportunity Fund VII-A LP. From at least 2006, Jerome Silvey, who was at that time Starwood Capital Group Executive Vice President and Chief Financial Officer, served as Executive Vice President and Chief Financial Officer of SOF-VII Management LLC. Defendant Starwood Capital Group was the managing member of SOF-VII Management LLC.

99.     A diagram depicting the labyrinth of entities through which Defendant Starwood Capital Group controlled and dominated Defendant Starman and Judgment-Debtor Woodman is attached as Exhibit A to this Complaint.

### C.    The Entities Upstream From Defendant Starman in the Ownership Structure Were Undercapitalized by Defendant Starwood Capital Group

100.    Judgment-Debtor Woodman was in a perpetual state of undercapitalization, thus further facilitating Defendant Starwood Capital Group's control and domination of it.  On numerous occasions at relevant times, as set out above, Drinka and/or Black-Roberts stressed to Plaintiff CGHA that Woodman was experiencing ongoing financial distress, emphasizing its financial dependence on Starman and on its shareholders.  On January 7, 2013, Drinka stated in a letter to CGHA that Woodman would file insolvency proceedings within one week.  Woodman operated at a loss from 2005 through 2013, except in 2008 and 2010.  Moreover, Woodman's financial statements as set out in regulatory filings showed a negative equity balance each year ranging from negative 12,005,674 Moroccan Dirham, approximately $1.3 million under current exchange rates, to negative 57,253,380 Moroccan Dirham, approximately $6.2 million under current exchange rates, over the course of 2005 through 2013, except in 2010.

101.    Defendant Starman, too, was undercapitalized as a result of its control and domination by Defendant Starwood Capital Group.  As detailed above, on numerous occasions Starman sent correspondence to Plaintiff CGHA acknowledging Starman's severe financial difficulties.  Moreover, Starman's financial statements as set out in regulatory filings show a negative equity balance ranging from negative €6,326,000 to negative €84,397,000 for each of the years 2009 through 2013, and also show Starman operating at a loss (before taking into account income tax and gain on disposal of assets) for each of the years from 2006 through 2013, in amounts ranging from a loss of €16,271,000 to a loss of €151,247,000.  Because of Starman's perennial negative equity financial condition, all of its financial statements from 2006 through at least 2013 also contained a "going concern" disclosure by its Management Committee.  In certain of these years the Management Committee stated that Starman had adequate resources to

continue in business as a going concern for the foreseeable future because of shareholder commitments to provide it capital.  In fact, in 2010, the Management Committee disclosed that a capital injection of €20,000,000 was received from its shareholders.  Ostensibly, management made these disclosures at least in part to obtain unqualified opinions from its financial statement auditors.  Drinka served on Starman's Management Committee from at least 2011 through 2013, and was therefore responsible for the going concern disclosures made for those years.

102.    Other entities upstream from Defendant Starman in the ownership structure created by Defendant Starwood Capital Group were similarly undercapitalized, as evidenced by negative equity positions and operating losses as disclosed in regulatory filings for certain entities in the first four levels upstream from Starman.

(a)    From 2005 through 2014, except in 2007, SOF MER Holdings S.à.r.l. carried a negative equity balance ranging from negative €115,035 to negative €108,974,397.  From 2005 through 2014, except in 2007, SOF MER Holdings S.à.r.l. operated at a loss, in amounts ranging from a loss of €128,035 to a loss of €69,631,159.

(b)    From 2005 through 2014, except in 2007, SOF European Hotel Co-Invest Holdings II S.à.r.l. carried a negative equity balance ranging from negative €579,557 to negative €107,540,315.  From 2005 through 2014, except in 2007, SOF European Hotel Co-Invest Holdings II S.à.r.l. operated at a loss, in amounts ranging from a loss of €592,557 to a loss of €50,833,849.

(c)    From 2005 through 2014, except in 2007 and 2008, SOF-VII European Hotel Holdings II S.à.r.l. carried a negative equity balance ranging from negative €35,896 to negative €30,167,088.  From 2005 through 2014, except in 2007 and 2008, SOF-VII

European Hotel Holdings II S.à.r.l. operated at a loss, in amounts ranging from a loss of €48,896 to a loss of €15,514,043.

(d)     From 2009 through 2014, SOF-VII European Hotel II Lux S.à.r.l. carried a negative equity balance ranging from negative €8,083,454 to negative €15,766,624. From 2008 through 2014, SOF-VII European Hotel II Lux S.à.r.l. operated at a loss, in amounts ranging from a loss of €25 to a loss of €8,095,929.

