IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COMPAGNIE DES GRANDS HÔTELS D'AFRIQUE S.A.,

Plaintiff,

v.

STARWOOD CAPITAL GROUP GLOBAL I LLC and STARMAN HOTEL HOLDINGS LLC,

Defendants.

Civil Action No. 18-654-RGA

MEMORANDUM ORDER

Presently before this Court is a joint motion to dismiss filed by Defendants Starwood Capital Group Global I LLC ("Starwood Capital Group")[1] and Starman Hotel Holdings LLC ("Starman"). (D.I. 15). The motion to dismiss is based on Federal Rule of Civil Procedure 12(b)(6). The matter is fully briefed. (D.I. 16, 23, 27).

For the reasons set forth herein, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

On April 30, 2018, Plaintiff Compagnie des Grands Hôtels d'Afrique S.A. filed this action to enforce against Starwood Capital Group and Starman a foreign arbitration award finding Woodman Maroc S.a.r.l. ("Woodman") liable for breach of contract. (D.I. 1). Plaintiff is the owner of the Royal Mansour Hotel ("Hotel"), a luxury hotel in Casablanca, Morocco. (*Id.* ¶ 2). In 1989, Plaintiff entered

[1] Starwood Capital Group is a Connecticut limited liability corporation with its principal place of business in Connecticut. (D.I. 1, ¶19).

into a thirty-five year Management Agreement with the Trusthouse Forte Group. (*Id.*)[2] The Management Agreement provided that the manager would always maintain the Hotel as an international five-star hotel and would make quarterly fee payments to Plaintiff as owner of the hotel. (*Id.*)

By 2005, Le Meridien Group ("Meridien") "had become the owner of the manager of the Hotel." (*Id.* ¶ 3).[3] That same year, Defendant Starwood Capital Group and Lehman Brothers formed Starman to purchase the owned and leased properties of the Meridien Group. (*Id.* ¶¶ 3-4). Thus, Starman became "owner of the manager of the Hotel." (*Id.*).[4] As part of the acquisition by Starman, Starman entered into a management agreement with Starwood Hotels & Resorts Worldwide, Inc. ("Starwood Hotels"). (*Id.* ¶¶ 5, 35-36). Additionally, the acquisition required Woodman to enter into a separate operating agreement with Starwood Hotels. (*Id.* ¶¶ 6, 38). Therefore, after the acquisition organized by Starwood Capital Group, Starman owned and leased the properties of the Meridien Group and those properties entered management agreements with Starwood Hotels. (*Id.* ¶¶ 4-6). Under the operating agreement between Starwood Hotels and Woodman, Starwood Hotels became the agent of Woodman and agreed to "supervise, direct and control, the [o]peration of all aspects of the [Hotel] for and on behalf of" Woodman. (*Id.* ¶ 38).

In June 2006, Plaintiff, unaware of the acquisition, attempted to communicate with Meridien in regard to the Management Agreement. (*Id.* ¶ 43). In response, Starwood Hotels contacted the Hotel and informed it of the change in management, i.e., that Starwood Hotels had acquired the Meridien brand and that the Management Agreement for the Hotel had been "transferred to Starman." (*Id.* ¶¶ 43-44). In

---

[2] Under Trusthouse Forte Group, the manager of the hotel was called Trusthouse Forte Morocco S.à.r.l. (*Id.* ¶ 29).

[3] Under the Meridien Group, the manager of the hotel was called Meridien Maroc S.à.r.l. (*Id.* ¶ 33).

[4] Because the briefing uses the name Woodman Maroc S.a.r.l ("Woodman") to refer to the manager after Starman purchased the properties from the Meridien Group, I will do the same.

the following months, Plaintiff received correspondence from Starman regarding the Hotel. (*Id.* ¶¶ 44-46).

