## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COMPAGNIE DES GRANDS HÔTELS D' AFRIQUE S.A., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) C.A. No. 18-654-SB-SRF |
| STARWOOD CAPITAL GROUP GLOBAL I LLC and STARMAN HOTEL HOLDINGS LLC, | ) ) ) ) |
| Defendants. | ) ) ) |

## <u>AMENDED COMPLAINT</u>

*Of Counsel*:

David Spears
Charlita Mays
Cynthia Chen
SPEARS & IMES LLP
51 Madison Avenue
New York, New York 10010
(212) 213-6996
dspears@spearsimes.com
cmays@spearsimes.com
cchen@spearsimes.com

**McCarter & English, LLP**
Michael P. Kelly (#2295)
Andrew S. Dupre (#4621)
Sarah E. Delia (#5833)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
mkelly@mccarter.com
adupre@mccarter.com
sdelia@mccarter.com

*Attorneys for Plaintiff Compagnie des Grands Hôtels d'Afrique S.A.*

Date: February 17, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

I.    OVERVIEW ...................................................................................................... 1

II.    THE PARTIES .................................................................................................. 8

III.    RELEVANT NON-PARTIES .......................................................................... 8

IV.    JURISDICTION AND VENUE ...................................................................... 9

V.    FACTUAL ALLEGATIONS .......................................................................... 9

    A.    The Hotel Before Starman Became the Owner of Woodman in 2005 .................................................................... 9

    B.    Starwood Capital and Lehman Brothers' Joint Venture Acquisition of the Meridien Group's Hotel Properties ........................... 11

    C.    The Creation of Starman ..................................................................... 12

    D.    Starman's Use of Starman UK Services Company Limited as Its Agent ............. 16

    E.    Starman's Operation and Use of Woodman ........................................ 17

        1.    Undercapitalization of Woodman ............................................ 17

        2.    Starman's failure to observe corporate formalities .................... 18

        3.    Woodman's failure to pay dividends ........................................ 20

        4.    Insolvency of Woodman ............................................................ 20

        5.    Starman's siphoning of Woodman's funds ................................ 21

        6.    Starman's use of Woodman as a facade .................................... 21

    F.    Starwood Capital's Use of Starman as its Agent ................................ 24

1.    Starwood Capital's strategic structuring of its relationship with Starman ...........................................................24

2.    Starman's reporting to Starwood Capital....................................26

3.    Starwood Capital's domination and control of Starman's funding for the Hotel ............................................27

4.    Concerns about Starman's liability for Woodman's breaches of the Management Agreement with CGHA ...........................33

5.    The effects of the world-wide financial crisis.............................37

6.    Crisis in Starman's dealings with the Hotel...............................38

7.    Starwood Capital and Starman's decision to sell Woodman's parent to an English shell entity ...........................41

G.    The Arbitration Continues ....................................................44

FIRST CAUSE OF ACTION ...............................................................49

SECOND CAUSE OF ACTION ...........................................................53

THIRD CAUSE OF ACTION ...............................................................55

PRAYER FOR RELIEF ......................................................................57

Plaintiff Compagnie des Grands Hôtels d'Afrique S.A., by its undersigned attorneys, for its amended complaint against Defendants Starwood Capital Global I LLC and Starman Hotel Holdings LLC hereby alleges as follows:

## I.    <u>OVERVIEW</u>

1.    Compagnie des Grands Hôtels d'Afrique S.A. ("CGHA") brings this action under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention") to enforce against Starwood Capital Global I LLC ("Starwood Capital") and Starman Hotel Holdings LLC ("Starman") an arbitral award dated May 6, 2015, ("Arbitral Award"), issued by the ICC International Court of Arbitration in London, United Kingdom in favor of CGHA against Woodman Maroc S.à.r.l. ("Woodman").  Starwood Capital and Starman directed and controlled the conduct by Woodman that gave rise to Woodman's liability under the Arbitral Award.  The Arbitral Award is enforceable, and collectible, against Starwood Capital and Starman based on established governing law.

2.    CGHA is the owner of a luxury hotel in Casablanca, Morocco called the Royal Mansour Hotel ("Hotel").  In 1989, CGHA entered into a management agreement ("Management Agreement") with an international hotel group, pursuant to which that group was to be the manager of the Hotel ("Manager") for a term of 35 years and make quarterly rent payments to CGHA as owner of the Hotel.  The Manager was given complete authority over management decisions and was required to maintain the Hotel at its historical level as an international five-star hotel.

3.    By 2005, Le Meridien Group ("Meridien" or "Meridien Group") had become the owner of the Manager of the Hotel.  In 2005, Starwood Capital, a private investment firm with a primary focus on global real estate, and the investment bank known as Lehman Brothers formed

a joint venture to acquire the owned and leased hotel properties of the Meridien Group, including the Manager of the Hotel.  Following the acquisition, the Manager was renamed Woodman.

4.    Starwood Capital and Lehman Brothers required as a condition of their acquisition of the Meridien hotel properties that each of the acquired hotel properties, including Woodman, enter into an operating agreement with a hotel management company called Starwood Hotels & Resorts Worldwide, Inc. (including its relevant affiliates, "Starwood Hotels").  At the time when the acquisition of the Meridien hotels was planned and negotiated, including Starwood Hotels' key role in the acquisition, Starwood Capital and Starwood Hotels were affiliated.  Starwood Capital's founder and Chief Executive Officer, Barry S. Sternlicht ("Sternlicht"), was also founder, Chief Executive Officer, and Chairman of Starwood Hotels, and one of its largest shareholders.

5.    Under the operating agreements that the acquired Meridien hotel properties entered into with Starwood Hotels, the hotel properties delegated to Starwood Hotels exclusive authority over a broad range of operating responsibilities and agreed to pay it fees for that service.  A Starman subsidiary that owned all of the acquired hotel properties provided a guarantee to Starwood Hotels for the performance of the individual hotel properties under the operating agreements, including agreeing to be responsible for the payment of a large financial penalty to Starwood Hotels if a hotel property terminated or breached the operating agreement. As of the time when Starman became the owner of Woodman, the amount of the penalty that would have been due to Starwood Hotels if Woodman terminated or breached the operating agreement was approximately €4,500,000.

6.      While the operating agreements delegated operating authority over the hotel properties to Starwood Hotels, the agreements expressly reserved to the respective individual hotel properties control over capital expenditures for repairs, maintenance, and improvements.

7.      Starwood Capital and Lehman Brothers entered into a limited liability agreement at the time of the formation of Starman.  Among other things, the limited liability agreement gave Starwood Capital approval rights over certain property-level decisions that had been retained by the hotel properties under their operating agreements with Starwood Hotels.  These property-level decisions included control over capital expenditures at the hotel properties.  This grant of authority was exclusive to Starwood Capital; Lehman Brothers was not given the same or a similar right.

8.      When the joint venture acquired the Meridien hotel properties, Starwood Capital took steps to formalize its control over capital expenditures at Woodman.  Woodman was required to enter into an agreement with a Luxembourg nominee of Starwood Capital pursuant to which Woodman surrendered to the nominee Woodman's authority over capital expenditures for repairs, maintenance, and improvements at the Hotel.  The agreement was signed on behalf of the Starwood Capital nominee by the number two executive at Starwood Capital after Sternlicht and by Starwood Capital's Co-General Counsel.

9.      At all relevant times, Woodman was insolvent and undercapitalized and had negative equity.  In 2006, the Hotel was one of a small number of Starman hotel properties given the label "DOGS" in discussions between Starwood Capital and Starman.  At all relevant times, Starwood Capital and Starman assigned to the Hotel either a value of zero or a negative value of millions of Euros based on the Hotel's poor physical condition.

10.     However, because the Starman subsidiary that owned the hotel properties would have been required to pay a large financial penalty to Starwood Hotels if Starwood Capital and Starman caused Woodman to terminate or breach its operating agreement with Starwood Hotels, Starwood Capital and Starman elected to keep Woodman in existence and ensure that Woodman always paid the required operating fees to Starwood Hotels.  At the same time, in order to limit the losses at Woodman, Starwood Capital and Starman made the strategic decision to starve Woodman of the critical funding it needed to maintain the Hotel at the international five-star level required under the Management Agreement.

11.     Among other things, Starman, at the express direction of Starwood Capital, provided funding to Woodman for only the most minimal expenditures at the Hotel, generally allowing only needed improvements labelled "FLS" – fire, life, and safety.  As a result, the physical condition of the Hotel steadily deteriorated.  In addition, in 2012, Starwood Capital directed Starman to cause Woodman to stop paying rent to CGHA but to continue to pay all of the other expenses of the Hotel, including Starwood Hotels' operating fees.

12.     By keeping Woodman in existence rather than placing it in insolvency proceedings, and by causing Woodman to continue to pay operating fees to Starwood Hotels after causing Woodman to stop paying rent to CGHA, Starwood Capital and Starman protected the Starman subsidiary that had guaranteed Woodman's performance under its operating agreement with Starwood Hotels from having to pay the large financial penalty to Starwood Hotels that would have been due if Woodman had terminated or breached the operating agreement.

13.     In August 2013, CGHA commenced an arbitration proceeding against Woodman before the ICC International Court of Arbitration in London alleging breach of the Management

Agreement ("Arbitration").  Although Starman was not a party to the Arbitration, it directed and controlled Woodman's participation in the Arbitration.  Starman arranged for its own counsel to represent Woodman in the proceedings at Starman's expense and caused Woodman to appear and participate in the Arbitration for 10 months.

14.     However, while the Arbitration was pending, Starwood Capital and Starman developed a plan to sell to a third party the most problematic hotel properties that Starman still owned, including Woodman, as well as the Starman subsidiaries that had provided guarantees and indemnities concerning those hotel properties.  The purpose of this plan was to relieve Starwood Capital and Starman of future liabilities and losses.

15.     Working with a former top Starwood Capital executive, Desmond Taljaard ("Taljaard"), who recently had moved to an unrelated investment firm in London, Starwood Capital and Starman agreed that an entity established by Taljaard would acquire from Starman for the nominal price of €100 most of Starman's remaining hotel properties, including Woodman, as well as the Starman subsidiaries that had provided guarantees and indemnities. The agreement provided that if Taljaard's entity found a way to realize value from any of the hotel properties being sold, Starman would participate in it.  The agreement between Starman and Taljaard's entity was signed by the head of acquisitions at Starwood Capital.

16.     In an internal memorandum at Starwood Capital seeking Sternlicht's approval for the sale to Taljaard's entity, the head of acquisitions at Starwood Capital emphasized that the sale was intended to eliminate the future financial losses and contingent liabilities to which Starman otherwise would have been subject from continuing ownership of the hotel properties and other subsidiaries.  Sternlicht approved the transaction.

17.    After Starwood Capital and Starman had approved the agreement between Taljaard's entity and Starman, Taljaard decided that he was unwilling to engage in the acquisition directly with Starman.  Instead, Taljaard recruited a London-based accountant named Sarah Purdy ("Purdy") to serve as a replacement for Taljaard's entity in the purchase of the same Starman subsidiaries.  Purdy had no prior history in the hotel industry, but on May 7, 2014 she established an English shell entity called Maquay Investments Limited ("Maquay") to purchase for €100 the Starman hotel properties and other subsidiaries that Taljaard previously had agreed to purchase.

