IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COMPAGNIE DES GRANDS HÔTELS
D'AFRIQUE S.A.,

        *Plaintiff,*

   v.                          No. 1:18-cv-00654-SB-SRF

STARMAN HOTEL HOLDINGS LLC AND
STARWOOD CAPITAL GROUP GLOBAL I,

        *Defendants.*

---

Andrew S. Dupre, Sarah E. Delia, MCCARTER & ENGLISH, LLP, Wilmington, Delaware.

*Counsel for Plaintiff.*

David Spears, Cynthia Chen, Zacharia Chibane, SPEARS & IMES LLP, New York, New York.

*Of Counsel for Plaintiff.*

David E. Ross, S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware.

*Counsel for Defendants.*

Jeffrey L. Willian, Devora W. Allon, Gilad Y. Bendheim, Patrick J. Gallagher, Vera C. Esses, KIRKLAND & ELLIS LLP, New York, New York

*Of Counsel for Defendants.*

---

**MEMORANDUM OPINION**

August 8, 2023

BIBAS, *Circuit Judge*, sitting by designation.

Limited liability is the heart of the corporate form. Corporations may struggle, fail, and even breach contracts without forfeiting it. So disregarding limited liability by piercing the corporate veil is an extreme step. Courts will do so only when a corporation has abused its status egregiously.

Woodman, a Moroccan hotel-management corporation, breached its contract with Moroccan hotel-owner Compagnie. Because Woodman is broke, Compagnie now seeks to recover from Woodman's Delaware parent, Starman. But Woodman did not egregiously abuse its corporate status; it just failed. And failure alone does not justify the extreme remedy of veil piercing. So I deny Compagnie's motion for summary judgment and grant Starman's.

## I. BACKGROUND

Compagnie des Grands Hôtels d'Afrique owns the Royal Mansour hotel in Casablanca. D.I. 287 Ex. 21 §§ 2.1–2.2. In 1989, it signed a long-term contract with a hotel-management company. *Id.* at 1. The manager was to pay Compagnie rent and maintain the hotel at the international five-star standard. *Id.* Art. 5, 7. The contract was guaranteed by a company later renamed Travelodge. *Id.* at 1–2, § 17.1; Ex. 17. But this was not the beginning of a beautiful friendship.

In 2005, Lehman Brothers and Starwood Capital Group formed a joint venture called Starman to invest in hotels. Ex. 31 at 1–2. Starman sat atop a large corporate hierarchy. Starman owned Lehwood Holdings, which owned Lehwood Netherlands Holdings. Ex. 37. Lehwood Netherlands, in turn, owned many companies managing individual hotels or providing services to the other companies. *Id.* One of those

2

companies was Woodman Maroc, the acquired (and renamed) manager of the Royal Mansour. *Id.*; Ex. 38; D.I. 284 Ex. C at 44:4–10.

As part of Starman's deal, Woodman (and the other hotel managers) signed an operating agreement with Starwood Hotels and Resorts Worldwide (an entity formally unaffiliated with Starwood Capital Group). Ex. 25 at 2–3; Ex. 30 at 1; Ex. 33; Ex. B at 2, 6. Woodman would owe Starwood Hotels a substantial penalty if it revoked the agreement; its performance of the contract and payment of the penalty were both guaranteed by Lehwood Holdings. Ex. E §16.6.1, ex. A §IV.E; Ex. F §16.1, 16.2. Woodman also signed a management agreement with Starman UK Services, another Lehwood subsidiary. D.I. 285 Ex. V §2, sched. 2; D.I. 284 Ex. D. Starman UK was to act as Woodman's agent in financial and other professional affairs.

So when all was said and done, Woodman (now owned by Starman) leased the hotel that Compagnie owned; Woodman's performance under the lease was guaranteed by Travelodge. Woodman hired Starwood Hotels to operate the hotel itself; Woodman's performance under that operation agreement was guaranteed by Lehwood Holdings. And Woodman hired Starman UK to run its finances. (To help keep all this straight, I append two diagrams. Figure 1 shows a simplified corporate hierarchy, and Figure 2 shows the contractual relationships.)