**D.     The Entities Upstream From Defendant Starman
        in the Ownership Structure Lacked Infrastructure**

103.    At all relevant times, all of the Luxembourg S.à.r.l. entities that were upstream from Starman in the ownership structure created by Defendant Starwood Capital Group were controlled and dominated by Starwood Capital Group such that they had no infrastructure and upon information and belief did not conduct any real business.  All of those Luxembourg S.à.r.l. entities shared the same address, namely 5 Rue Guillaume Kroll, L-1882 Luxembourg.  This address was widely known to be used by companies in Luxembourg as a "front."  In 2014, it was reported that "more than 1600 companies" listed 5 Rue Guillaume as their corporate address. The report noted that when journalists "went to the address and searched for a letterbox, bell or any sign of an individual company . . . it was in vain.  In reality, only one company was stationed there."

104.    The upstream Luxembourg S.à.r.l. entities were in fact no more than shells, as evidenced by the lack of a legitimate business location.  Moreover, only four managers of all the the Luxembourg S.à.r.l. entities combined were located in Luxembourg.  The other eight managers were high-ranking executives of Defendant Starwood Capital Group who were based elsewhere, four of them in Starwood Capital Group's Connecticut headquarters, including, at

relevant times, Starwood Capital Group's Chief Financial Officer, General Counsel, Chief

Operating Officer, and Senior Managing Director.

### FIRST CAUSE OF ACTION

**(Against Defendant Starman)**

**(Enforcement of the Arbitration Award Pursuant to 9 U.S.C. § 207
Based on Alter Ego Liability)**

105.    Plaintiff CGHA repeats and realleges the allegations set forth in Paragraphs 1-104

above as if fully set forth herein.

106.    The United States is a signatory to the New York Convention, codified at Chapter

2 of the Federal Arbitration Act, 9 U.S.C. §§ 203 *et seq.*

107.    The New York Convention applies to the Arbitration Award, which was issued by

the ICC International Court of Arbitration in London, United Kingdom.  The United Kingdom is

also a signatory to the New York Convention.

108.    The Arbitration Award was obtained pursuant to the Management Agreement, a

signed contractual writing containing the following arbitration provision agreed to by

Judgment-Debtor Woodman:  "All disputes arising in connection with this agreement shall be

finally settled under the rules of Conciliation and Arbitration of the International Chamber of

Commerce by one or more arbitrators in accordance with said rules."

109.    The Arbitration Award was issued in favor of CGHA in the amount of

549,612,765 Moroccan dirham, approximately $57.1 million at then-prevailing exchange rates,

along with attorney's fees and other costs, plus interest.

110.    On December 14, 2016, Plaintiff CGHA obtained an order from the Commercial

Court in Casablanca, Morocco recognizing and enforcing the Arbitration Award against

Judgment-Debtor Woodman in Morocco.

40

111.    Judgment-Debtor Woodman was the alter ego of Defendant Starman and therefore Starman is liable for the Arbitration Award against Woodman.

112.    Throughout the relevant time period, Defendant Starman controlled and dominated the affairs of Judgment-Debtor Woodman, such that Defendant Woodman was merely the alter-ego of Starman.  The two functioned as a single economic entity and this structure worked a fraud and injustice on CGHA.

113.    Throughout the relevant time period, up until June 19, 2014 – when, during the pendency of the Arbitration, Defendant Starman strategically sold Judgment-Debtor Woodman's parent Starman (Maroc) to Maquay for a nominal sum – Starman was the indirect parent of Woodman.  After Starman sold Starman (Maroc) to Maquay, Maquay immediately placed it into liquidation.  This was a means of defrauding CGHA and frustrating its ability to enforce any award eventually obtained in the Arbitration.

114.    Defendant Starman and Judgment-Debtor Woodman did not observe corporate formalities.  Starman's management spoke for both Starman and Woodman.  And in fact, Starman's management was Woodman's management.  Between 2006 and 2014, members of Starman's management team simultaneously served in management roles at Woodman:  (a) Black-Roberts, one of CGHA's early contacts at Starman/Woodman, served as Director of Property for Starman from 2005-11 and as a manager of Woodman from 2009-10, and she communicated extensively with CGHA about disputes arising under the Management Agreement in both of those roles; and (b) Drinka, who served as manager of Woodman from 2010-14 and manager of Starman from at least 2011-14.  Correspondence about issues arising under the Management Agreement frequently came on Starman letterhead rather than on Woodman

letterhead and, in addition, Plaintiff CGHA was specifically directed by Woodman to include Starman management on communications to Woodman.