From 2006 to 2011, Plaintiff received and addressed letters to Starman and a Starman subsidiary, Starman UK. (*Id.* ¶¶ 46-47). By 2010, Woodman failed to make the minimum payments due to Plaintiff under the Management Agreement. (*Id.* ¶ 49). As a result, Plaintiff's counsel intervened and began corresponding with Woodman and Starman. (*Id.*) Shortly after Plaintiff's counsel accused Woodman of default, Woodman began to communicate directly with Plaintiff. (*Id.* ¶ 52).[5]

Between 2011 and 2013, there was continued correspondence between Woodman and Plaintiff regarding the Management Agreement. (*Id.* ¶ 52). On February 28, 2012, Woodman's shares were sold to a Starman subsidiary called Starman (Maroc) S.à.r.l. (*Id.* ¶ 54).[6] On January 7, 2013, Woodman contacted Plaintiff to acknowledge Woodman's failure to pay the December 31, 2012 minimum payment under the contract and to inform Plaintiff that Woodman did not intend to make any more payments and planned to file for insolvency soon. (*Id.* ¶ 55). The next day, Plaintiff gave Woodman formal notice of default and informed Woodman that it was in breach of the Management Agreement. (*Id.* ¶ 56). Woodman did not file for insolvency, but through continued correspondence, claimed multiple times to be insolvent. (*Id.* ¶¶ 57, 66, 80, 90, 100).

On August 6, 2013, Plaintiff commenced arbitration against Woodman for breach of the Management Agreement. (*Id.* ¶ 58). On June 19, 2014, Defendant Starman sold its subsidiary, Starman

---

[5] This correspondence was between Plaintiff and Thierry Drinka, who acted as manager of Woodman, was closely affiliated with Starwood Capital Group, and worked for Starman. (*Id.* ¶¶ 9-12, 24, 47).

[6] According to the complaint, this sale occurred in three separate transactions all occurring on the same day. (*Id.* ¶ 54). The series of transactions were between the direct owner of Woodman (Lehwood Netherlands Holdings BV) and a parent entity to Lehwood Netherlands Holdings BV (Lehwood Holdings S.à.r.l.), Lehwood Holdings S.à.r.l. and Starman, and lastly, Starman and Starman (Maroc) S.à.r.l., which was created that same day by Starman. (*Id.*)

(Maroc) S.à.r.l., to a newly created entity called Maquay Investments Ltd. ("Maquay") for €100. (*Id.* ¶ 59). In July 2014, Plaintiff received news of this sale and Maquay placed Starman (Maroc) S.à.r.l. into liquidation. (*Id.* ¶ 61). On August 13, 2014, Woodman informed Plaintiff that Woodman would no longer take part in the arbitration due to its insolvency and would "not be in a position to satisfy any judgment or award for costs." (*Id.* ¶ 66).

At the arbitration, Plaintiff requested interim relief, which was granted on September 19, 2014. (*Id.* ¶ 69). The arbitrators reasoned that Plaintiff had "shown sufficient evidence that, despite its failure to pay the fees owed under the Management Agreement, [Woodman] may have made and still is about to make, payments to the profit of [Starman] under an operating agreement which it allegedly entered into with [Starwood Hotels]," and that "there is a serious threat that [Woodman's] assets [will] be diverted to the profit of [Starman] and to the detriment of" Plaintiff. (*Id.*) The arbitrators ordered Woodman

> (a) to "hand back the possession, operation and business of the Hotel to [Plaintiff]" within 31 days, including taking all practical measures needed to effect an orderly handover of the business with respect to the transition of Hotel guest and reservation data; (b) within 14 days of handing over the Hotel, to provide a full financial statement as of the handover date and [to] account to CGHA for all payments made by Woodman since December 31, 2012; and (c) to cease making any payments to any third party, including under the Operating Agreement, until the [a]rbitrators issued their final award on liability.

(*Id.* ¶ 70). The financial statements revealed that Woodman made payments totaling approximately $1 million to Starwood Hotels' entities during 2013 and 2014. (*Id.* ¶ 71). Woodman made none of its required payments to Plaintiff during this time. (*Id.* ¶ 55). The arbitration award was issued on May 6, 2015 and found Woodman breached its obligations under the Management Agreement. (*Id.* ¶¶ 73, 76). Woodman has failed to make any payments on the arbitration award. (*Id.* ¶ 81).