18.    On June 19, 2014, Maquay purchased the Starman subsidiaries, including Woodman's parent, for €100.  Two of the hotel properties that Maquay purchased had value, and minutes after Maquay's purchase of the Starman subsidiaries, Taljaard caused a separate English company to acquire from Maquay for £2,000,000 the two hotel properties that had value.  By means of this side transaction between Taljaard and Maquay, Maquay and Purdy received compensation for taking ownership of the Starman subsidiaries.  Through related side agreements, Starman received a financial interest in the two hotel properties with value that the Taljaard entity had just acquired from Maquay.  These actions were orchestrated by Starwood Capital and Starman to avoid liability to Starman for any judgment against Woodman.

19.    After acquiring Woodman and its parent in June 2014, in August 2014 Maquay placed Woodman's parent in insolvency proceedings and caused Woodman to withdraw from the Arbitration.  The Arbitration proceeded in Woodman's absence after Starwood Capital and Starman had strategically caused Woodman to abandon the proceeding.

20.    On May 6, 2015, the Arbitrators issued the 82-page Arbitral Award in favor of CGHA on its claim against Woodman.  In the Arbitral Award, the Arbitrators noted the

6

requirement in the Management Agreement that Woodman must ensure "that the Hotel shall remain an international five star Hotel" and concluded that there was "clear evidence of the lack of maintenance by [Woodman] and poor level of services in the operation of the Hotel at least since 2005, in breach of [Woodman's] obligations under the Management Agreement." The Arbitrators discussed in detail Woodman's failure over many years to provide even rudimentary maintenance to the Hotel and the resulting damage.

21.    Regarding Starman's relationship with Woodman, the Arbitrators found that CGHA had been led to believe that Starman would be acting as the Manager of the Hotel under the Management Agreement. The Arbitrators further found that Maquay "was created for the sole purpose of receiving the shares of [Woodman's] sole shareholder before being . . . placed in voluntary liquidation and, as result, avoid any possible liabilities under the Management Agreement."

22.    The Arbitrators held that Woodman owed CGHA an amount that, converted from the different currencies in which the damages, costs, and fees were awarded, totaled the dollar-equivalent of approximately $59,400,000, together with 6% interest per annum for as long as the Arbitral Award remained unpaid. Woodman has paid no part of the Arbitral Award, and significant interest has accrued and continues to accrue.

23.    Starman dominated and controlled Woodman and its finances and caused Woodman to breach the Management Agreement with CGHA.

24.    Starwood Capital dominated and controlled Starman in its dealings with Woodman, including the funding that Starman provided to Woodman, and through its exercise of that domination and control, Starwood Capital caused Woodman to breach the Management Agreement with CGHA.

7

## II.    THE PARTIES

25.    CGHA is a limited liability company organized under the laws of Morocco.  It is the owner of the Royal Mansour Hotel in Casablanca, Morocco.  Its registered address is 27 Avenue de l'Armée Royale, Casablanca, Morocco.  CGHA holds a judgment against Woodman that totals approximately $59,400,000, plus post-judgment interest of 6% per annum.

26.    Starwood Capital is a limited liability company established under the laws of Connecticut, with its principal place of business at 591 West Putman Avenue, Greenwich, Connecticut.  It is a private investment firm with a primary focus on global real estate and has assets under management in excess of $60 billion.  It creates investment funds to raise money from passive investors, and it manages and invests the money raised by those investment funds. It was previously known by the name of Starwood Capital Global LLC.

27.    Starman is a limited liability company established under the laws of Delaware.  Its registered agent is located at 1209 Orange Street, Wilmington, Delaware.  It was formed in 2005 as a joint venture vehicle to own the hotel properties acquired by Starwood Capital and Lehman Brothers from the Meridien Group that same year.  It was an indirect owner of Woodman.

## III.    RELEVANT NON-PARTIES

28.    Woodman is a limited liability company organized under the laws of Morocco. From 2005 to June 19, 2014, it was indirectly owned by Starman.  In the Arbitral Award issued on May 6, 2015, CGHA was awarded damages against Woodman of approximately $57,100,000 at then-prevailing exchange rates, plus attorneys' fees and costs of approximately $2,300,000 at then-prevailing exchange rates, along with post- judgment interest at the rate of 6% simple interest per annum.

29.     Sternlicht co-founded Starwood Capital in 1991, and at all relevant times he was its Chief Executive Officer.  He also founded Starwood Hotels, and at relevant times, he was its Chief Executive Officer and Chairman and one of its largest shareholders.

## IV.     JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) because, under 9 U.S.C. § 203, actions under the New York Convention arise under the laws and treaties of the United States; and under 28 U.S.C. 1367(a) because all of the claims set forth in the Amended Complaint are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

31.     The Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) (diversity jurisdiction) because there is complete diversity of citizenship between CGHA and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

32.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391(b)(3) because Starman is formed under the laws of Delaware and subject to the Court's jurisdiction, and because there is no judicial district in which this action may otherwise be brought under 28 U.S.C. § 1391(b)(1) or (2).

## V.     FACTUAL ALLEGATIONS

### A.     The Hotel Before Starman Became the Owner of Woodman in 2005

33.     CGHA is the owner of the Hotel.  Historically, the Hotel was an international five-star luxury hotel.  It opened in 1952 as one of the first modern luxury hotels in Casablanca, and for many years after it opened it was the only five-star hotel in Casablanca.  The Hotel had an international reputation for excellence, having hosted as guests many foreign dignitaries and

international celebrities.  In 1989, while owned and operated by CGHA, the Hotel underwent a complete renovation and was associated with The Leading Hotels of the World luxury brand.

34.    On November 23, 1989, following the renovation, CGHA entered into the Management Agreement with Trusthouse Forte Morocco S.à.r.l. and Trusthouse Forte (UK) Limited, which were part of a large international hotel group called the Trusthouse Forte Group. Under the Management Agreement, Trusthouse Forte Morocco S.à.r.l. was to be the Manager of the Hotel for a term of 35 years from the effective date of April 1, 1989, and Trusthouse Forte (UK) Limited was the guarantor ("Guarantor") of the Manager's obligations under the Management Agreement.

35.    In the Management Agreement, CGHA granted the Manager "the sole and exclusive right to manage the Hotel during the Term in its own name."  CGHA agreed that the Manager would be "entirely responsible for and have full and absolute day to day control and discretion in the marketing operation and management of the Hotel and [CGHA] shall not attempt to interfere with or be in any way concerned with such management."

36.    The Management Agreement provided that during each year of its 35-year term, the Manager would pay CGHA, as owner, a minimum annual rental amount, payable at the end of each quarter.  It also required the Manager to "decorate and maintain and keep in good and substantial repair and condition the interior of the Hotel, the Fixed Plant," and "when necessary renew" the interior, the fixed plant, and the furniture, fixtures, and equipment of the Hotel so that it "shall remain an international five star Hotel."  Under the Management Agreement, the Guarantor "jointly and indivisibly" with the Manager "guarantee[d] to [CGHA] . . . the due performance by the Manager of its obligations under [the Management Agreement]."

10

37.    By 2005, the Manager and the Guarantor were owned by different entities.  The Manager had been acquired by the Meridien Group, and the Guarantor had been acquired by an entity that changed the Guarantor's name to Travelodge Hotels Ltd. ("Travelodge").

**B.    Starwood Capital and Lehman Brothers' Joint Venture
Acquisition of the Meridien Group's Hotel Properties**

38.    In the summer of 2005, Starwood Capital, Lehman Brothers, and Starwood Hotels entered into two related and conditional transactions with the Meridien Group for the acquisition of its hotel properties.

39.    First, Starwood Capital and Lehman Brothers agreed to acquire 31 owned and leased hotel properties from Meridien.  Second, Starwood Hotels agreed to acquire Meridien's hotel brand and management business.  Starwood Capital, Lehman Brothers, and Starwood Hotels structured the two related acquisitions from Meridien so that the hotel properties acquired by Starwood Capital and Lehman Brothers would be required to enter into operating agreements with Starwood Hotels.  These operating agreements delegated to Starwood Hotels, to the exclusion of the hotel properties, operating authority over the hotel properties and required the hotel properties to pay Starwood Hotels operating fees.

40.    In the operating agreement that Woodman was required to enter into with Starwood Hotels ("Operating Agreement"), Woodman delegated authority to Starwood Hotels to "supervise, direct and control, the Operation of all aspects of the [Hotel] for and on behalf of" Woodman, "as the exclusive operator of the Hotel".  Woodman agreed to pay Starwood Hotels an operating fee on a monthly basis, and to pay Starwood Hotels a large financial penalty if Woodman terminated or breached the Operating Agreement.  The amount of this penalty was to

11

decline gradually over time; when the Operating Agreement was first entered into, the amount of

the penalty for termination or breach was approximately €4,500,000.

41.     Lehwood Holdings S.à.r.l. ("Lehwood Holdings"), a wholly owned subsidiary of

Starman, guaranteed Woodman's performance under the Operating Agreement for the benefit of

Starwood Hotels.  If Woodman terminated the Operating Agreement or failed to pay the

operating fees it owed to Starwood Hotels, Lehwood Holdings would be liable to pay Starwood

Hotels the required penalty.

42.     The Operating Agreement expressly reserved to Woodman authority over capital

expenditures to be made for repairs, maintenance, and improvements at the Hotel.

**C.     The Creation of Starman**

43.     Starwood Capital and Lehman Brothers created Starman as a special purpose

entity to own the properties acquired by the joint venture from Meridien.  By design, Starman

was (a) to exist for a finite and limited period of time in order to further the interests of the joint

venture; (b) to have and to engage in no business other than the business of the joint venture; and

(c) to have no access to funding or financing other than what was provided to it, or arranged for

it, by the joint venture.

44.     According to a 2005 Lehman Brothers internal memorandum, the business plan

for the joint venture was to acquire 31 hotel assets from Meridien to be owned by the newly

created Starman; to dispose of the non-core hotel assets within two to three years of the

acquisition; to actively manage the remaining core portfolio of assets, improving revenue and

operating margin performance; to complete capital expenditures and upgrades through a

refurbishment reserve; and to sell the stabilized assets as a portfolio at the end of year five.  The

leveraged internal rate of return over the five-year projected hold period was expected to be 30.9%.

45.    Starman was formally registered as a limited liability company in Delaware on July 19, 2005.  Starman had two members, which were Luxembourg nominees of Starwood Capital and Lehman Brothers, respectively.  Each of the Luxembourg nominees owned 50% of Starman.

46.    Starwood Capital invested in the Starman joint venture on behalf of two Starwood Capital investment funds ("Starwood Capital Funds"), which respectively held 75% and 25% interests in Starman.  Consistent with the way Starwood Capital always structured such investments, Starwood Capital made and managed the Starman investment on behalf of the Starwood Capital Funds.

47.    In connection with its investment in Starman, Starwood Capital used two Luxembourg nominees that it created for tax purposes to hold investments made on behalf of the Starwood Capital Funds.

(a)    Starwood Capital created SOF MER Holdings S.à.r.l. ("SOF MER") to own the Starwood Capital Funds' 50% interest in Starman and to be a member of Starman.  SOF MER had no employees or offices and served as a nominee for Starwood Capital.

(b)    Starwood Capital created SOF European Hotel Co-Invest Holdings II S.à.r.l. ("SOF European") to hold the Starwood Capital Funds' interests in all of the hotel investments Starwood Capital made on their behalf, including the investment in Starman.  SOF European had no employees or offices and served as a nominee for Starwood Capital.

13

(c)    Jerome Silvey and Jeff Dishner, who were, respectively, the number two and number three Starwood Capital executives after Sternlicht, were directors of SOF MER and SOF European, along with two other Starwood Capital executives.