The Royal Mansour was struggling when Starman got involved, and things only got worse. *See* Ex. 22 at 4; Ex. 44 at Bates numbers ending 549–713; Ex. H. Woodman did not make enough money to cover all its costs, so it kept going back to Starman for more. Ex. H; Ex. 43; Ex. 63; Ex. 83; Ex. 104 at 3. Starman obliged, but not completely:

Woodman was generally able to pay its bills but could not keep up with all the maintenance demands of a five-star hotel. Ex. 61; Ex. 66; Ex. 67; Ex. 68; Ex. 69; Ex. 70; Ex. 72; Ex. 73; Ex. 88. The hotel fell into disrepair. Ex. 156 ¶¶ 162–64.

Compagnie saw the problems with the hotel and, for years, tried to negotiate with Woodman to either shape up or surrender its lease. Ex. 74; Ex. 85; Ex. 86; Ex. 94; Ex. 99. But the negotiations went nowhere. Then, at the start of 2013, Woodman missed paying rent to Compagnie after Starman cut off its funding. Ex. 98; Ex. 101; Ex. 102. So Woodman filed for insolvency in the Commercial Court of Casablanca. Ex. 100; Ex. 101; Ex. 102; Ex. 104; Ex. 110. But that court dismissed Woodman's filing. Ex. 110. Woodman continued to miss rent payments and struggled to keep the hotel running.

Eventually, in August 2013, Compagnie started arbitration against Woodman and Travelodge, the guarantor, in England. Ex. 125. While the arbitration was pending, Starman sold Woodman as part of a package of distressed assets. Ex. 135; Ex. 138; Ex. 141 ex. 2. The new owner put Woodman's new parent and Lehwood Holdings into English insolvency proceedings. Ex. L ¶ 89; Ex. 148; Ex. 149.

Woodman stopped taking part in the arbitration. Ex. 152, 156. In 2015, Compagnie won a default judgment against Woodman for roughly $55 million plus interest. Ex. 156 ¶¶ 7-8, 73, 74, 298. Woodman never paid. And Travelodge, which was itself in insolvency proceedings, covered only a fraction of the debt. D.I. 284 Ex. O; D.I. 285 Ex. P.

Seeking to recover the rest of its arbitral award against Woodman, Compagnie has sued Starman in Delaware. 9 U.S.C. §§ 201 et seq. (letting American courts enforce foreign arbitral awards); Am. Compl., D.I. 215 ¶ 1. Its sole remaining claim is that Woodman was Starman's alter ego. D.I. 238. The parties have filed cross-motions for summary judgment. D.I. 279, 281. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II. THRESHOLD ISSUES

Before reaching the veil-piercing analysis, I must address three threshold issues.

### A. Compagnie is not judicially estopped from making its claim

First, Starman says Compagnie should be judicially estopped from asserting its alter-ego claim. To recover on its guarantee from Travelodge, Compagnie filed a notice of claim in Travelodge's English insolvency proceeding. Ex. N. In response to the question, "Is any party jointly liable for the debt?", Compagnie wrote, "This is unclear and a matter of Moroccan law with respect to the construction of Article 17 of the Management Agreement." *Id.* at 4. The next question asked, "If so, identify the party(ies) in question and specify the nature of the claim against each one." *Id.* Compagnie responded, "Subject to Moroccan law, Woodman Maroc is liable as principal debtor for its own performance under the Management Agreement." *Id.* In the end, Compagnie recovered about £300,000 from Travelodge. Ex. O; Ex. P.

Starman says Compagnie's responses to those questions are inconsistent with Compagnie's pursuing Starman for the same debt. Not so. Those responses do not meet the high bar for judicial estoppel, which requires that Compagnie's positions be

5

"clearly inconsistent." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks omitted). They are not. Before, it said Woodman may be jointly liable for Travelodge's debt. Now, it says Woodman is an alter ego of Starman. Joint liability and alter ego liability are different theories, not inconsistent ones. *See Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *16–17 (Del. Ch. Aug. 28, 2012). So Compagnie is not judicially estopped from seeking to pierce the corporate veil here.