115.   Defendant Starman operated Judgment-Debtor Woodman as a facade.  In a letter that Plaintiff CGHA received after Defendant Starwood Capital Group and Lehman Brothers' acquisition from the Meridian Group, Starwood Hotels informed CGHA that Starman was assuming all of Woodman's responsibilities under the Management Agreement.  Other letters came from Starman management and were on Starman letterhead.  All meetings and negotiations with CGHA about disputes under the Management Agreement involved Starman; and Starman's correspondence indicated, and CGHA understood, that any negotiated resolution would have to be approved by and financed by Starman.

116.   Judgment-Debtor Woodman was not adequately capitalized, as evidenced by its late payments under the Management Agreement; its ultimate default under the Management Agreement by failing to pay the Minimum Fee to CGHA; its failure to make required investments in the Hotel to ensure that the Hotel was maintained as a luxury international five-star hotel; its general practice of operating at a loss and carrying a negative equity position since 2006, and its repeated representations in letters to CGHA regarding its dire financial condition and financial dependence on Starman.

117.   Defendant Starman operated Judgment-Debtor Woodman in such a manner as to perpetuate a fundamental fraud or injustice on CGHA, as evidenced by Starman's sale, after the Arbitration commenced, of Woodman's parent, Starman (Maroc), to Maquay, an entity that had only been incorporated a month before the sale and had no history of involvement in the hotel industry.  Starman, Maquay, and other Starman subsidiaries in Woodman's ownership structure were shareholders of Eigg, demonstrating that this transaction was not arms-length.  Upon

42

information and belief, Starman engaged in this transaction to unjustly prevent CGHA from

recovering on any award issued by the Arbitrators.

118.    Because Defendant Starman assumed all of Woodman's responsibilities under the

Management Agreement, Starman was responsible for Woodman's continued payment of

operating fees to Starwood Hotels in 2013 and 2014, after Woodman had defaulted on the

Minimum Fee payments due to Plaintiff CGHA on December 31, 2012 and thereafter.  This

siphoning of funds worked a fraud and injustice on CGHA.

119.    Accordingly, Judgment-Debtor Woodman's alter ego Defendant Starman is liable

for the Arbitration Award against Woodman.

<u>**SECOND CAUSE OF ACTION**</u>

**(Against Defendants Starman and Starwood Capital Group)**

**(Enforcement of the Arbitration Award Pursuant to 9 U.S.C. § 207
Based on Agency Liability**)

120.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-119 above

as if fully set forth herein.

121.    In carrying out the Management Agreement with Plaintiff CGHA, Judgment-

Debtor Woodman acted as the agent of Defendant Starman and Defendant Starwood Capital

Group at all relevant times and, accordingly, Starman and Starwood Capital Group are each

liable for the Arbitration Award against Woodman.

122.    Defendant Starman identified itself as having assumed all responsibilities under

the Management Agreement.  Judgment-Debtor Woodman had no other business apart from its

business pursuant to the Management Agreement, which Starwood Capital Group required

Woodman to delegate to Starwood Hotels by entering the Operating Agreement, allowing

Starwood Hotels to operate the Hotel in a manner that contributed to Woodman's breach of the

Management Agreement.  Starman and Woodman had substantially overlapping management, including at least Drinka and Black-Roberts.  Starman spoke for and on behalf of Woodman in correspondence, negotiations, and meetings with CGHA regarding the Management Agreement.

123.     Defendant Starwood Capital Group identified itself as being in control of the 2005 restructuring of the Meridien Group hotels, including the Hotel.  As Defendant Starman indicated to Plaintiff CGHA, Starman was from its inception controlled by affiliates of Starwood Capital Group and Lehman Brothers.  Starwood Capital Group and Sternlicht were deeply involved in structuring and negotiating the Meridien transaction, which required Woodman to enter the Operating Agreement with Starwood Hotels, leaving Woodman with no power or authority to operate the Hotel on its own or select a different manager and allowing Starwood Hotels to operate the Hotel in a manner that contributed to Woodman's breach of the Management Agreement.  Starwood Capital Group and/or Sternlicht were significant and influential shareholders of Starwood Hotels, and through 2004 and 2005 Sternlicht was Starwood Hotels' Chief Executive Officer and Chairman, respectively.  These overlapping interests gave Starwood Capital Group and Sternlicht the motive and the ability to impose Starwood Hotels as the mandatory manager of the Hotel under the terms of the Meridien Group transaction, thus allowing Starwood Hotels to operate the Hotel for the benefit of Starwood Capital Group and Sternlicht.