Plaintiff's complaint alleges that the arbitration award against Woodman should be enforced under Delaware law (D.I. 23 at 1)[7] against Starman on alter ego and agency liability theories, and against Starwood Capital Group on agency liability theory. Plaintiff seeks to recover damages accordingly. (*Id.* at 46).

## II. LEGAL STANDARDS

### a. Rule 12(b)(6)

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the complaint's factual allegations as true.[8] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 555. The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of

---

[7] Notwithstanding that Plaintiff states it is relying upon Delaware law, its brief cites only two Delaware cases, but cites ten District of Delaware cases, ten Third Circuit cases, and numerous cases from other courts. Defendants cite about seven Delaware cases in their opening brief (D.I. 16), but also cite numerous federal cases. Thus, although I think Delaware cases are the primary source for Delaware law, I too mostly cite federal cases.

[8] There is no question that I can consider, in addition to the complaint, the various purported contracts and agreements that form the basis for the claims. *See Lum v. Bank of America*, 361 F.3d 217, 221 n. 3 (3d Cir. 2004).

the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

## III. DISCUSSION

Defendants Starman and Starwood Capital Group move to dismiss each of Plaintiff's cause of actions pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (D.I. 16, 27). I will analyze each cause of action in order to determine whether Plaintiff has sufficiently stated a claim.

### a. Alter Ego Liability against Starman

Plaintiff claims Starman is liable for the arbitration award against Woodman based on a theory of alter ego liability. (D.I. 1 ¶ 111). Starman moves to dismiss, arguing Plaintiff fails to allege any of the factors considered under alter ego liability and has failed to plead any fraud or injustice. (D.I. 16 at 16)

In order to successfully establish alter ego liability, a plaintiff "must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008). Under Delaware law, in order to determine whether two entities functioned as a single economic entity, the court should consider if any of following factors have been pled: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." *Id.* at 528-29. While no single factor is determinative, some combination of the above is required. *Id.* at 529.

As to the first element of alter ego liability, Starman argues Plaintiff failed to sufficiently plead any of the factors required to show the entities acted as a single economic entity under Delaware law. I disagree.

Plaintiff claims evidence of insolvency, failure to observe corporate formalities, siphoning of funds, undercapitalization, and facade. Because Woodman repeatedly admitted that it was insolvent (D.I. 1 at ¶¶ 55, 66, 80), insolvency is adequately pled.

As to Woodman and Starman's failure to observe corporate formalities, Plaintiff points to Starman's management speaking on behalf of Woodman and Starman. (*Id.* at ¶ 114). The complaint alleges not only that Starman often responded for Woodman on issues arising under the Management Agreement, but also that "Starman's management was Woodman's management." (*Id.*) This failure to maintain formal barriers between management is enough to plead that Starman failed to observe corporate formalities. *See Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 (3d Cir. 2002).

Starman argues that Plaintiff's claim regarding siphoning of funds is inadequate because 1) there is no evidence that the "contractually obligated payments to Starwood Hotels pursuant to the Operating Agreement" were directed by or went to Starman and 2) "contractually obligated payments" are insufficient to establish siphoning. (D.I. 16 at 24-25). However, as Plaintiff argues, not all of these payments were legitimate contractually-obligated payments because some were paid after the Interim Order, which directed Woodman to "cease making payments to any third parties." (D.I. 23 at 29; D.I. 1 ¶¶ 15, 71). Even if they were contractually-obligated payments, they were made at a time when Woodman claimed to be insolvent. (D.I. 1 ¶¶ 55-57). As the Third Circuit has noted, making payments "at a time when a corporation is insolvent favors piercing the corporate veil." *Trustees of Nat. Elevator*

*Industry Pension, Health Benefit & Educational Funds v. Lutyk*, 332 F.3d 188, 196 (3d Cir. 2003). Lastly, Plaintiff's complaint claims the arbitrators found Starman profited from "payments . . . under an operating agreement which it allegedly entered into with [Starwood Hotels]." (*Id.* ¶ 69). Therefore, I find Defendant's arguments in regard to siphoning of funds unpersuasive.