48.    In forming Starman, Starwood Capital and Lehman Brothers entered into the Limited Liability Company Agreement of Starman Hotel Holdings L.L.C. dated as of August 24, 2005 ("Starman LLC Agreement" or "LLC Agreement").

49.    The Starman LLC Agreement provided that the business and affairs of Starman were to be managed by a management committee.  The management committee was to consist of six members, three designated by Starwood Capital and three designated by Lehman Brothers. Schedule 7.2(a) of the LLC Agreement identified the initial three Starwood Capital representatives on the management committee as Sternlicht and Starwood Capital executives Merrick Kleeman and Michael Murphy.  Kleeman and Murphy were simultaneously directors of SOF MER and SOF European, along with Jerome Silvey and Jeff Dishner.

50.    Section 7.1(b) of the LLC Agreement provided that Starman's management committee had the right to act through agents, and that those agents had the power and authority to do everything that was permitted or required to be done by the management committee.  That section also provided that the power and authority of the management committee's agents extended to the management and governance of each Starman subsidiary.  Thus, on its face, the LLC Agreement authorized Starman, through its agents, to directly manage and govern the subsidiaries that owned or leased hotel properties, including Woodman, rather than establishing independent management at those subsidiaries.  According to Sternlicht, it was typical to have the same people managing the affairs of both the enterprise – in this instance, Starman – and its subsidiaries.

14

51.     The LLC Agreement gave Starwood Capital powers over Starman's hotel properties that it did not give Lehman Brothers.  Section 15.10 of the LLC Agreement provided that SOF MER, Starwood Capital's nominee owner of its 50% interest in Starman, or one of SOF MER's affiliates, "intends to qualify as a 'real estate operating company'" and would enter into letter agreements with individual Starman hotel properties that would give SOF MER or its affiliate "certain approval rights over property-level decisions" that the hotel properties had retained under their operating agreements with Starwood Hotels.

52.     In connection with the closing on the joint venture's acquisition of the Meridian hotel properties, Starwood Capital defined and formalized this grant of exclusive power as it pertained to Woodman.  On November 17, 2005, Woodman's legacy directors under Meridien held a telephonic meeting and recorded their actions in formal minutes.  The minutes noted that the meeting was held to authorize Woodman to execute certain documentation in connection with the joint venture's acquisition of Woodman from Meridien.  One of the documents before the Woodman directors was "a draft of a side letter" between Woodman and SOF European "relating to the grant of certain management rights by [Woodman] to SOF European."  Woodman's directors approved the "side letter" with SOF European.

53.     On November 25, 2005, Woodman and SOF European executed the "side letter".  It had the heading "REOC Letter Agreement"; the term "REOC" is an acronym for real estate operating company.  The Letter Agreement referred to the Operating Agreement between Woodman and Starwood Hotels, and provided that Woodman was required to obtain SOF European's written consent before exercising powers that had been retained by Woodman under the Operating Agreement.  The powers that Woodman surrendered to SOF European included control over budgeting for, and implementation of, capital expenditures for repairs, maintenance,

15

and improvements at the Hotel.  Jerome Silvey, Starwood Capital's number two executive after Sternlicht, and Madison Grose, Co-General Counsel of Starwood Capital, signed the REOC Letter Agreement for SOF European.

54.    Through the REOC Letter Agreement's grant to Starwood Capital's nominee of Woodman's retained powers over capital expenditures for the Hotel, Starwood Capital assumed unilateral control over capital expenditures for maintenance, repairs, and improvements at the Hotel.  Over the following years, Starwood Capital exercised that authority through Starman in such a way as to cause Woodman's breaches of the Management Agreement with CGHA.

### D.    Starman's Use of Starman UK Services Company Limited as Its Agent

55.    Starman operated through its English agent, Starman UK Services Company Limited, which was referred to as "SUKS".  According to SUKS' directors' reports and financial statements as filed publicly in England, SUKS did not "engage in trade" but rather acted "primarily as a head office cost centre".

56.    The individuals who acted on behalf of Starman day-to-day worked out of SUKS' offices in London.  Starman had no employees other than SUKS's employees and no offices other than SUKS's offices.  Typically, directors of SUKS served simultaneously as members of Starman's management committee.  Starman and SUKS used the same letterhead, which bore only a "Starman" logo.

57.    SUKS' employees all used email addresses from the domain "starmanhotels.com".  The two primary representatives of Starman were Ed Nixon ("Nixon") and Felicity Black-Roberts ("Black-Roberts").  Nixon held the title of Finance Director, and later CEO, at SUKS.  Black-Roberts held the title of Property Director, and she alternately signed her

correspondence on "Starman" letterhead as "Director of Property, Starman Hotels" and "Director of Property, Starman UK".  The signature block on Black-Roberts' emails set out her title as "Director of Property, Starman Hotels".

      **E.**      **Starman's Operation and Use of Woodman**

            1.      Undercapitalization of Woodman

58.     As of the time when Starman became the owner of Woodman, Woodman was undercapitalized for purposes of honoring its obligations under the Management Agreement with CGHA.  Starwood Capital and Starman knowingly accepted that state of affairs.

59.     On May 12, 2005, Black-Roberts wrote an email discussing "Cassablanca [sic]", a reference to the Hotel.  She set out a detailed analysis of the Management Agreement, noting that the Manager had to "maintain and keep in good and substantial repair and condition" the interior of the Hotel "so that the Hotel remains an international five star Hotel."  She also pointed out that the Manager was required to create a reserve of 6% of annual revenues, to be used to make capital expenditures for the Hotel.  She noted that the 6% reserve had not been accrued, "as specified in the contract," and that the "unaccumulated amount" totaled £1,300,000.

60.     In addition, in connection with the joint venture's acquisition of the Meridien hotel properties, the joint venture commissioned an independent third party to provide valuations of the hotel properties being acquired.  The valuation provided for the Hotel indicated that approximately $2,300,000 needed to be invested "to put the Hotel back on a proper operational and maintenance footing."

61.     Woodman had insufficient capital to make up the £1,300,000 deficit in the reserve account for maintenance of the Hotel or to pay the $2,300,000 needed to put the Hotel back on a proper footing.

62.     In theory, CGHA still had the benefit of the guarantee by the Guarantor –

Travelodge – of Woodman's performance of its obligations under the Management Agreement.

However, through agreements entered into in connection with the acquisition of the Meridien

hotel properties, Starman subsidiaries were responsible to pay any claim made by CGHA against

Travelodge as Guarantor.  Starwood Capital and Starman were aware of this contingent liability

from the beginning, and over the years they took actions intended to limit or cut off this liability.

2.     Starman's failure to observe corporate formalities

63.     From the time when Starman became the owner of Woodman, Starman

disregarded the formal corporate distinction between Starman and Woodman.  Starman's

Finance Director Nixon (later CEO) and Property Director Black-Roberts consistently

disregarded Woodman's separate corporate existence by speaking and acting on behalf of

Woodman.  In doing so, they acted at the direction of Starwood Capital.

64.     Based on dealings with Starman's representatives, third parties understood that

Starman spoke and acted for Woodman.  For example, on June 7, 2006, unaware that Woodman

was then owned by Starman and that Starwood Hotels had taken over operations at the Hotel,

CGHA wrote to a representative of the Meridien Group about the need for significant investment

in the Hotel, including a renovation.  On July 3, 2006, CGHA received a response from

Starwood Hotels stating that the Management Agreement for the Hotel had been "transferred to

Starman" and Starman had "assumed all the responsibilities related to" the Management

Agreement.

65.     On July 17, 2006, CGHA received a second response to its June 7 letter, this time

directly from Black-Roberts.  Black-Roberts wrote on the letterhead of "Starman" and signed the

letter as "Director of Property, Starman Hotels."  Black-Roberts explained in her letter that

18

"[Starman] has acquired practically all of the Meridien Hotels controlled directly or operating under [a lease], in particular the [Hotel]," and that "Starman hesitates to incur equipment expenses" for the Hotel until the "vision" for the Hotel had been "fine-tuned." Black-Roberts made no mention of Woodman.

66.   Thereafter, CGHA and Black-Roberts corresponded often about Starman's role as de facto Manager of the Hotel. For example:

(a)   In a December 19, 2006 letter addressed to CGHA on "Starman" letterhead, Black-Roberts noted that "Starman has increasing difficulties in leasing the [H]otel as a result of the commercial losses." Black-Roberts signed the letter as "Director of Property[,] Starman Hotels".

(b)   In a December 26, 2006 letter addressed to Black-Roberts, a CGHA representative referenced the acquisition of the Meridien hotel properties that had made "Starman Hotel Holding ('Starman') a party to the free management contract between us as owner of the Hotel."

(c)   In a July 17, 2007 letter addressed to Black-Roberts, a CGHA representative referred to a recent meeting with Black-Roberts at which they had discussed "Starman's wish to terminate the [Management Agreement] in exchange for compensation to be paid [to CGHA]."

(d)   In a July 26, 2007 letter addressed to CGHA on "Starman" letterhead, Black-Roberts stated that "Starman wishes to surrender the current lease and transfer the current business to you," and "Starman is willing to make a payment to you of [€2,000,000] in consideration of the transfer of the business and surrender of the [Management Agreement]." Black-Roberts signed the letter as "Director of Property[,] Starman Hotels".

19

67. As CGHA became more vocal over time about the deteriorating physical condition of the Hotel, Nixon and Black-Roberts met with representatives of CGHA to talk about possible ways to satisfy CGHA's demands and also to end Starman's involvement with Woodman and the Hotel. During these meetings, Nixon and Black-Roberts made clear that Starman was speaking for Woodman.

68. A June 3, 2011 email that Nixon sent to a top executive at Starwood Capital further demonstrates Starman's assumption of Woodman's role. Referring to an upcoming meeting that Nixon was to have with a representative of CGHA in Morocco to discuss CGHA's concern that the physical state of the Hotel did not meet the required standard, Nixon stated: "The objective is to placate and delay. . . ."

69. After Drinka became involved in negotiations with CGHA, he wrote on the letterhead of Woodman. However, in a letter to CGHA on Woodman letterhead on October 4, 2011, Drinka instructed CGHA that, when it mailed correspondence to Woodman, it should also email a copy to a property manager at Starman.

3.     Woodman's failure to pay dividends

70. Throughout the period when Starman owned Woodman, Woodman never paid a dividend to Starman or to any Starman subsidiary.

4.     Insolvency of Woodman

71. At all relevant times, Woodman was insolvent. In a public filing for 2006, Woodman disclosed that, in 2005, it had negative net equity of 32,000,000 Moroccan dirham (approximately $3,362,000 at current exchange rates), meaning that its liabilities exceeded the amount of its assets, and that if its liabilities all came due, it did not have sufficient assets to pay them. Woodman made similar disclosures in subsequent years.

20

72.     At a later time, Woodman's insolvency was confirmed on Woodman letterhead by Thierry Drinka ("Drinka"), who was simultaneously a Starwood Capital representative on Starman's management committee and a manager of Woodman.  In a January 7, 2013 letter, Drinka acknowledged Woodman's failure to pay the rent due to CGHA on December 31, 2012 and stated:  "We do not anticipate having the funds available to pay the monies owing in the immediate future.  Woodman is taking insolvency advice and anticipates filing by January 14, 2013."

5.     Starman's siphoning of Woodman's funds

73.     Starwood Capital and Starman caused Woodman not to make the rent payment due to CGHA for the last quarter of 2012, or for any quarter thereafter.  However, throughout the period when Woodman was not paying rent to CGHA, Starwood Capital and Starman caused Woodman to continue to make payments to Starwood Hotels under its Operating Agreement with Woodman.  In 2013 and 2014, when Woodman was no longer paying rent to CGHA, Woodman's payments to Starwood Hotels totaled 10,107,524 Moroccan dirhams (approximately $1,000,000 at current exchange rates).