### B. Delaware law applies

Next, I must decide whether federal or Delaware law governs this case. Compagnie's suit is based on a federal statute, and it invokes both federal-question and diversity jurisdiction. Am. Compl., D.I. 215 ¶¶ 30–31, 163. Federal common law and Delaware law apply slightly different tests for veil piercing, although the line between them is fuzzy at best. *Compare Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528–29 (D. Del. 2008) (quoting the federal test), *with Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706–07 (Del. Ch. 2021) (quoting the Delaware test). And both parties cite both sets of law. *See, e.g.*, D.I. 280 at 9 & n.1; D.I. 283 at 8.

Starman argues that Delaware law governs this case. D.I. 280 at 9 n.1. Compagnie does not dispute Starman's argument. I agree with Starman. The federal common-law test in this circuit was made to provide uniformity in cases involving the United States. *See United States v. Pisani*, 646 F.2d 83, 85–88 (3d Cir. 1981). The United States is not a party here; instead, the parties are both corporations, one of which is incorporated in Delaware. Am. Compl., D.I. 215 ¶¶ 25, 27. Delaware thus has an interest in its own corporate law determining the status of one of its corporations. Besides, the tests overlap so much that the choice of law does not make a difference. *See*

*Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989). So I will apply Delaware law.

### C. Sequential veil piercing is not required

Finally, Starman says Compagnie has sought to pierce only one veil when really there are three. Although I have previously called Starman Woodman's parent for simplicity, Starman was really Woodman's great-grandparent. Ex. D. And according to Starman, Compagnie "must win at every link in the chain, proving that [Lehwood Netherlands's] and Lehwood [Holdings'] corporate veils should be pierced before even reaching Starman." D.I. 280 at 8.

I disagree. "Delaware's state courts … have not squarely decided the issue of sequential veil piercing of a multi-level corporate structure for alter ego liability purposes." *N.J. Dep't of Env't Prot. v. Occidental Chem. Corp.*, 2021 WL 6109820, at *11 (N.J. Super. Ct. App. Div. Dec. 27, 2021). But a Delaware bankruptcy court recently rejected sequential veil piercing. *In re Maxus Energy Corp.*, 641 B.R. 467, 556–58 (Bankr. D. Del. 2022) (Sontchi, C.J.). The bankruptcy court explained that sequential veil piercing "does not account for the reality that corporate separateness may be ignored in many scenarios." *Id.* at 557. Despite the attractiveness of "walking up the corporate entity ladder," veil piercing is an equitable doctrine that lets a plaintiff hold liable "the *party actually responsible*." *Id.* The court's analysis is persuasive and is good evidence of Delaware law. Plus, the alter-ego test for veil piercing already implicitly accounts for intermediaries. So I predict that Delaware courts would not require sequential veil piercing. Thus, Compagnie need pierce only one veil to show that Woodman is Starman's alter ego.

7

### III. Veil Piercing

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted). Piercing the corporate veil is thus an extraordinary remedy, and "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (internal quotation marks omitted).

Delaware's test for veil piercing has various formulations, but they boil down to the same two elements. Compagnie must show that (1) Starman and Woodman operated as a single economic entity, and (2) Woodman's misuse of the corporate form caused fraud or injustice. *Manichaean Cap.*, 251 A.3d at 706–07; *Wallace* 752 A.2d at 1183–84. Piercing the corporate veil strips the owner of limited liability, so it is appropriate only when the owner has abused that limited liability. Ultimately, Compagnie must show that Woodman is "a sham and exist[s] for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184.

### A. The parties genuinely dispute whether Starman and Woodman operated as a single economic entity

Delaware courts consider all the circumstances in deciding whether two corporations acted as a single economic entity. Five factors are particularly important:

(1) whether the company was solvent;
(2) whether the company was adequately capitalized for the undertaking;
(3) whether corporate formalities were observed;

8

(4) whether, in general, the company simply functioned as a façade for the dominant shareholder; and

(5) whether the dominant shareholder siphoned company funds.

*Manichaean Cap.*, 251 A.3d at 706–07 (cleaned up). No one factor is dispositive.

*1. Woodman may have been insolvent.* There are at least two ways to show insolvency: "(1) [The balance-sheet test:] a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) [The payment-of-obligations test:] an inability to meet maturing obligations as they fall due in the ordinary course of business." *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 98 (Del. 2007) (internal quotation marks omitted). By the end of 2012, Woodman was undisputedly insolvent. Ex. 104. But the parties debate its solvency before then. Ex. 9 at 22–46; Ex. G at 29–66. The raw financial data is undisputed; the parties disagree only about how to characterize the data and what conclusions to draw from it.