124.     The Luxembourg S.à.r.l. entities upstream from Defendant Starman in the ownership structure created by Defendant Starwood Capital Group had substantially overlapping management, including Drinka, Gerard Becquer, Jerome Silvey, Desmond Taljaard, Michael Patrick Murphy, Sarah Broughton, John Cody Bradshaw, Julien Petitfrere, Peggy Murphy, and

Franck Hebrard.  Throughout the relevant period, the majority of these managers were senior executives at Starwood Capital Group.

125.    Judgment-Debtor Woodman, Defendant Starman, and the Luxembourg S.à.r.l. entities upstream from Starman in the ownership structure created by Defendant Starwood Capital Group were all undercapitalized as a result of the control and domination of Starwood Capital Group.  Woodman claimed that it operated at a loss, and in fact did generally operate at a loss from 2006, and it repeatedly referenced its insolvency.  Starman maintained a negative equity position from at least 2009 through 2013, and operated at a loss (before taking into account income tax and gain on disposal of assets) for each of the years from 2006 through 2013. The Luxembourg S.à.r.l. entities upstream from Starman in the ownership structure created by Starwood Capital Group generally maintained negative equity positions and generally operated at a loss from at least 2005 through 2014.

126.    The Luxembourg S.à.r.l. entities upstream from Defendant Starman in the ownership structure created by Defendant Starwood Capital Group were shell companies with no infrastructure that were controlled and dominated by Starwood Capital Group.  Those entities upstream from Starman in the ownership structure all shared the same Luxembourg address, which was 5 Rue Guillaume Kroll, L-1882 Luxembourg , a location where they did not in fact maintain an actual corporate office.

127.    All of the actions taken by Judgment-Debtor Woodman with respect to the operation of the Hotel, including (a) its entering the Operating Agreement with Starwood Hotels; (b) its failure to properly maintain the Hotel to a five-star standard; (c) its failure to pay Plaintiff CGHA the Minimum Fee due under the Management Agreement; and (d) the sale of Woodman's parent entity to Maquay while the Arbitration was pending in order to avoid liability under the

Management Agreement, were directed, authorized, and/or caused by Defendant Starman, Woodman's indirect parent who, from the very start, admitted to CGHA responsibility for Woodman's duties under the Management Agreement.  Likewise, all of the foregoing actions by Woodman, were directed, authorized, and/or caused by Defendant Starwood Capital Group, which controlled and dominated Starman and Woodman through a labyrinth of entities with shared management up to at least four levels upstream from Starman in the ownership structure created by Starwood Capital Group.  Accordingly, Woodman was an agent of Starman and an agent of Starwood Capital Group.  Starman and Starwood Capital Group, as the principals of Woodman, are each therefore liable for Woodman's obligations under the Arbitration Award.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CGHA respectfully requests that this Court enter:

a.      On Plaintiff's claim for enforcement of the Arbitration Award against Defendant Starman and Defendant Starwood Capital Group in the amount of 549,612,765 Moroccan dirham, approximately $57.1 million under then-prevailing exchange rates, plus attorney's fees and other costs in the approximate amount of $2.3 million at then-prevailing exchange rates;

b.      A judgment imposing post-judgment interest of 6% per annum from May 27, 2015 and for as long as the amount awarded remains unpaid;

c.      Any other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.


CHIPMAN BROWN CICERO & COLE, LLP

 _/s/ Paul D. Brown_____
Paul D. Brown (#3903)
Joseph B. Cicero (#4388)
Gregory E. Stuhlman (#4765)
Hercules Plaza
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
Telephone:  (302) 295-0191

OF COUNSEL:

David Spears
Charlita Mays
Cynthia Chen
SPEARS & IMES LLP
51 Madison Avenue
New York, New York 10010
Tel:  (212) 213-6996
Fax:  (212) 213-0849

*Attorneys for Plaintiff Compagnie des Grands Hôtels d'Afrique S.A.*