Turning to Plaintiff's argument that Woodman was grossly undercapitalized, Starman argues that Plaintiff conflates undercapitalization with insolvency. "A company that was initially adequately capitalized, but then suffered financially thereafter, it not undercapitalized; at best, it is insolvent." (D.I. 16 at 21). Although I agree with Starman, I do not find the absence of undercapitalization determinative. As Starman notes, the inquiry into capitalization "is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or [for] other improper purposes." *Lutyk*, 332 F.3d at 197. Because I have already found that siphoning of funds has been pled, I am not concerned with the absence of undercapitalization. *See id.* at 197-98 (finding that even in the absence of undercapitalization, evidence of substantial insolvency can "add great support to [a] [c]ourt's conclusion regarding siphoning of funds" and can support the court's ultimate decision to pierce to corporate veil).

Lastly, Plaintiff claims Starman operated Woodman as a facade. (D.I. 1 ¶ 115). To plead facade, Plaintiff must show Starman had significant control over Woodman's operations and finances. *Blair v. Infineon Technologies AG,* 720 F. Supp. 2d 462, 472 (D. Del. 2010). Here, Plaintiff claims Starman required Woodman and Plaintiff to involve them in correspondence and meetings regarding the default of Woodman. (*Id.* ¶ 52). Additionally, the complaint claims Starman required Woodman to continue making payments to Starwood Hotels, Starman transferred ownership of Woodman's shares to a Starman subsidiary, and Starman made the final decision to sell that Starman subsidiary to Maquay. (*Id.*

¶¶ 54, 57, 59). *See Blair*, 720 F. Supp. 2d at 472. I find these claims sufficient to plead Starman controlled Woodman's finances and operated Woodman as a facade.

I find the first element of alter ego more than adequately pled.

As to the second element of alter ego liability, Plaintiff asserts that Starman strategically sold Woodman's parent entity in order to prevent Plaintiff from recovering any award issued by the arbitrators. (D.I. 1 ¶ 117). Plaintiff supports this argument with allegations that Maquay was only incorporated six weeks before the sale took place, there were shared connections between Maquay and Starman, and the sale occurred shortly after the arbitration was initiated. (*Id.* ¶¶ 59, 63-65). While Defendant attempts to argue that this theory cannot be used to pierce the corporate veil (D.I. 16 at 17-18), I disagree. These facts, accepted as true, support Plaintiff's claim that Starman's acts were strategic and intended to leave Woodman unable to pay any award. *See Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *6 (Del. Ch. Dec. 23, 2008). Acts intended to leave a debtor judgment proof are sufficient to show fraud and injustice. Thus, I find fraud and injustice adequately pled.

I find that Plaintiff has adequately pled insolvency, failure to observe corporate formalities, siphoning of funds, and facade, and properly pled evidence of fraud or injustice. That is more than enough at the pleading stage. I will therefore deny Starman's motion to dismiss as to Plaintiff's alter ego claim.

**b. Agency Liability against Starman and Starwood Capital Group**

Plaintiff claims Starman and Starwood Capital Group should be held liable for Woodman's judgment based on a theory of agency liability. (D.I. 1 at 43). In order to determine if an agency relationship exists, the court should consider "(1) if there is 'an arrangement ... between the two

corporations so that one acts on behalf of the other' and (2) whether that [] arrangement relates directly to the matter alleged." *Energy Marine Services, Inc. v. DB Mobility Logistics AG*, 2016 WL 284432, at *4 (D. Del. Jan. 22, 2016) (quoting *Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir. 1988). This Court has held that "the central issue [in an agency claim] is control, i.e., whether the parent corporation dominates the activities of the subsidiary." *Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*, 456 F.Supp. 831, 841 (D. Del. 1978). Although the control need not be "total domination," it must be "actual, participatory, and total." *Id.*; *Phoenix Canada Oil,* 842 F.2d at 1477. Furthermore, this Court has held that a finding of agency may be appropriate "where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp. & Advanced Cardiovascular Sys., Inc.,* 997 F.Supp. 556, 560 (D. Del. 1998) (jurisdictional analysis). In this case, in order to prove agency, Plaintiff must show that Woodman's failure to maintain the Hotel to a five-star standard and failure to meet the payment obligations were due to Defendants' control, that is, were done on behalf of Defendants or at their direction. (*Id.* ¶¶ 2, 12, 75).