74.     Under the terms of the Operating Agreement between Woodman and Starwood Hotels, had Woodman not continued making payments to Starwood Hotels, Starman subsidiary Lehwood Holdings would have been directly liable to Starwood Hotels for Woodman's breach of the Operating Agreement.  By causing Woodman to pay operating fees to Starwood Hotels from 2012 to 2014 when Woodman was no longer paying rent to CGHA, Starwood Capital and Starman avoided a breach by Woodman of the Operating Agreement that would have required Lehwood Holdings to pay a large financial penalty to Starwood Hotels.

6.      Starman's use of Woodman as a façade

75.      At all relevant times Starman exercised domination and control over Woodman's finances.  Because Woodman frequently had negative cash flow from its operations, Starman provided funding to Woodman to cover the operating expenses that Woodman could not cover from its revenues, simultaneously recording the transfer to Woodman as an intercompany loan. Starman typically provided "just in time financing" for Woodman, only transferring money to Woodman as necessary to enable Woodman to pay its bills.  For example:

(a)      On October 6, 2006 Woodman's Director of Finance wrote to Nixon: "We have paid our rent for the second quarter and we have to pay the third as promised to the owner as soon as possible.  We are waiting some funds to do it."  On October 9, Nixon forwarded that email to Starman finance person, stating:  "Theyre [sic] going to need about a mill".  On October 30, the Starman finance person wrote to Woodman's Director of Finance: "We have authorized an electronic fund transfer for EUR lm this morning. . . .  [W]e will apply this to your intercompany loan. . . ."

(b)      On August 24, 2009, following a request by Woodman's Director of Finance to Starman for funds, a Starman finance person wrote in an internal Starman email: "[5,000,000 Moroccan dirham] might not last for three months as he thinks it will, but at the moment it looks like a reasonable amount to send (approx. £450k)."

(c)      On November 12, 2009, a Starman finance person wrote to Woodman's Director of Finance:  "Please note that Casablanca will, in all likelihood, need funding from us in 2010.  Your cash flow shows that money will be needed starting from January and amounts will only go up from there."

22

(d)      On April 4, 2011, Woodman's Director of Finance wrote to Starman: "[W]e obviously need 3 million [Moroccan dirham] to assume the minimum of payments. . . . Please confirm that funds could be received by April 10."

76.      On April 1, 2011, Starman abandoned all pretense that Woodman had any financial independence and simply had Woodman execute a contract called an "Asset Advisory Agreement," in which Woodman "engage[d]" Starman to take responsibility for all of Woodman's financial operations.

77.      The Asset Advisory Agreement provided that "[Woodman] hereby appoints Starman to act as the asset advisor and consultant with respect to the [Hotel]," and that "Starman shall provide the Services to [Woodman] as set out in Schedule 2."  Over three pages, Schedule 2 itemized 50 different financial services to be provided by Starman to Woodman.  The different categories under which the services were grouped included "Treasury", "Asset Advisory Services", "Asset Management", "Agency Services Management", "Acquisition Services", "General", and "Property Management".  Given the all-encompassing list of Woodman financial activities placed in the hands of Starman, there was very little left for Woodman to do except write checks.

78.      The Agreement was signed on behalf of Woodman by Drinka as manager of Woodman; at that time, Drinka was also a Starwood Capital representative on Starman's management committee.  The Agreement was signed on behalf of SUKS by Michael Murphy, who was a director of SUKS and an executive of Starwood Capital.

79.      In early 2013, after causing Woodman to stop paying rent to CGHA, Starwood Capital and Starman attempted to place Woodman in insolvency in Morocco.  In anticipation of the insolvency filing, Starman thought it necessary to terminate the Asset Advisory Agreement.

On January 14, 2013, a director of SUKS signed a Notice of Termination of the Asset Advisory Agreement addressed to Woodman, stating: "[W]e [Starman] hereby cancel and terminate the Agreement with effect from the date of this letter."

80.    Starman's attempt to place Woodman in insolvency in Morocco failed because no director of Woodman was willing to appear on behalf of Woodman at a court hearing, and Starman had to reckon with Woodman's continuing existence. Accordingly, on February 18, 2013, barely one month after it had unilaterally terminated the Asset Advisory Agreement, Starman reinstated it. The new document referenced the January 14, 2013 letter terminating the Agreement and stated that Starman and Woodman acknowledged that Woodman still needed Starman's services "until a bankruptcy order is made in respect of Woodman." The reinstatement was signed on behalf of Woodman by Drinka.

81.    The reinstatement was short-lived, as Starman changed its mind yet again. On June 19, 2014, Starman sold nearly all of its remaining subsidiaries, including Woodman's parent, to an English shell entity for €100, and in anticipation of that event, on June 9, 2014, Starman unilaterally issued to Woodman a written notice of termination of the Asset Advisory Agreement, referencing the upcoming sale.

F.    **Starwood Capital's Use of Starman as its Agent**

1.    Starwood Capital's strategic structuring of its relationship with Starman

82.    From the time when Starman was created, Starwood Capital had control over funding for capital expenditures at the hotel properties. In addition, Starwood Capital embedded its executives in Starman and Starman's many subsidiaries, including ones that owned hotel properties.

24

83.    The formal governance structure set out in the Starman LLC Agreement provided that Starman would be governed by a management committee composed of three Starwood Capital investor representatives and three Lehman Brothers investor representatives.  In addition to Sternlicht, one of the three initial representatives appointed by Starwood Capital was Michael Murphy, director of Starwood Capital's Luxembourg operations.  Murphy held this position from July 2005 to August 2010, and during that same period he was also one of two directors of SUKS and one of two or three managers or directors for 20 Starman subsidiaries, including numerous subsidiaries that held hotel properties.

84.    Notwithstanding the formal role assigned to Starman's management committee under the LLC Agreement, the management committee never held a meeting.  Rather, Nixon and Black-Roberts reported regularly to ad hoc groups of Starwood Capital executives and Lehman Brothers representatives regarding financial performance and developments at Starman's hotel properties.  Starman took direction from Starwood Capital with regard to capital expenditures at the hotel properties.

85.    Pursuant to the Starman LLC Agreement and the REOC Letter Agreement, Starwood Capital possessed exclusive authority over Woodman's capital expenditures at the Hotel, and Starwood Capital unilaterally exercised that authority through Starman.

86.    Starman also interacted with representatives of Lehman Brothers, but to a much lesser extent.  After Lehman Brothers filed for bankruptcy in September 2008, the Lehman Brothers bankruptcy estate ("Lehman Bankruptcy Estate" or "Estate") was represented on the Starman investment by representatives of various financial firms advising the Estate during bankruptcy.  The Lehman Bankruptcy Estate continued as a financial partner in Starman, voting

25

on the disposition of Starman's individual hotel properties and financing arrangements for Starman, and contributing capital to Starman as required.

87.    A schedule of Lehman Brothers' investment positions that was part of a March 11, 2010 report by the Lehman Bankruptcy Estate's court-appointed bankruptcy examiner listed scores of Lehman Brothers investments, with an indication of the "Operating Partner" for each. For Lehman Brothers' Starman investment, the schedule identified the Operating Partner as "SOF MER Holdings, S.à.r.l." – the Starwood Capital nominee that held Starwood Capital's 50% interest in, and served as Starwood Capital's member of, Starman.

2.    <u>Starman's reporting to Starwood Capital</u>

88.    While Starman's management committee never met, Nixon and Black-Roberts regularly informed Starwood Capital executives and Lehman Brothers representatives about developments regarding Starman's hotel properties and recommended actions to be taken. Among other things, Nixon and Black-Roberts sent what was called a Starman Monthly Board Report ("Board Report"), which typically contained detailed analysis about the hotel subsidiaries' financial performance and a status report for individual hotel properties. During the 102 months from January 2006 through June 2014, Starman distributed a Board Report to Starwood Capital and Lehman Brothers or representatives of the Lehman Bankruptcy Estate in all but 13 months. Nixon and Black-Roberts also set up on a monthly or less frequent basis what were called "shareholder calls" or "shareholder meetings" to discuss the Board Reports and take instructions.

89.    For the first few years, the Starwood Capital executive who took the lead in managing Starman was Jeff Dishner ("Dishner"). At that time Dishner was head of asset

26

management at Starwood Capital and its number three executive after Sternlicht. Dishner was never at any time a member of Starman's management committee.

90.    Starwood Capital executives Desmond Taljaard ("Taljaard") and Chris Brill-Edwards ("Brill-Edwards") also interacted extensively with Starman and directed its actions, particularly with regard to Starman's funding for capital expenditures at individual hotel properties, including the Hotel. Taljaard was head of European hotel assets for Starwood Capital, and Brill-Edwards was responsible for Starwood Capital's construction projects in Europe. More than a dozen other Starwood Capital personnel also were involved in decision-making for Starman.

### 3.    Starwood Capital's domination and control of Starman's funding for the Hotel

91.    Beginning in 2006, the Hotel was regarded as a problem property, and Starwood Capital directed Starman to try to exit the relationship with the Hotel. Over time, the assessment of the Hotel and its prospects worsened. Starman reported to Starwood Capital that the Hotel was losing money and could not be made profitable. As the physical condition of the Hotel grew worse over time, Starwood Capital and Starman agreed that it would cost millions of Euros to obtain CGHA's consent for Starman to walk away from the Hotel.

92.    Because Woodman was insolvent from the beginning and consistently lost money, Starwood Capital and Starman should have placed Woodman in insolvency in Morocco early on. This would have resulted in CGHA regaining possession of the Hotel before the damage to the Hotel from a prolonged failure to make capital expenditures became extreme.

93.    But Starwood Capital and Starman were unwilling to place Woodman in insolvency because that would have caused a termination of the Operating Agreement between

Woodman and Starwood Hotels, with resulting liability to Starman's subsidiary Lehwood Holdings for the large financial penalty due to Starwood Hotels.  Instead, Starwood Capital and Starman chose to keep Woodman in existence but starve it of virtually all of the critical funding necessary to provide capital expenditures for repairs, maintenance, and improvements.

94.    From the beginning, Starwood Capital and Starman tracked and documented Woodman's breach of the Management Agreement and the declining physical state of the Hotel. On January 6, 2006, Nixon sent the first Board Report to Dishner and a Lehman Brothers representative.  A section titled "Property Issues Summary" included the following entry for "Casablanca":  "FF&E [furniture, fixtures, and equipment] Reserve:  LL [the landlord, CGHA] has requested that the company spends the FF&E reserve – €1.5 million."  This was a reference to the 6% annual reserve to fund capital expenditures for maintenance, repair, and improvements at the Hotel that was compulsory under the Management Agreement between Woodman and CGHA.

95.    The next Board Report was for May 2006.  Nixon sent it to Dishner, three other Starwood Capital executives, and a Lehman Brothers executive on June 26, 2006.  A section titled "Property Strategy Report" set out the "Agreed Strategy" for Casablanca:  "open negotiations for surrender of the lease."  This reflected the direction from the unofficial "Board" to Starman to try to end its relationship with CGHA and the Hotel.

96.    Starman's reported view of the Hotel steadily worsened.  On December 4, 2006, Starman met with representatives of Starwood Capital and Lehman Brothers to present a written "Budget Presentation."  Black-Roberts' minutes of the meeting indicate that Dishner, Taljaard, and Brill-Edwards attended on behalf of Starwood Capital; none of the three was a member of Starman's management committee.