The balance-sheet test is indeterminate. Compagnie's expert claims that Woodman's net equity was negative in every year but 2010. Ex. 9 at App. D, H table. 2. But the expert used book value, and market value is often a better measure. And the experts dispute both which measures to use and what those measures say. Ex. 7 ¶ 95; D.I. 269 Ex. 2 at 166:25–167:9.2.

The payment-of-obligations test is also indeterminate. Woodman relied on funding from its parent to pay its bills. *See, e.g.*, Ex. BB, CC. Like a child on an allowance, Woodman could not afford everything it wanted: for example, when its operators at Starwood Hotels asked Starman to fund a full refurbishment of the hotel's air

conditioning, Starman sent only enough money for essential repairs. Ex. 67; Ex. 70; Ex. 72; Ex. 73; *see also* Ex. 61. Still, Woodman paid most of its bills on time and kept trying to run the hotel. *But see* Ex. 82; D.I. 327 Ex. 162 (suggesting that Woodman was late paying rent to Compagnie).

In sum, there is a genuine factual dispute about whether Woodman was insolvent before 2012. It plays only a minor role in the overall analysis, though. Insolvency alone does not justify piercing the corporate veil. *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *3–4 (Del. Ch. July 1, 2005).

*2. Woodman may have been undercapitalized.* Corporations have an ongoing duty to be adequately capitalized. *See United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104–05 (D. Del. 1988) (Roth, J.). What counts as adequate capitalization varies by industry. And as both parties' experts explain, capitalization is closely connected to solvency. *See* Ex. G ¶ 90; Ex. Q ¶¶ 51, 89.

Compagnie's expert emphasizes that Woodman maintained negative net working capital (the difference between its current assets and liabilities) and had too little money to fulfill its maintenance obligations. Ex. Q ¶¶ 51–88. Starman's expert, after questioning the calculations supporting that claim, responds that many thriving companies choose to operate with negative working capital, including successful hotel companies. Ex. G ¶¶ 32–84. And both parties say their arguments about solvency compel similar findings on capitalization. D.I. 283 at 11–13; D.I. 280 at 16–18.

There is thus a genuine factual dispute about whether Woodman was adequately capitalized. Whereas a corporation's solvency depends on financial metrics,

appropriate capitalization is a more open-ended inquiry about its obligations and industry. Like insolvency, undercapitalization alone does not justify piercing the corporate veil. *See Trevino*, 583 F. Supp. 2d at 527, 529–530. It is just one factor among many.

3. *Woodman observed corporate formalities.* Woodman and its owners observed corporate formalities. They held formal meetings, kept minutes, maintained separate balance sheets, and so on. Ex. R; Ex. S; Ex. T; Ex. U; Ex. Q App. D, E; *see, e.g., In re Opus E., LLC*, 528 B.R. 30, 62–63 (Bankr. D. Del. 2015) (listing typical corporate formalities). Compagnie does not dispute these facts.

Instead, Compagnie first claims to list "the factors for assessing the proper observance of corporate formalities [under Delaware law]." D.I. 307 at 9–10. It pulls these factors from a handful of decisions, mostly on motions to dismiss, in which courts recognized other facts as relevant to the observance of corporate formalities. D.I. 283 at 15; D.I. 307 at 9–10. But the proper observance of corporate formalities, like the rest of the single-economic-entity analysis, is not a box-checking exercise reducible to a five-factor test. Besides, the facts Compagnie lists are innocuous. For example, Starman and Woodman shared a manager, and Starman's annual reports consolidated the financials of all its subsidiaries. D.I. 283 at 15–16. These facts fall short of the kind of systematic failure to observe corporate formalities that justifies piercing the veil.

Compagnie has a better argument. It hinges on Starman UK, Woodman's corporate sibling. According to Starman's Rule 30(b)(6) designee, Starman UK was merely

"a collection of consultants that had a career in hotel finance and hotel operations and hotel [spending] and hotel leases, and they provided support to the managers of the [hotel] entities." Ex. 4 at 37:7–10. Yet Compagnie says Starman UK was far more than this.