Plaintiff claims Woodman was the agent of Starman because Starman assumed responsibility under the Management Agreement, had overlapping management with Woodman, and spoke "for and on behalf of Woodman." (*Id.* ¶ 122). However, Defendants argue that none of these allegations support the conclusion that Starman controlled or directed Woodman's breach. (D.I. 16 at 10-16). I agree with Defendants here.

The Third Circuit has held that liability will not be imposed on a parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001). Thus, Plaintiff's claim of overlapping management is not enough to show control.

Plaintiff's claim that, "Starman spoke for and on behalf of Woodman," is also insufficient to show Woodman was the agent of Starman. (*Id.* ¶ 122). Plaintiff points to correspondence between Plaintiff and Defendant Starman in an attempt to establish agency between Woodman and Starman. However, this argument is insufficient because the correct inquiry is whether Woodman spoke for or was acting on behalf of, or was directed by, Starman, not vice-versa. Additionally, Plaintiff points to this correspondence to argue that because the correspondence relates "directly to the Management Agreement and Woodman's breaches, . . . it adequately plead[s] agency liability." (D.I. 23 at 19). To support this argument, Plaintiff compares the correspondence between Starman and Plaintiff to correspondence used to prove agency liability in *Energy Marine,* 2016 WL 284432, at *4. (D.I. 23 at 19) However, in *Energy Marine*, the correspondence in question was between the parent and agent, and explicitly discussed the "matter" at issue. *Id.* Here, the correspondence is not between Starman (the parent) and Woodman (the alleged agent). It is between Starman and Plaintiff.[9] Thus, even if the correspondence relates directly to the matter at issue, it does not have the same effect as the correspondence in *Energy Marine*. Therefore, this correspondence does not show Starman controlled or directed Woodman.

Furthermore, alleging Starman assumed responsibility under the management agreement does not show it directed or controlled Woodman. *See Japan Petroleum Co,* 456 F. Supp. at 841 (finding that "[t]he fact that a creditor corporation takes an active part in the management of a debtor corporation does not indicate the necessary control"). Therefore, due to the lack of control and direction by

---

9 There is some dispute over the entities involved in this correspondence. Plaintiff claims it was Defendant Starman, while Defendants claim it was Starman UK, a separate entity. (D.I. 23 at 19). However, regardless of this dispute, the complaint does not allege correspondence that would establish an agency relationship.

Defendants, I cannot find that Plaintiff has alleged an agency relationship between Starman and Woodman.

The assertion of the agency liability against Starwood Capital Group is completely at odds with my understanding of Delaware law. For example, when the Chief Justice of Delaware was Vice-Chancellor, he stated:

> A huge amount of wealth generation results from the use of distinct entities by corporate parents to conduct business. This allows parents to engage in risky endeavors precisely because the parents can cabin the amount of risk they are undertaking by using distinct entities to carry out certain activities. Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and their limited liability entities would be stymied if it did otherwise.

*Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2008).

In an attempt to prove agency against Starwood Capital Group, Plaintiff claims that Starwood Capital Group controlled Starman and required Woodman to enter into an operating agreement with Starwood Hotels. (*Id.* at ¶ 122).[10] Since Plaintiff failed to establish Starman controlled or directed Woodman, it cannot proceed against Starwood Capital Group by claiming it controlled Starman. It would need both levels in the chain to establish that Woodman was Starwood Capital Group's agent.

Turning to the agreement between Woodman and Starwood Hotels, Plaintiff acknowledges that under the Operating Agreement, Starwood Hotels was the agent of Woodman. (D.I. 1 at ¶ 38). Thus, Plaintiff's claim that this operating agreement allowed "Starwood Hotels to operate the Hotel in a

---

[10] Plaintiff provides a diagram in Exhibit A of its complaint (D.I. 1-1, Exh. A) that depicts "the labyrinth of entities through which Defendant Starwood Capital Group controlled and dominated" Starman and Woodman." (D.I. 1 ¶ 99). This diagram is reproduced in Exhibit A to this Memorandum Order.

manner that contributed to Woodman's breach,"[11] does not show that Defendants directed the breach because Starwood Hotels' actions were directed and controlled by Woodman. (*Id.* at ¶ 122). As stated above, an active part in management does not indicate control. "Rather, the control must be actual, participatory, and total." *Id.* at 841. Thus, I find Plaintiff has not plausibly alleged the necessary control or direction to plead agency against Starwood Capital Group.