28

97.     Starman's Budget Presentation included a section titled "Starman Portfolio Overview: 2007 Plan".  The overview grouped Starman's hotel properties into four categories: "Sales", "Value Enhancers", "DOGS", and "Rest of Portfolio".  "Casablanca" and four other hotel properties were placed in the DOGS category.

98.     In a section of the Budget Presentation titled "Limitation of Liability – Casablanca", Starman reported that the Hotel was budgeted to lose money in 2007; that it was "difficult to put [the] hotel into profitability"; and that "[t]here is a €1.9m shortfall in the FF&E allowance which is contractual."  The reference to a "contractual" FF&E allowance was an acknowledgement that the Management Agreement expressly required Woodman as Manager to accrue a specific amount annually for repairs, maintenance, and improvements to the Hotel, and the use of the term "shortfall" was an acknowledgement that the required accrual had not been made.   Black-Roberts' minutes of the meeting indicate that Nixon emphasized that the FF&E reserve for the Hotel was "short" and still was being underfunded.  Black-Roberts was instructed at the meeting to "try to surrender the lease."

99.     On June 18, 2007, Nixon and Black-Roberts met with Dishner, Taljaard, and a representative of Lehman Brothers.  Black-Roberts's notes record the thinking at the meeting that Casablanca "will take €5mm to go away".  This meant that Starman would have to pay €5,000,000 to CGHA to end the relationship with the Hotel because the physical condition of the Hotel was so far below the standard required under the Management Agreement.  There was further discussion that the Hotel had become "an embarrassment" to CGHA.

100.     In the period from mid-2007 through 2010, Brill-Edwards, acting as a Starwood Capital executive, became the Capex Project Manager for Starman's hotel properties, which included control over Starman's funding for capital expenditures at the hotel properties.  Brill-

Edwards routinely dictated to Starman the amounts that could be spent for each hotel property and for what.  Starman representatives diligently carried out Brill-Edwards' directions to them. During this period, Brill-Edwards was a director of construction for Starwood Capital in its London office but had no formal affiliation with Starman.

101.    On April 19, 2007, a Starman finance person sent an email to Brill-Edwards, copied to Nixon, with the subject line "Updated Capex Process".  The email stated that, "[a]ll major project invoices" – with "major" defined very broadly – "MUST be approved by Chris Brill-Edwards prior to them being paid at hotel level".

102.    As Capex Project Manager, Brill-Edwards authorized only the most minimal amounts of capital expenditure for the Hotel, typically only for essential FLS (fire, life, safety) purposes.  Even in that area, the restraints imposed on spending were such that at one point Black-Roberts commented in an email to Brill-Edwards about the lack of funding for fire safety measures at the Hotel:  "Wow someone dies in a fire for want of a cash flow."

103.    Brill-Edwards routinely dictated what funding Starman could provide for capital expenditures at the Hotel.  A capital expenditure project was referred to as a "Project Release", and as Capex Project Manager, Brill-Edwards controlled Project Releases for the Hotel.  For example:

(a)    On June 22, 2007, the Director of Finance at Woodman sent by email to Starman an "unbudgeted" Project Release for "a sound system" that would cost $19,780, explaining that "we really need this equipment."  Starman forwarded the request to Brill-Edwards, with the following message: "Chris, Can you please have a look at this PR (attached) and let us[] no [sic] if you approve or not."

(b)     On June 26, 2007, a Starman financial person emailed the Director of Finance at Woodman with the following message: "I attach an invoice that we require you to pay.  It relates to an engineering survey that Chris Brill-Edwards commissioned for the hotel. . . . Ed [Nixon] and Chris have signed off for payment."  The email was copied to Brill-Edwards and Nixon.

(c)     On March 31, 2008, a Starman finance person sent an email to Brill-Edwards attaching a capex report for "Casablanca" and two other hotels.  The Starman person asked: "Till [sic] when do you think you can up-date your sheet?"  In a follow-up email, the Starman person said: "The only thing I am not sure about is Casablanca."  In a reply, Brill-Edwards told the Starman person to "cancel the December cash flow for Casa."

(d)     On April 16, 2009, a Starman financial person sent an email to Woodman's Director of Finance pointing out that Woodman's "Capex" was due that day.  The Starman person followed up to say: "When you send the Capex report can you please copy Chris Brill-Edwards in your e-mail."

104.    Starman charged Woodman for Brill-Edwards' exercise of control over Woodman's capital expenditures at the Hotel.  On June 25, 2009, a Starman finance person sent an email to Woodman's Director of Finance informing him that Woodman would be charged for "various legal and professional fees and charges relating to Chris Brill Edwards."  Attached was an invoice for "Costs and Fees for Chris Brill Edwards, Project Director, relating to overseeing the refurbishment."

105.    By 2010, due to the sustained lack of capital expenditures for the Hotel, the air conditioning system had failed.  Brill-Edwards took control of the issue.  On April 15, 2010, he wrote an email to Black-Roberts reporting that he had engaged mechanical engineers to do a full

review of the HVAC system at the Hotel, and they had reported that "the entire system is on its last legs both due to age of the system and the lack of preventative maintenance." The estimated cost of the work recommended was "approximately £3.0M." However, Brill-Edwards reported that he had worked out a priority list of items that cut the cost to £800,000. The proposed work included "a replacement of the existing central cooling system which is currently running on 16% of the needed capacity". Brill-Edwards also added the following cautionary note: "I do want to stress that this is not a total fix to the problems associated with HVAC at this hotel. The remainder of the system will need to be replaced in the coming years as well, hopefully on someone else's dime."

106.    However, Brill-Edwards quickly decided against spending that much on a repair at the Hotel. On April 20, 2010, Brill-Edwards announced his decision: "In order to get any kind of certainty that the air conditioning system will make it through the summer we have come up with a series of patches and minor replacements of equipment that have been disused for years. The total is approximately £120k." This approach, down from the £800,000 capital expenditure that he had proposed initially, was referred to as "Plan B".

107.    The prolonged failure by Starwood Capital and Starman to provide capital expenditures for the Hotel caused a steady deterioration in the Hotel's physical state, as confirmed by Starman in its Board Reports.

(a)    In the Board Report for August 2009, sent by Nixon to Taljaard and Brill-Edwards, among others, Starman reported the "presen[ce] in the marketplace" of a "deteriorated/negative image of the Hotel driven by the ageing [sic] product". The Report added: "Guests [sic] comments . . . continue to highlight product perception issues."

32

(b)      The Board Report for August 2010, which Nixon sent to Taljaard, Brill-Edwards, and other Starwood Capital executives, noted that "[t]he landlord [CGHA] has written a letter of complaint regarding the operation of the hotel and the lack of capital investment."

(c)      The Board Report for January 2012, sent to Taljaard and other Starwood Capital executives, reported that "the Corporate segment . . . have decided to move to other property because of the aging and outdated position of the hotel".

(d)      The Board Report for December 2012, sent to Taljaard and a number of other Starwood Capital personnel, reported on the Hotel's "loss [of] business to the competition as a result of the property physical product."

(e)      In the most unsettling report of all about the condition of the Hotel, the January 2014 Board Report, which Nixon sent to Starwood Capital executive John Cody Bradshaw, stated that a firm retained to conduct a safety inspection of the Hotel had walked out "due to the lack of sprinklers in the rooms".

    4.    Concerns about Starman's liability for Woodman's
<u>breaches of the Management Agreement with CGHA</u>

108.      From the time of its acquisition of Woodman, Starman was aware that, through transaction documents executed in connection with the acquisition of the Meridien hotel properties, two subsidiaries of Starman had taken on legal obligations that made Starman (through its subsidiaries) responsible for any claims made against Travelodge, the Guarantor under the Management Agreement.  Starman reported this information to Starwood Capital early, and Dishner approved further research into the extent of Starman's liability for Travelodge's obligations under the Management Agreement.  The topic of Starman's liability in this regard resurfaced multiple times over the ensuing years.  As Starwood Capital and Starman pushed

33

Woodman into ever greater liability for breach of the Management Agreement, Starwood Capital and Starman strategized about how to avoid Starman's contingent liability for the breaches.

109.    The origin of Starman's liability arose from the 2001 purchase of Meridien Group assets by a Nomura entity known as Meridien Acquisition Company I Limited ("MAC I") from Compass Group plc ("Compass").  Prior to the purchase by MAC I, the Manager of the Hotel and the Guarantor were both owned by Compass.  The Meridien assets that MAC I purchased from Compass included the Manager under the Management Agreement with CGHA, but Compass retained ownership of the Guarantor.

110.    In connection with its purchase of the Manager, MAC I agreed to procure the release of Compass from any obligation of the Guarantor and to indemnify Compass for any liability arising out of the Guarantor's breach of its obligations.  Subsequently in 2001, Compass sold the Guarantor, but retained liability for any obligations of the Guarantor.

111.    In 2005, pursuant to an Asset and Liability Transfer Agreement ("ALTA"), Starman's agent SUKS purchased the Meridien Group assets from MAC I.  Lehwood Holdings, the Starman subsidiary that guaranteed Woodman's performance under the Operating Agreement, was also a party to the ALTA.  In the ALTA, SUKS agreed to pay any liability associated with MAC I's obligations to Compass relating to the Guarantor; and Lehwood Holdings agreed to fully indemnify MAC I against liabilities assumed by SUKS.

112.    In sum, Compass, following the sale of the Guarantor, remained liable for any obligations of the Guarantor under the Management Agreement, and Compass was indemnified by MAC I for this liability.  As a result of the ALTA, MAC I received an indemnity from SUKS and Lehwood Holdings for the same liability.

34

113.    From the beginning, Starwood Capital and Starman were aware of and concerned about Starman's liability in connection with the guarantee provided by the Guarantor under the Management Agreement.  In the Starman Board Report for May 2006 that Nixon sent to Dishner, three other Starwood Capital executives, and a Lehman Brothers executive, a section titled "Property Strategy Report" recorded the "Agreed Strategy" for Casablanca:  "Investigate lease guarantee and open negotiations for surrender of the lease once full facts have been established."  Dishner expressly approved the investigation of the guarantee.

114.    In a January 30, 2007 Property Strategy Report that Black-Roberts sent to Dishner, Taljaard, and a Lehman Brothers representative, a section titled "Key Issues By Hotel" set out the findings of the investigation into Starman's ultimate financial responsibility for Woodman's breaches of the Management Agreement:  "The Guarantee is enforceable against Traveldge [sic] Hotels and it appears clear that through a string of indemnities . . . Starman would be responsible for any claims made against this guarantee."

115.    In late 2010, unaware of Starman's potential liability concerning the guarantee, CGHA contacted Travelodge as the Guarantor under the Management Agreement regarding Woodman's breaches in failing to maintain the Hotel at the required international five-star level. Travelodge informed Compass that it had been approached by CGHA regarding the guarantee in the Management Agreement, and that to the extent that "a valid claim is made against Travelodge, then Travelodge in turn will recover any losses incurred by it from Compass under the Compass Guarantee."  Compass then contacted MAC I, at that time known as ZAC I, and warned that "in the event a claim is made by Travelodge against Compass Group in connection with the Management Agreement, Compass Group will seek to recover its losses from [ZAC I]."

Evidently, ZAC I informed Starman of these developments:  Nixon emailed Taljaard concerning ZAC I, reporting that "[t]his is not good news."