Woodman had no employees of its own. It contracted to have Starwood Hotels and Resorts handle its operations and to have Starman UK handle its management. Ex. 25; 84 § 4, sched. 2. Notably, Starman also had no employees of its own and used Starman UK for management. In other words, the people who managed Woodman's (great-grand)parent were also the people who managed Woodman. What is more, Starman UK often called itself "Starman" and did not always specify the principal on whose behalf it was acting. *See, e.g.*, Ex. 45; Ex. 46; Ex. 53; Ex. 67; Ex. 70; Ex. 74.

Starman paints this setup as an innocent example of one agent (Starman UK) working for multiple principals (Starman and Woodman) within a corporate family. Formally, there is nothing wrong with that. Companies often operate without employees, and it can be efficient to have the same set of financial and management experts serve as agents to several corporate entities in the same family. Starman and Starman UK are presumed to be meaningfully separate companies, just like Starman and Woodman.

But Compagnie paints a different picture. It says Starman UK's employees really answered just to Starman. And some evidence in the record supports this claim. For example, when Compagnie asked Starman's Rule 30(b)(6) designee, "Other than the services that it performed for Starman, did Starman UK work for any other person

or entity?", the representative responded, "No, not that I'm aware of." Ex. 4 at 35:13–16.

Yet Compagnie's picture does not show a failure to observe corporate formalities. Rather, it suggests that Starman both gave orders to Woodman as a parent and carried them out through its agent, Starman UK. That gets at the next factor: whether Woodman was a mere façade for Starman. *See Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 472 (D. Del. 2010) (explaining that the façade factor hinges on the parent "exercising significant control over the [subsidiary's] operations [and] finances"); *cf. Pontiaki Special Mar. Enter. v. Taleveras Grp.*, 2016 WL 4497058, at *3–5 & n.1 (D. Del. Aug. 26, 2016) (discussing facts relevant to façade status, as opposed to corporate formalities).

*4. Woodman may have been a façade for Starman.* Here is where Compagnie's argument about Starman and Starman UK has some bite. As discussed, Starman UK was an agent for both Starman and Woodman. Its representatives did not always specify the principal on whose behalf they were acting. A reasonable observer could think that "Starman" (whether Starman, Starman UK, or both) was the entity managing the hotel. Indeed, there is some evidence that Compagnie was confused about which entity was which. Ex. 3 at 84:4–13. And there is also some evidence that Starman UK's employees acted as employees for Starman. Ex. 4 at 35:13–16. On the other hand, Woodman's contract with Starman UK makes it clear that Starman UK was simply an agent and was obligated to act in Woodman's best interest, suggesting that

13

Woodman operated as a meaningfully distinct company. Ex. 84 § 4. So there is a gen-
uine dispute over whether Woodman was a mere façade for Starman.

*5. Starman did not siphon funds from Woodman.* Compagnie says Starman si-
phoned funds from Woodman in two ways. Neither works.

*First*, Compagnie argues that Woodman repaid two loans to Starman in 2007 and
2008, when it was allegedly insolvent. Ex. 56. Starman objects to this argument, say-
ing that Compagnie forfeited it twice: first by not mentioning it before its summary-
judgment brief, and again by not including it in its response brief to Starman's mo-
tion. D.I. 314 at 20; D.I. 319 at 8. Though Compagnie should have raised the issue
sooner, I will let it come in anyway—repaid loans are an obvious theory of siphoning,
and Starman spent enough time with the financial data that it should be (and is)
ready to counter the argument. *See* D.I. 314 at 20–21.

Yet repaying those loans was not siphoning. True, caselaw and common sense
suggest that repaying loans to a parent while insolvent can be a form of siphoning.
*See Pisani*, 646 F.2d at 88; *Trs. of Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp.
2d 447, 458 (E.D. Pa. 2001). But Starman later lent more than that amount of money
back to Woodman. Ex. H. In context, then, repaying those loans was not siphoning.
Besides, a parent's net contribution to its subsidiary does not warrant piercing the
veil.