Because Plaintiff has failed to sufficiently allege that Defendants controlled or directed the breaching conduct by Woodman, I will grant Defendants' motion to dismiss on Plaintiff's theory of agency liability.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss as to alter ego liability is **DENIED**. Defendants' motion to dismiss as to agency liability is **GRANTED**.

Entered this 9 day of January , 2019.

[signature]
United States District Judge

[11] Plaintiff's problem here is that, "Absent unusual circumstances, . . . the ordinary rule is that only the formal parties to a contract are bound by its terms." *Alliance Data*, 963 A.2d at 760.

# EXHIBIT A

Diagram of Starman Hotel Holdings LLC's Ownership Structure
Starwood Capital Group Global I LLC
Barry Sternlicht – Chief Executive Officer and Chairman
Jerome Silvey – Executive Vice President and Chief Financial Officer
Managing Member
General Manager
Managing Member
Managing Member
Level 5
SCG Hotel Management LLC
SOF-VII International Management LLC
Jerome Silvey – Signatory
SOF-VII Management LLC
Jerome Silvey – Chief Financial Officer
General Partner
General Partner
General Partner
General Partner
Starwood Global Opportunity Fund VII-A LP
Shareholder
Level 4
Starwood International Opportunity Fund VII-E LP
Jerome Silvey – Signatory
Barry Sternlicht – Signatory
Starwood Global Opportunity Fund VII-B LP
SOF-VII European Hotel II Lux SARL
Managers
Michael Murphy - 2007 – 2010
Gérard Becquer - 2007 – 2010
Jerome Silvey - 2007 – 2015
Franck Hebrard - 2010
Thierry Drinka - 2010 – 2017
Peggy Murphy - 2010 – 2014
Julien Petitfrère - 2014 – Present
23.8% Shareholder
20.6% Shareholder
55.6% Shareholder
Level 3
I-3/I-2 European Holdings 2 LP
Jerome Silvey – Signatory
SOF-VII European Hotel Holdings II SARL
Managers
Jeffrey Dishner - 2005 – 2007
Madison Grose - 2005 – 2007
Merrick Kleeman - 2005 – 2007
Michael Murphy - 2005 – 2010
Gérard Becquer - 2005 – 2010
Jerome Silvey - 2005 – 2015
Thierry Drinka - 2010 – 2017
Peggy Murphy - 2010 – 2014
Julien Petitfrère - 2014 – Present
75% Shareholder (2005 – 2015)
25% Shareholder (2005 – 2015)
Level 2
SOF European Hotel Co-Invest Holdings II SARL
Managers
Jeffrey Dishner - 2005 – 2007
Madison Grose - 2005 – 2007
Merrick Kleeman - 2005 – 2007
Michael Murphy - 2005 – 2010
Gérard Becquer - 2005 – 2010
Jerome Silvey - 2005 – 2015
Desmond Taljaard - 2007 – 2012
Thierry Drinka - 2010 – Present
Peggy Murphy - 2010 – at least 2013
Sarah Broughton - 2012 – 2013
John Cody Bradshaw - 2013 – Present
Julien Petitfrère - 2014 – Present
100% Shareholder
Level 1
SOF MER Holdings SARL
Managers
Jeffrey Dishner - 2005 – 2007
Merrick Kleeman - 2005 – 2007
Michael Murphy - 2005 – 2010
Jerome Silvey - 2005 – at least 2014
Gérard Becquer - 2005 – 2015
Desmond Taljaard - 2007 – 2012
Thierry Drinka - 2010 – Present
Sarah Broughton - 2013
John Cody Bradshaw - 2013 – Present
LBS Holdings SARL
50% Shareholder
50% Shareholder
Operating Partner (from at least 2008)
Level 0
Starman Hotel Holdings LLC
Michael Murphy - 2007 – 2009
Thierry Drinka - at least 2011 – 2014