116.    Starwood Capital and Starman were worried about two things.  First, it appears that under the ALTA, ZAC I was required to liquidate, and the proceeds of that liquidation were to flow to Starman.  Accordingly, Starwood Capital and Starman were concerned that any claim concerning the Hotel "would require provisioning in ZAC I's books and thus reduce our distribution, potentially to nil."  Nixon proposed that Starman "get the proceeds out from ZAC I by way of 'irreclaimable' dividend before any unforeseen event happens that could cause a distribution blockage."  Second, there was the issue of Starman's contingent liability to ZAC I under the ALTA.

117.    The concerns about Starman's contingent liability for Woodman's breaches of the Management Agreement intensified after CGHA filed the Arbitration against Woodman.  By September 10, 2013, one month after the Arbitration was commenced, Travelodge had notified Compass of the Arbitration, and in turn, Compass notified ZAC I.  Compass wrote to ZAC I that "you have not indicated whether or not ZAC I took any form of indemnity protection from the Starman Group when ZAC I sold the operator in 2005 and, assuming ZAC I does have the benefit of an indemnity from Starman Group, whether you have therefore notified Starman Group of the potential claim."  Compass also noted that it wanted to know "exactly what [Starman Group's] position is because they could have a key role to play in resolving this matter, by either helping to avert the potential claim altogether (for example by procuring that the operator meets its obligations under the Management Agreement) or in the ICC proceedings."

118.    Within a week, the liquidator for ZAC I reached out to Starman subsidiaries SUKS and Lehwood Holdings.  The liquidator noted prior meetings and communications with

36

Nixon and others regarding the Hotel and pointed to the "potential claims lodged in the liquidation of ZAC I by Compass Group plc." The liquidator notified SUKS and Lehwood Holdings of Compass's letter and noted that the damages in the Arbitration were estimated to be in excess of $50 million. The liquidator concluded that "in the event that Compass Group plc's claims against ZAC I are admitted in ZAC I's liquidation, these claims would fall to be settled in full directly by [SUKS] under clause 2.2 of the ALTA or subsequently by payment to ZAC I under the Lehwood Indemnity."

119.    The fact of Starman's contingent liability for the Guarantor's obligations under the Management Agreement was not disclosed to CGHA, and CGHA knew nothing about any potential liability on the part of Starman until receiving discovery in this lawsuit.

120.    Faced with the high probability of direct liability for tens of millions of dollars in damages on account of Woodman's breaches of the Management Agreement, which Starwood Capital and Starman had caused, Starwood Capital and Starman resolved to jettison the liability through a sham transaction. Within months of ZAC I's notice of potential demand, Starman sold to Purdy and Maquay Woodman's parent and Starman subsidiaries that had contingent liabilities. These actions were orchestrated by Starwood Capital and Starman, in part, to avoid liability for any judgment against Woodman.

                5.      The effects of the world-wide financial crisis

121.    By early 2010, the effects of the world-wide financial crisis had become severe for Starman and for the Starwood Capital Funds' investment in Starman. According to Sternlicht, as a result of the crisis, the cash flow of Starman "plummeted", Starman "had debt everywhere", and Lehman Brothers "went bankrupt" and "disappeared". During this period Sternlicht became personally involved in Starwood Capital's decision-making for Starman, and

37

increasingly, issues regarding Starman's financial problems and proposed solutions to those problems made their way to Sternlicht.

122.    On November 11, 2010, Taljaard had an email exchange with Starwood Capital's head of portfolio management about a proposal that Starwood Capital buy outright one of the hotel properties owned by Starman.  Taljaard reported to the other executive that "[t]here are no plans to buy currently, unless Barry [Sternlicht] has changed his mind."  The executive replied to Taljaard:  "Barry has not said anything, but I want to make sure I understand the cash need if he does change his mind."

123.    Sternlicht was clearly focused on getting rid of unprofitable Starman hotel properties, including the Hotel in particular, but he was also mindful of Starman's liability for the financial penalty due to Starwood Hotels if Woodman terminated its Operating Agreement with Starwood Hotels.  On November 15, 2010, Sternlicht initiated an email exchange with Taljaard by asking how much it would cost to "terminate" Starwood Hotels at the "Casablanca" asset.  This was a reference to Starman's liability for the penalty that would be payable to Starwood Hotels.  Taljaard replied that it would cost roughly $1,250,000 to terminate and added: "Who is asking?"  Sternlicht replied: "Me. I'm in Morocco."

124.    On June 13, 2011, a Starwood Capital executive sent an internal email reporting that he was working on an analysis for Sternlicht for concerning the sale of assets for the Starwood Capital Funds, and that Sternlicht had said he would like to see a sale of Starman's properties "pushed to 4Q 2011."

6.    Crisis in Starman's dealings with the Hotel

125.    Beginning in May 2012 and extending through the end of the year, CGHA repeatedly asserted to Drinka, who presented himself as the face of Woodman, that Woodman

38

had unilaterally terminated the Management Agreement through its multiple breaches and demanded that possession of the Hotel be returned to CGHA.  In letter after letter, Drinka insisted that Woodman had complied fully with its obligations under the Management Agreement and refused to return possession except on terms that were unacceptable to CGHA.

126.    In November 2012, Drinka cautioned CGHA that, "[w]hilst our shareholders have continued to support us, we do not believe they will do so for much longer."  When no resolution was reached, Woodman did not make the rent payment to CGHA for the last quarter of 2012. Drinka wrote to CGHA on January 7, 2013, that Woodman would not pay the rent it already owed for 2012 and that it would not have funds available to pay rent in the future.  Drinka added: "Woodman is taking insolvency advice and anticipates filing by Monday, 14 January 2013."

127.    Starman sought formal approval from Starwood Capital and Lehman Brothers for Woodman's proposed filing in insolvency in Morocco.  On January 10, 2013, a Starman employee sent an email to Starwood Capital executive Sarah Broughton ("Broughton"), who was at the time a Starwood Capital representative on Starman's management committee, informing her that there was to be a short telephonic meeting of the board of Starman subsidiary Lehwood Holdings.  The purpose was "to discuss the impact of a possible filing for insolvency of Woodman Maroc S.à.r.l. (and any possible call to the guarantee)."

128.    Broughton forwarded the email to Taljaard on January 11, 2013, asking who would give her the "go-ahead" to sign the document approving Woodman's insolvency filing and "[i]s Barry on board yet?"  Shortly after, Broughton emailed Taljaard again to say: "Confirm[ed] with Jeff [Dishner] – we have to sign; Lehman have, and Starman can't spare the €450k injection."  The reference to €450,000 was to the amount Woodman would need in order to pay CGHA the rent it was owed for the last quarter of 2012.

39

129.    One day later, on January 12, 2013, the head of portfolio management at Starwood Capital sent to Sternlicht and numerous other Starwood Capital executives – including Jerome Silvey and Dishner – a "Weekly Asset Management Report" containing summary information about various assets that Starwood Capital had acquired for its investors.  New information was highlighted in yellow.  A yellow-highlighted entry under "Le Meridian Hotel Portfolio" stated:  "The Meridien Casablanca SPV owned in Starman JV will presumably be unable to afford the rent payment that is now due, they may be forced to file for bankruptcy on January 14."

130.    Starman had in fact made an insolvency filing for Woodman in Morocco on January 14, 2013, knowing that the filing would be rejected by the Moroccan court because no Woodman representative was willing to appear for Woodman at the hearing.  On February 1, 2013, a Woodman manager stated that he could "understand the reasons why Starman . . . doesn't want anyone from their side to represent the directors of Woodman Maroc on the hearing of the insolvency of Woodman Maroc," but he warned that "this will be a recurrent issue as Woodman Maroc will have to file again for insolvency as the Judge will probably declare no [sic] valid the current filing."  After noting that he was unwilling to appear at the insolvency hearing for Woodman, that manager resigned his position with Woodman.  Similarly, neither Drinka nor anyone else associated with Woodman was willing to appear on behalf of Woodman.

131.    The Woodman managers' unwillingness  to appear for Woodman in the insolvency proceeding in Morocco likely reflected their understanding of the legal ramifications of doing so.  Under Article 704 of the Moroccan Commercial Code, when a company's insolvency proceedings reveal a deficiency of assets, the court may decide, in cases of

mismanagement that contributed to this deficiency of assets, that the deficiency will be borne, in whole or in part, by some or all of the insolvent company's managers and directors.

132.    Notably, the extent of Starman's domination and control of Woodman was so complete that there was no need to inform anyone at Woodman about the insolvency filing. Drinka commented on January 21, 2013, a full week after Woodman's insolvency filing, that "not even [Woodman's] General Manager of the Hotel is aware of Woodman['s] situation."

133.    CGHA commenced the Arbitration in London on August 6, 2013.  Starman had its own counsel, Latham & Watkins, represent Woodman in the Arbitration, and Starman paid the legal bills.  Starman caused Woodman to appear in the Arbitration and file an answer. Starman's reports to Starwood Capital for the 10 months during which Woodman participated in the Arbitration gave detailed accounts of what was happening in the Arbitration.

7.    Starwood Capital and Starman's decision to sell<br>Woodman's parent to an English shell entity

134.    Taljaard, who had been deeply involved in Starwood Capital's management of Starman from 2007 through 2012, left Starwood Capital in early 2013 to join an investment firm in London.  Taljaard also formed his own investment company called Mildmay Capital Limited ("Mildmay").  Working through Mildmay, in early 2014 Taljaard negotiated a deal with Starwood Capital and Starman that resulted in a February 25 "Heads of Terms".  The Heads of Terms reflected a preliminary agreement for a transaction referred to as "Project Ford", in which Mildmay would acquire 27 subsidiaries from Starman, including Woodman's parent.  A lawyer for Starwood Capital assisted in drafting the Heads of Terms.

135.    The purchase price Mildmay was to pay Starman for the 27 entities was €100, "if demanded."  The sale to Mildmay was to be "As Is"; Starman was to give Mildmay no

41

indemnities for any undisclosed actual or potential liabilities; and Mildmay was to indemnify Starman for any post-closing liabilities or claims against Starman relating to its former holdings.

136.    John Cody Bradshaw, head of acquisitions at Starwood Capital and a Starwood Capital representative on Starman's management committee, signed the Heads of Terms for Starman, while Taljaard signed for Mildmay.

137.    Bradshaw sent a March 24, 2014 email to Sternlicht seeking his approval to complete the Project Ford transaction between Starman and Mildmay.  Bradshaw explained the benefits of the deal to Sternlicht in detail:

(a)    The transaction would complete the disposition of eight "underwater, short-leasehold hotels (FMV of nearly nil) as part of our on-going liquidation of the Starman investment."

(b)    Those eight hotels would cost Starman around €5 million to €7 million per year going forward "unless resolved."

(c)    "Several hotels are already subject to judicial proceedings which are incredibly time-consuming and costly to the Starman JV."

(d)    "Mildmay's plan is to stop paying rent and spend the next several years in litigation and negotiation in an attempt to extract modest value out of one or two of the short-term leasehold hotels."

(e)    The "Deal Merits" for Starman included "'As is' deal", "NO material recourse to seller", "NO press releases", and "Avoids more years of on-going litigation, insolvency, negative working capital and equity injections related to leases that Starman has owned for almost 10 years".

(f)    The deal included an "anti-embarrassment" clause for Starman, providing Starman with a portion of any value Taljaard managed to salvage from the acquired Starman hotel properties.