*Second*, Compagnie says Woodman siphoned funds by making preferential pay-
ments while insolvent. After Starman stopped funding it in 2012, Woodman lacked
enough money to pay all its bills. Ex. 101; Ex. 102; Ex. 145. So it prioritized: rather

than trying to pay large rent bills to Compagnie, it paid smaller operations bills to Starwood Hotels (the operational management company) and other creditors to keep the hotel running. Ex. 98; Ex. 115; Ex. G at 69 Fig. 18.

Recall, though, that Lehwood Holdings, another Starman subsidiary, was contingently liable if Woodman breached its obligation to pay Starwood Hotels. Ex. 28 § 16.1–16.2; Ex. 33 § 16.1(a)–16.2, ex. A § IV.E. Compagnie points to evidence in the record that Starman was keenly focused on Lehwood Holdings avoiding this contingent liability. *See, e.g.*, Ex. 100; Ex. 114; Ex. 115; Ex. R; Ex. S. So, Compagnie says, Starman caused Woodman to pay money for Starman's own indirect benefit (delaying another subsidiary's contingent liability that it later paid), thus siphoning funds from Woodman.

This theory of siphoning also fails. Starwood Hotels controlled Woodman's bank account under the management agreement and pulled the money out itself, and it does not appear that Woodman could stop that payment without breaching the contract. Ex. E §§ 3.5.3, 5.4.1(a)–(b). So Starman's role in all this was marginal at best. Plus, taking a step back, for several years Starman did not *siphon* money from Woodman; it *funded* Woodman. But Starman had no duty to fund Woodman forever. Once Woodman lost Starman's funding, it paid a smaller bill to keep the hotel running rather than a larger bill to make rent. (Indeed, Starman says Woodman did not have enough money to cover the rent anyway; Compagnie does not seem to dispute this. D.I. 280 at 13–14; D.I. 307 at 16–18.) Even if Woodman's decision helped Starman by

delaying another subsidiary's contingent liability (that it later paid), this is not a story of a parent's siphoning funds from a subsidiary.

* * * * *

In sum, Starman did not siphon funds from Woodman, and they both observed corporate formalities. But there are genuine disputes about whether and when Woodman was insolvent or undercapitalized, and there is a plausible argument that it was a mere façade for Starman. Without two of the most significant factors, Compagnie faces an uphill climb to show that Starman and Woodman operated as a single economic entity. But enough of the inquiry is genuinely disputed that a trier of fact could reasonably go either way. So I will not decide it at this stage.

### B. Woodman did not cause fraud or injustice by misusing the corporate form

Even so, Compagnie's steep climb goes no further. The second requirement for piercing the veil on an alter ego theory is that the defendant's misuse of the corporate form caused fraud or injustice. Compagnie cannot show either.

The Delaware Supreme Court set out a broad standard: veil piercing "may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved." *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968). Delaware courts routinely cite this language as the controlling standard. In doing so, they do not adopt a literal reading that *any* violation of law or breach of contract suffices. Rather, they focus on fraud and injustice. *See, e.g.*, *Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*, 2022 WL 611274,

16

at *2 (Del. Ch. Mar. 2, 2022) ("Courts have also required a veil-piercing claim to demonstrate an overall element of injustice or unfairness." (internal quotation marks omitted)); *Wallace*, 752 A.2d at 1184 ("Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."); *see also Mobil Oil*, 718 F. Supp. at 267–68 (collecting cases showing that "[f]raud or something like it is required").

So Compagnie must show that Woodman's misuse of the corporate form caused fraud or fraud-like injustice. With that standard in mind, I turn to Compagnie's three theories of fraud or injustice. Each has a fatal flaw.

*1. Woodman did not violate Moroccan insolvency law.* Compagnie's first theory of injustice is that Woodman kept operating even when Moroccan law required it to be in insolvency proceedings. By January 1, 2013, Woodman's funding had dried up and it had missed its rent payment to Compagnie. Ex. 98; Ex. 101; Ex. 102. Woodman thought then, as Compagnie thinks now, that Articles 560 and 561 of the Moroccan Commercial Code require a company to file for insolvency within fifteen days of being in suspension of payments. *See* Morocco Comm. Code Art. 560, 561 (1996). So, on January 14, Woodman filed for insolvency in the Commercial Court of Casablanca. Ex. 98; Ex. 100, 104.