138.    Bradshaw attached to his email a "Board Memorandum" from Nixon recommending the sale.  Nixon highlighted his own view of the benefits of the proposed sale. The entities being sold included Lehwood Holdings S.à.r.l. and Lehwood Netherlands Holdings B.V., which were "each subject to material contingent liability."  While that liability might not "reach across the group, a disposal would certainly mitigate future risk."  This was a reference, in part, to Lehwood Holdings' indemnification obligations to Travelodge, as Guarantor to CGHA for any breaches of the Management Agreement by Woodman.

139.    Sternlicht approved the transaction by Starman, but then Taljaard delayed the closing.  On April 25, 2014, Bradshaw emailed Nixon for an update on the transaction. Bradshaw explained:  "I have internal mtg with Barry next week and at this point a[m] being ridiculed for believing [Taljaard] will actually close".

140.    By May 2014, Taljaard had concluded that Mildmay would not transact directly with Starman on the deal outlined in the February 25, 2014 Heads of Terms.  Instead, Taljaard recruited Purdy to stand in for Mildmay, and Purdy formed the English shell entity Maquay to buy the same Starman subsidiaries for €100.

141.    The law firm Latham & Watkins, which was then representing Woodman in the Arbitration, represented Starman in finalizing the lengthy Sale and Purchase Agreement with Maquay that formalized the terms of the sale by Starman to Maquay.

142.    Starman's sale to Maquay was a sham transaction.  In addition to the Sale and Purchase Agreement between Starman and Maquay, side agreements were entered between and

43

among Starman, Maquay, and a Taljaard entity.  Pursuant to these side agreements, (a) Maquay agreed to make a post-closing sale to the Taljaard entity, for £2,000,000, of two Starman hotel properties that Maquay was purchasing from Starman, and (b) the Taljaard entity gave Starman a financial participation in the two entities it was acquiring from Maquay.

143.    Maquay's acquisition of the Starman entities for €100 closed in London at 11:28 AM London time on June 19, 2014.  Seventeen minutes later, at 11:45 AM London time, the Taljaard entity purchased from Maquay two of the hotel properties that Maquay had just purchased from Starman, paying Maquay £2,000,000.  Pursuant to its financial participation in those two entities, Starman eventually received a significant payout from the Taljaard entity.

144.    Following the completion of Starman's sale to Maquay, a property manager at SUKS who had been managing the hotel properties sold to Maquay gave notice that he would continue to manage the properties for Maquay.  In addition, Starman and Maquay entered into a number of "option agreements" in connection with Maquay's acquisition, and in connection with those option agreements, Starman interacted with Purdy and Maquay about the hotel properties Starman had sold to Maquay, and Starman, with advice and direction from Starwood Capital, sought to influence Purdy and Maquay's dealings on those hotel properties.

145.    Everything about these related events concerning Starman's sale to Maquay was unknown to CGHA until it obtained discovery in this proceeding.  The sole exception was that Purdy sent CGHA a letter dated July 2, 2014, summarily informing CGHA, with no detail, that Starman had sold Woodman's parent to Maquay.  CGHA wrote to Starman on July 31, 2014 seeking information about Woodman, and in a reply on August 4, 2014, Starman directed CGHA to "address all future correspondence to [Woodman's] new owner" because Starman "no longer has any interest in [Woodman]."

### G.    The Arbitration Continues

146.    On July 15, 2014, less than one month after Starman sold Woodman's parent to Maquay, Maquay placed the parent company into voluntary liquidation.  Woodman's parent was a Luxembourg entity, and therefore the liability risks to Woodman's managers and directors that existed in connection with Woodman's failed insolvency proceeding in Morocco did not exist in relation to the liquidation of Woodman's parent.  Upon information and belief, Woodman is still extant at the present time.

147.    On August 11, 2014, Woodman's counsel in the Arbitration, Latham & Watkins – which had just represented Starman in the sale of Woodman's parent to Maquay – advised the Arbitrators that it was no longer authorized to represent Woodman.  In a related move two days later, the Joint Liquidator of Woodman's parent company informed CGHA by email that Woodman would not, "by virtue of its insolvency, participate in the proceedings at the [ICC]" and that Woodman "would clearly not be in a position to satisfy any judgment or award for costs."  By selling Woodman's parent to Maquay in a sham transaction, followed by Woodman's immediate withdrawal from the Arbitration, Starwood Capital and Starman strategically chose to abandon the Arbitration and waive any defense that Woodman might have had in the Arbitration.

148.    One week later, on August 20, 2014, CGHA requested that the Arbitrators issue an urgent order requiring Woodman to (a) return possession and operation of the Hotel to CGHA immediately; (b) account for all payments made by it since December 31, 2012, when it had ceased making required rent payments to CGHA; and (c) refrain from making any future payments to any third party pending the Arbitrators' future determination on liability.

149.    On September 19, 2014, the Arbitrators issued the Interim Order, granting interim relief to CGHA.  The Interim Order explained that CGHA "has shown sufficient evidence that,

45

despite its failure to pay the fees owed under the Management Agreement, [Woodman] may have made, and still is about to make, payments to the profit of [Starman] under an operating agreement which it allegedly entered into with [Starwood Hotels]," and that "there is a serious threat that [Woodman's] assets be diverted to the profit of [Starman] and to the detriment of [CGHA]."

150.    Among other things, the Interim Order directed Woodman (a) to "hand back the possession, operation and business of the Hotel to [CGHA]" within 31 days, including taking all practical measures needed to effect an orderly handover of the business with respect to the transition of Hotel guest and reservation data; (b) within 14 days of handing over the Hotel, to provide a full financial statement as of the handover date and account to CGHA for all payments made by Woodman since December 31, 2012; and (c) to cease making any payments to any third party, including under the Operating Agreement with Starwood Hotels, until the Arbitrators issued their final award on liability.

151.    On October 19, 2014, representatives of CGHA and representatives of Woodman met for the handover of the Hotel to CGHA.  Woodman openly flaunted the direction in the Interim Order to provide an orderly handover to CGHA with respect to the transition of Hotel guest and reservation data.  The only information that Woodman provided to CGHA was a list of upcoming bookings, with only the guests' names and no contact information.  Also, CGHA was blocked from access to the Hotel's IT operating system; Woodman left behind all computers but deleted all data regarding Hotel guests, depriving CGHA of 20 years of historical data essential for the orderly transition of the business; and Starwood Hotels, Woodman's contractual agent in the management and operation of the Hotel, took active steps to migrate customers away from the Hotel to its own nearby Sheraton Hotel.

46

152.    On November 3, 2014, Woodman provided to CGHA the required financial statement and list of payments.  That list of payments showed that Woodman had made payments totaling 10,107,524 Moroccan dirham, approximately $1,000,000 under current exchange rates, to Starwood Hotels entities in 2013 and 2014, during which period Woodman had failed to make any of the required rent payments to CGHA.  Further, as the Arbitrators noted, the list showed that Woodman had "continued to make payments to Starwood entities, including after the [Interim Order] and in breach of such Order."

153.    The hearing in the Arbitration was held on January 28 and 29, 2015, in Woodman's absence.  On May 6, 2015, the Arbitrators issued the 82-page Arbitral Award, in which they set out a reasoned decision in favor of CGHA and ordered Woodman to pay CGHA damages of 549,612,765 Moroccan dirham, approximately $57,100,000 at then-prevailing exchange rates, plus attorneys' fees and other costs in the amount of approximately $2,300,000 at then-prevailing exchange rates, and imposed post-judgment interest of 6% interest per annum for as long as the amount awarded remained unpaid.

154.    In the Arbitral Award, the Arbitrators reviewed in detail the Management Agreement that governed the relationship between CGHA, as owner of the Hotel, and Woodman, as Manager of the Hotel.  The Arbitrators focused on Woodman's contractual obligation to take specific actions to ensure "that the Hotel shall remain an international five star Hotel" and on Woodman's egregious breach of that obligation.

155.    The Arbitrators cited with approval the findings of an expert witness who had concluded "that the current condition of the Hotel is far short of an international five-star standard."  The Arbitrators endorsed the findings by the expert that there had been: (a) "overall a poor level of maintenance for many years of electrical and mechanical installations . . . as well as

47

[furniture, fixtures, and equipment] requiring complete refurbishment and replacement," (b) "an understaffed maintenance team which decreased from 32 to 12 over the years with no proper replacement strategy and no planned maintenance strategy showing a clear lack of investment in maintenance," (c) "dilapidated plant & equipment systems and neglected interior," (d) "a number of mechanical and electrical systems at high risk of failure," and (e) "an accelerated deterioration of the building due to lack of planned preventive maintenance." These findings led the Arbitrators to recognize "[t]he poor level, if not the absence, of maintenance of the premises."

156.   The Arbitrators adopted expert findings that Woodman had "a maintenance cycle 10 years behind that required by international five-star standard" and that "the maintenance that has been carried out by the Manager has been late, degrading in advance the building and increasing the maintenance costs." The Arbitrators found that "there was no proper plant replacement, [and] no planned preventative maintenance strategy." The Arbitrators concluded that there was "clear evidence of the lack of maintenance by [Woodman] and poor level of services in the operation of the Hotel at least since 2005, in breach of its obligations under the Management Agreement."

157.   The Arbitrators examined the role of Starman in Woodman's performance as Manager. The Arbitrators pointed to the July 3, 2006 letter from Starwood Hotels to CGHA, which stated that the "[Management Agreement] has been transferred to Starman" and Starman "has assumed all responsibilities related to [the Management Agreement]." The Arbitrators found, from this correspondence, that CGHA was led to believe that it could rely on Starman assuming all the responsibilities of the Manager under the Management Agreement.

48

158.    The Arbitrators made negative findings regarding Starman's machinations in the sale of Starman (Maroc), its wholly owned subsidiary and Woodman's parent, to Maquay after the commencement of the Arbitration:

> The restructuring of the Manager's sole shareholder after the Management Agreement had been terminated and this Arbitration started . . . suggests that Maquay Investments, which does not appear in any way related to the international five-star hospitality industry or involved in the operation of hotels in such category, was created for the sole purpose of receiving the shares of the Manager's sole shareholder before being . . . placed in voluntary liquidation and, as a result, avoid any possible liabilities under the Management Agreement.

159.    Over more than 20 pages of the Arbitral Award, the Arbitrators set out their detailed analysis and calculation of the damages that CGHA had suffered as a result of Woodman's breach of the Management Agreement.

160.    On October 30, 2015, counsel for CGHA sent to the Joint Liquidator of Woodman's parent, and to a representative of Woodman, a letter attaching the Arbitral Award and demanding payment, noting that, as of that date, Woodman had failed to make the ordered payments.  Woodman's representative replied in emails on October 30 and November 4, 2015, stating that Woodman "is insolvent" and "will not trade again", tax authorities in Casablanca have "put a block on the company's bank account" due to unpaid taxes, and Woodman has "no assets," "[j]ust large liabilities."

161.    On December 14, 2016, CGHA obtained an order from the appropriate court tribunal in Casablanca, Morocco recognizing and enforcing the Arbitral Award against Woodman in Morocco.  Woodman was notified of the decision, but Woodman has failed to make any payment on the Arbitral Award to CGHA, and the Arbitral Award and the interest due on it remain unsatisfied in full.

49

## FIRST CAUSE OF ACTION
### (Against Defendant Starman)
### (Enforcement of the Arbitral Award Pursuant to 9 U.S.C. § 207
### Based on Alter Ego Liability)

162.    Plaintiff CGHA repeats and realleges the allegations set forth in Paragraphs 1-161 above as if fully set forth herein.

163.    The United States is a signatory to the New York Convention, codified at Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 203 et seq.