The court rejected Woodman's filing. Woodman thought then, as Compagnie thinks now, that the court had rejected the filing because no Woodman manager was willing to appear in person. Ex. 124; D.I. 283 at 20–21. The record is full of evidence that Woodman managers thought the company was afterward operating in violation

of Moroccan law. One manager even appears to have resigned rather than go to Casablanca. Ex. 75; Ex. 106; Ex. 108; Ex. 124.

The managers' reluctance to appear is understandable: Moroccan law may, in exceptional circumstances, hold managers personally liable for a company's debts. *See* Morocco Comm. Code Art. 704, 706 (1996); *see also* Ex. 75. Compagnie says this possibility is why Woodman's violation of Moroccan insolvency law justifies veil piercing: Compagnie believes it might have recovered some money from the managers had Woodman gone into insolvency proceedings.

Remarkably, Woodman's managers at the time—like Compagnie now—were wrong. The Commercial Court of Casablanca's opinion, apparently unavailable to Woodman's managers, explains why that court rejected the filing. The court held that the petition "was submitted in accordance with the statutory formal requirements." Ex. FF. But the court continued:

> Default as a substantive condition for initiating procedures for addressing a business concern's difficulties requires the existence of a proven debt that is both due *and claimed before the courts. … Because the debts of the applicant are not claimed before the courts*, then default as a substantive and fundamental condition for initiating the procedure is not established in this case, which renders the application baseless and necessitates dismissal.

*Id.* (emphases added). After the court dismissed Woodman's filing, Woodman kept operating even though it was admittedly insolvent.

Compagnie and its expert contest the court's legal reasoning, saying that it erred in its reading Articles 560 and 561 of the Moroccan Commercial Code to require an asserted claim. *See* Ex. 10; D.I. 265 Ex. 2. Compagnie also argues that, because the proceeding never started, it never got the notice required to assert a claim. But as a

18

matter of judicial comity, I will not interpret the Moroccan Commercial Code when the Commercial Court of Casablanca has already done so. Deferring to that court's decision, Woodman followed the law when it filed for insolvency and was not responsible for the court's rejecting the filing. So this theory of fraud or injustice fails.

*2. Starman's causing Woodman to breach the management agreement does not supply the required fraud or injustice.* Compagnie's second argument is that Starman starved Woodman of funding, "deliberately driving Woodman into ever more extreme breach" to avoid Lehwood Holdings' contingent liability. D.I. 326 at 11–12. Whatever Starman's motivation, Woodman undoubtedly breached its contract with Compagnie for lack of money. Still, Compagnie's theory fails as a matter of law.

A breach of contract, without more, does not supply the fraud or injustice required to pierce the corporate veil. *See Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical,* 2004 WL 415251, at *4 & n.30 (Del. Ch. Mar. 4, 2004) (citing *Mobil Oil*, 718 F. Supp. at 268). There are at least two reasons for this. First, if the underlying breach that gives rise to a lawsuit also justified piercing the corporate veil, then the injustice element of the test would be meaningless. *See Mobil Oil*, 718 F. Supp. at 268. Second, mere breach of contract seldom has a causal connection to the misuse of the corporate form. *See id.* at 269 ("The law requires that fraud or injustice be found in the defendant['s] use of the corporate form.").

Both reasons apply here. Compagnie's claim is based on Woodman's long-running breach; it was thus on Compagnie to sue to fix the problem and end the contract. Compagnie complains that Starman and Woodman pretended to negotiate and kept

saying they would improve the hotel's condition, all the while secretly scheming to "placate and delay." Ex. 85. But delaying tactics are a common, if sharp, negotiation technique. Compagnie chose not to call Woodman's bluff with a lawsuit, even though the hotel's condition was deteriorating the whole time. Nor did anything about Woodman's use of the corporate form prevent Compagnie from suing for breach of contract. Indeed, when Compagnie eventually sued Woodman in arbitration, it won.

I will not resort to an extreme remedy when milder ones were available. When companies need to hedge the risk of a contractual breach, they purchase guarantees. Compagnie had a guarantor, Travelodge, from whom it partially recovered for Woodman's broken contract. The guarantor's own financial straits are no reason to disregard Woodman's corporate status.