164.    The New York Convention applies to the Arbitral Award, which was issued by the ICC International Court of Arbitration in London, United Kingdom.  The United Kingdom is also a signatory to the New York Convention.

165.    The Arbitral Award was obtained pursuant to the Management Agreement, a signed contractual writing containing the following arbitration provision agreed to by Woodman: "All disputes arising in connection with this agreement shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators in accordance with said rules."

166.    The Arbitral Award was issued in favor of CGHA in the amount of approximately $57,100,000, along with attorney's fees and other costs of approximately $2,300,000, plus interest.

167.    On December 14, 2016, CGHA obtained an order from the Commercial Court in Casablanca, Morocco recognizing and enforcing the Arbitral Award against Woodman.

168.    Woodman operated as the alter ego of Starman, and therefore Starman is liable for the Arbitral Award against Woodman.

50

169. Throughout the relevant time period, Starman dominated and controlled the affairs of Woodman, such that Woodman was the alter-ego of Starman. The two functioned as a single economic entity, and this structure worked a fraud and injustice on CGHA.

170. Throughout the relevant time period, up until June 19, 2014 when Starman sold Woodman's parent to Maquay, Starman was the indirect owner of Woodman.

171. As of the time when Starman became the owner of Woodman, Woodman was undercapitalized for purposes of honoring its obligations under its Management Agreement with CGHA. When Starman became the owner of Woodman, Woodman had insufficient capital to make up the £1,300,000 deficit in the reserve account for maintenance of the Hotel, or to pay the $2,300,000 needed to put the Hotel back on a proper footing. With full knowledge of Woodman's undercapitalization, Starman chose not to provide funding to correct it.

172. Starman and Woodman did not observe corporate formalities. Starman's management spoke for both Starman and Woodman, and in fact, Starman's management was Woodman's management. Correspondence about issues arising under the Management Agreement frequently came on Starman letterhead rather than on Woodman letterhead, and CGHA was specifically directed to include Starman management on communications to Woodman.

173. Woodman never paid a dividend to Starman. At all relevant times, Woodman was insolvent. Woodman disclosed that at the beginning of Starman's ownership of it in 2005, it had total net equity of negative 32,000,000 Moroccan dirham (approximately $3,370,000). Woodman's insolvency was also evidenced by its failure to make required capital expenditures for the Hotel to ensure that the Hotel was maintained as an international five-star hotel; its ultimate failure to pay rent to CGHA; its general practice from 2006 forward of operating at a

51

loss and carrying a negative equity position; its financial dependence on Starman; its representations in letters to CGHA regarding its dire financial condition; and Starman's attempt to place Woodman in insolvency proceedings.

174.    Starman siphoned funds from Woodman.  By causing Woodman to pay operating fees to Starwood Hotels from 2012 to 2014 when Woodman was no longer paying rent to CGHA, Starman saved its subsidiary Lehwood Holdings from having to pay a large penalty to Starwood Hotels.  This benefitted Starman to CGHA's detriment.

175.    Starman operated Woodman as a facade.  At all relevant times, Starman exercised domination and control over Woodman's finances, and Starman used that control to advance its own financial interests and the financial interests of Starwood Capital.  All meetings and negotiations with CGHA about disputes under the Management Agreement were carried out by Starman; and Starman's correspondence indicated, and CGHA understood, that Starman spoke for Woodman regarding the Hotel.  Starman caused Woodman to enter into the Asset Advisory Agreement with Starman, delegating full control over Woodman's financial operations to Starman.

176.    Starman operated Woodman in such a manner as to perpetrate a fraud or injustice on CGHA.  In addition to the injustices described above, Starman elected not to place Woodman in insolvency in a timely manner.  By electing not to put Woodman in insolvency when it was appropriate to do so, Starman saved its subsidiary Lehwood Holdings from having to pay a large penalty to Starwood Hotels.

177.    Starman further perpetrated a fraud or injustice with the sham sale of Woodman's parent to Maquay, which immediately placed Woodman's parent in insolvency.  After leading CGHA to believe that it could rely upon Starman to assume all of the responsibilities of

52

Woodman, Starman disappeared like a thief in the night, leaving CGHA to face a technically, but not legally, insolvent Woodman under the ownership of Maquay. As Starman planned and arranged, Maquay had no intention to be responsible for Woodman's obligations to CGHA. This pattern of conduct by Starman frustrated and virtually eliminated CGHA's opportunity to recover on any award issued in the Arbitration.

178.    Starman also perpetrated a fraud and injustice against CGHA by causing Woodman to stop paying rent to CGHA while continuing to pay operating fees to Starwood Hotels. This misdirection of payments disadvantaged CGHA, and it benefitted Starman because it enabled Woodman to stay in compliance with the Operating Agreement long enough for Starman to complete the sham sale to Maquay of Woodman's parent, along with Lehwood Holdings, the Starman subsidiary that had guaranteed Woodman's performance under the Operating Agreement.

179.    Based on the foregoing, Starman's use of Woodman as its alter ego makes Starman liable for the Arbitral Award against Woodman.

## SECOND CAUSE OF ACTION
### (Against Defendant Starman, In the Alternative)
### (Enforcement of the Arbitral Award Pursuant to 9 U.S.C. § 207
### Based on Agency Liability)

180.    Plaintiff CGHA repeats and realleges the allegations set forth in Paragraphs 1-179 above as if fully set forth herein.

181.    The United States is a signatory to the New York Convention, codified at Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 203 et seq.

182.    The New York Convention applies to the Arbitral Award, which was issued by the ICC International Court of Arbitration in London, United Kingdom. The United Kingdom is also a signatory to the New York Convention.

183.    The Arbitral Award was obtained pursuant to the Management Agreement, a signed contractual writing containing the following arbitration provision agreed to by Woodman: "All disputes arising in connection with this agreement shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators in accordance with said rules."

184.    The Arbitral Award was issued in favor of CGHA in the amount of approximately $57,100,000, along with attorney's fees and other costs of approximately $2,300,000, plus interest.

185.    On December 14, 2016, CGHA obtained an order from the Commercial Court in Casablanca, Morocco recognizing and enforcing the Arbitral Award against Woodman.

186.    Throughout the relevant time period, up until June 19, 2014 when Starman sold Woodman's parent to Maquay, Starman was the indirect owner of Woodman. Starman used Woodman as its agent in connection with actions that caused Woodman's breaches of the Management Agreement resulting in the Arbitral Award against Woodman. Therefore Starman is liable for the Arbitral Award.

187.    Throughout the relevant time period, Starman dominated and controlled Woodman's finances. Among other things, Starman used its domination and control to cause Woodman to provide only the most minimal amount of capital expenditures for the Hotel, typically only for fire, life, and safety. As a result, the physical condition of the Hotel steadily deteriorated over time to a condition well below the contractually mandated level. In addition, in

54

2012, Starman caused Woodman to stop paying rent to CGHA while continuing to pay all of the other expenses of the Hotel, including the operating fees owed to Starwood Hotels. This discrimination by Woodman benefitted Starman.

188.    At various times, Starman caused Woodman to take other actions on behalf of Starman that caused or contributed to Woodman's breaches of the Management Agreement. After causing Woodman to stop paying rent to CGHA, Starman caused Woodman, through Drinka, who was simultaneously a member of Starman's management committee and a manager of Woodman, to deny that there had been any breaches of the Management Agreement and to refuse to return possession of the Hotel to CGHA except on terms that were unacceptable. The delay occasioned by Drinka's false denials contributed to Woodman's ongoing breaches. Starman caused Woodman to enter into the Asset Advisory Agreement with Starman, which allowed Starman to further control Woodman's finances to the detriment of the Hotel and CGHA.

189.    Accordingly, in the event the jury finds that Woodman was not Starman's alter ego, Woodman at all relevant times acted as the agent of Starman, and thus Starman is alternatively liable for the Arbitral Award against Woodman under applicable agency law.

**THIRD CAUSE OF ACTION**
**(Against Defendant Starwood Capital)**
**(Enforcement of the Arbitral Award Pursuant to 9 U.S.C. § 207**
**Based on Agency Liability)**

190.    Plaintiff CGHA repeats and realleges the allegations set forth in Paragraphs 1-189 above as if fully set forth herein.

191.    At all relevant times, Starman dominated and controlled the affairs of Woodman such that Woodman was the alter-ego of Starman, or in the alternative, the agent of Starman.

192.    At all relevant times, Starwood Capital arranged with Starman that Starman would act on Starwood Capital's behalf with respect to domination and control of Woodman's finances, and this arrangement related directly to Woodman's breaches of the Management Agreement.

193.    Specifically, Starwood Capital used Starman as its agent to dominate and control the provision of funds to Woodman for capital expenditures and for payment of rent to CGHA. Starwood Capital's use of Starman as its agent caused Woodman's breaches of the Management Agreement with CGHA.

194.    In connection with the formation of Starman, Starwood Capital and Lehman Brothers entered into Starman Limited Liability Agreement, which gave Starwood Capital exclusive control over certain property-level decisions for the Hotel, including capital expenditures at the Hotel.

195.    Starwood Capital formalized this grant of exclusive control in the REOC Letter Agreement, in which Woodman surrendered to Starwood Capital the control over capital expenditures for the Hotel that Woodman had retained under its Operating Agreement with Starwood Hotels.  Starwood Capital used its control over Woodman's capital expenditures by directing Starman to limit to a bare minimum funding to Woodman to use for capital expenditures at the Hotel.  Starwood Capital's use of Starman as its agent for purposes of limiting funding to Woodman for capital expenditures at the Hotel caused Woodman to breach the terms of the Management Agreement with CGHA that required Woodman to maintain the Hotel at the level of an international five-star hotel.

196.    Starwood Capital directed Starman to cause Woodman to stop paying rent to CGHA while continuing to pay all of the other expenses of the Hotel, including the operating

ME1 32949047v.1

fees owed to Starwood Hotels under its Operating Agreement with Woodman.  Woodman's failure to pay rent constituted a breach of the Management Agreement.  Starwood Capital also used Starman to arrange the sham sale of Woodman's parent to a third party.

197.    Because Starman operated as the agent of Starwood Capital in connection with Woodman's breaches of the Management Agreement, and in connection with Starman's use of Woodman as its alter ego, or in the alternative, as its agent, Starwood Capital is jointly and severally liable with Starman for the Arbitral Award against Woodman.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CGHA respectfully requests that this Court enter:

a.    Judgment in favor of Plaintiff enforcing the Arbitral Award against Defendant Starwood Capital and Defendant Starman in the amount of 549,612,765 Moroccan Dirham, approximately $57,100,000 million, plus attorney's fees and other costs in the amount of $2,300,000, and post-judgment interest of 6% per annum from May 27, 2015 for as long as the Arbitral Award remains unpaid; and

b.    Any other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff CGHA hereby demands a jury trial on all issues so triable.

DATED: February 17, 2021                    **MCCARTER & ENGLISH, LLP**

                                            */s/ Michael P. Kelly*
**OF COUNSEL**:                             Michael P. Kelly (#2295)
                                            Andrew S. Dupre (#4621)
David Spears                                Sarah E. Delia (#5833)
Charlita Mays                               Renaissance Centre
Cynthia Chen                                405 N. King Street, 8th Floor
SPEARS & IMES LLP                           Wilmington, DE 19801
51 Madison Avenue                           Telephone: (302) 984-6300
New York, NY 10010
Telephone: (212) 213-6996                   *Attorneys for Plaintiff Compagnie*
Fax: (212) 213-0849                         *des Grands Hôtels d'Afrique S.A.*

58