Compagnie offers this theory in one other flavor. It says "Starman tortiously interfered with Woodman's contractual obligations to [Compagnie], and it did so for its own financial benefit, to [Compagnie's] detriment." D.I. 326 at 12. This version fails too. It is self-defeating: if Compagnie is right, then through Starman's tortious interference with Woodman they were the same company; but in that case, Starman/Woodman cannot tortiously interfere with its own contract. *See Wallace*, 752 A.2d at 1183.

At bottom, Compagnie's second theory of injustice fails because there are straightforward ways to remedy a breach of contract. It is unfortunate for Compagnie that those remedies fell short, but that misfortune does not justify piercing the corporate veil.

*3. Compagnie has not shown that Starman's sale of Woodman made Woodman judgment-proof.* Compagnie's final theory of injustice—that Starman rendered Woodman judgment-proof—fares no better. In 2014, Starman arranged a sale of its distressed hotels. For €100, it sold the set of companies, including Woodman and Lehwood Holdings, to a newly created entity connected to a Starwood Capital Group executive. Ex. 135; Ex. 138; Ex. 141; Ex. M. The new owner put Lehwood Holdings and Woodman's new parent into English insolvency proceedings. Ex. L ¶ 89; Ex. 148; Ex. 149. Compagnie says this sale was a sham. It also says the sale prevented it from pursuing Woodman in a Moroccan bankruptcy where Woodman's managers might be personally liable, thus depriving Compagnie of a possible recovery. D.I. 283, at 24–25.

True, the parties genuinely dispute whether the sale was a sham. But it does not matter. Woodman was broke both before the sale and after, so Compagnie's theory is limited to the chance it might have recovered from Woodman's managers. And with that limitation, the theory fails for at least two independent reasons.

*First*, as discussed above, the only thing keeping Woodman out of Moroccan insolvency proceedings before the sale was Compagnie's failure to file a claim. Compagnie protests that it never received notice that it needed to file a claim. But Compagnie is a sophisticated commercial entity, and the Royal Mansour was an important asset. Compagnie saw problems with the hotel and continually negotiated with Woodman to fix them. Yet it went years without asserting a claim against Woodman. Now it wants to use the chance that a Moroccan court might have held Woodman's directors

personally liable as a toehold to reach Starman. If Compagnie wanted to see Woodman in Moroccan insolvency proceedings, it had ample opportunity to put it there. Compagnie's fumbling its chance of recovering from Woodman's managers is not a sufficient fraud or injustice to warrant the exceptional and equitable veil-piercing remedy.

*Second*, Compagnie omits a crucial element of its argument. Compagnie merely insinuates that Woodman cannot be forced into Moroccan insolvency proceedings now that its parent is in a London insolvency proceeding. D.I. 283, at 25. Compagnie studiously avoids explaining *why* Woodman is now immune. When Starman raised this omission in its brief, Compagnie simply reasserted that the sale and liquidation "avoided a Woodman insolvency proceeding in Morocco that could have resulted in liability for Woodman's managers." D.I. 307 at 22. Compagnie then followed up with a rhetorical question:

> If Woodman was already judgment proof and therefore there was no need to sell it and run it through a liquidation proceeding, why did Starman refuse to surrender possession of the Hotel to [Compagnie] without a broad release and why did Starman go through the time-consuming and elaborate process of selling Woodman to a third party so it could be liquidated away from a Moroccan court?

*Id.* But naked assertions and rhetorical questions are no substitute for evidence and analysis. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If there is some legal reason why Compagnie cannot now push Woodman into Moroccan bankruptcy, Compagnie should have said so. Like the dog that did not bark, Compagnie's silence solves the case.

\* \* \* \* \*

Woodman breached its contract with Compagnie and went broke. These are the ordinary risks of doing business, and there are ordinary ways to address them. Through a combination of Compagnie's mistakes and misfortune, it was not made whole. But ordinary business problems do not justify the extraordinary remedy of piercing the corporate veil. Woodman's corporate status did not cause fraud or injustice to Compagnie. So I deny Compagnie's motion for summary judgment and grant Starman's.

# IV. APPENDIX

## Figure 1
### The Corporate Hierarchy



**Figure 2**
**The Contractual Relationships**

